[Crim. No. 15402. First Dist., Div. Two. Mar. 25, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
JESSIE LEE COOKS et al., Defendants and Appellants.

226

228

COUNSEL

Kenneth F. Coho, Ronald D. MacGregor, Michael Satris, Jack Leavitt and Alan M. Caplan, under appointments by the Court of Appeal, and Bushnell, Caplan & Fielding for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Robert R. Granucci, W. Eric Collins and Richard G. Tullis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ROUSE, Acting P. J.**—In May 1974, the Grand Jury for the City and County of San Francisco returned an indictment that accused Jessie Lee Cooks, Larry Craig Green, Manuel Moore, and J.C.X. Simon of conspiracy to commit murder between October 20, 1973, and April 30, 1974 (Pen. Code, §§ 182, 187). The indictment alleged four overt acts (Pen. Code, §§ 184, 1104). Cooks and Green were also accused of the following crimes in which Quita Hague was the victim: kidnaping (Pen. Code, § 207), robbery (Pen. Code, § 211), and

murder (Pen. Code, § 187). Cooks and Green were also accused of the following crimes in which Quita's husband, Richard Hague, was the victim: kidnaping (Pen. Code, § 207), robbery (Pen. Code, § 211), and assault with a deadly weapon (Pen. Code, § 245, subd. (a)). These crimes against Mr. and Mrs. Hague were committed on the night of October 20, 1973. The indictment further alleged that in robbing Quita Hague defendant Green inflicted great bodily injury on her (former Pen. Code, § 213), that in robbing Richard Hague defendant Cooks inflicted great bodily injury on him (former Pen. Code, § 213), and that Cooks used a firearm in committing each offense against Richard and Quita Hague (Pen. Code, § 12022.5).

Defendants Moore and Simon were both accused of the murders of Tana Smith and Jane Holly on January 28, 1974 (Pen. Code, § 187). The indictment alleged that Simon used a firearm in killing Tana Smith (Pen. Code, § 12022.5), and that Moore used a firearm in killing Jane Holly (Pen. Code, § 12022.5). Moore and Simon were also accused of assault with a deadly weapon on Roxanne McMillian January 28, 1974 (Pen. Code, § 245, subd. (a)); the indictment alleged that Simon used a firearm in committing that offense (Pen. Code, § 12022.5). Moore was also charged with assault with a deadly weapon against Ward Anderson and Terry White on April 14, 1974 (Pen. Code, § 245, subd. (a)); the indictment alleged that Moore used a firearm in committing those two offenses (Pen. Code, § 12022.5).

The indictment alleged two prior felony convictions against Cooks (1965 robbery and 1966 federal bank robbery), and one prior felony conviction (1969 burglary) against Moore.

The defendants pleaded not guilty and denied the special allegations. Trial by jury commenced in March 1975, and a year later, in March 1976, the jury, after 18 hours of deliberations, found the defendants guilty of all charges, including first degree murder. The jury also found all the special allegations to be true, other than the alleged prior convictions which Cooks and Moore had admitted before trial. The court sentenced the defendants to state prison for terms provided by law (life imprisonment) under the then existing Indeterminate Sentence Law. Each defendant appeals from his judgment of conviction. We affirm each judgment except for a minor modification of the judgment against Simon.

## I. "Operation Zebra"

In December 1973, and January 1974, a number of persons were randomly shot and killed or injured on the streets of San Francisco. Random shootings occurred again in April 1974. In each instance the victim was a Caucasian and the gunman a Negro male. Witnesses gave police various descriptions of the gun-

man's height, weight, and appearance. In most instances, the gunman was described as 25 to 30 years old, about 6 feet tall, 160 to 180 pounds. The San Francisco Police Department took extraordinary measures to identify the person or persons responsible for the shootings. The police investigation of these crimes became known as "Operation Zebra," based on the police radio code letters for that particular investigation. This case has become known as the "Zebra" case.[1]

In April 1974, the City of San Francisco offered a reward of $30,000 for information leading to the arrest and conviction of the person or persons involved in the "Zebra" crimes. Police released to the news media two composite drawings of a suspect, and on April 18, 1974, those sketches appeared in local newspapers. On April 22, 1974, Anthony Cornelius Harris telephoned the San Francisco Police Department and, during a number of interviews on successive days, Harris provided the police with information which led to the arrest (on May 1, 1974) and indictment of the defendants in this case.[2] Although the defendants argued that Harris' main motive was revenge against the Black Muslims and collection of the reward, Harris said he telephoned the police primarily "to stop a lot of senseless killing, that's all."

Anthony Harris became a principal prosecution witness before the grand jury and at trial. Because of his involvement in some of the crimes, he invoked (on advice of counsel at trial) his constitutional privilege against self-incrimination. The court, on petition by the People, granted Harris immunity from prosecution and ordered him to testify (Pen. Code, § 1324). When the case was submitted to the jury the court instructed that Anthony Harris was an accomplice as a matter of law, and therefore his testimony had to be corroborated (Pen. Code, § 1111).

---

[1] In late December 1973, San Francisco police suspected there were approximately 32 "Zebra" shootings.

[2] Harris telephoned the San Francisco police at 4:15 p.m. on April 22, 1974. Two San Francisco police inspectors went to Oakland, picked up Harris and brought him to San Francisco where he was interviewed by Inspector Gus Coreris about 7 p.m. Harris was scared, distrusted the police, and concerned about revocation of his parole. He was, therefore, reluctant to tell police details of what he knew. Police interviewed Harris several times from April 23 to April 28. At one point Harris demanded a meeting with Mayor Joseph Alioto to discuss immunity. Alioto was in San Diego at the time. He flew to San Francisco and met with Harris, in the presence of police inspectors, at 3 a.m. on April 27. Mayor Alioto told Harris he would not be granted immunity from prosecution if he had killed anybody. They also discussed the reward money. Most, if not all, the police interviews of Harris were recorded on tape.

Harris and his wife and child were placed in protective custody. In October 1974, Harris asked to be placed in jail for protection. While in jail he became frustrated by the way he was being treated. He felt the police had not given him protection as promised and that he had been denied legal counsel as promised. He wrote letters to a number of high government officials and, at one point, threatened to "mess up" the entire Zebra investigation and prosecution.

## II. Background of Anthony Harris, the Defendants, and the Alleged Conspiracy

At the time of trial, Anthony Harris was 29 years old, a slender, well-groomed, good-looking black man about 5 feet 11 inches tall. He grew up in southern California (Santa Ana and Long Beach) with five brothers and two sisters. He dropped out of school after the ninth grade. Since he was about 14 years old he learned, practiced, and taught the martial art of Kung Fu. Certain defense witnesses revealed that Harris was once married to a white girl and had two children in southern California. A couple of Harris' brothers were also married to white girls. In 1966, Harris was convicted of second degree burglary. In July 1971, he was again convicted of second degree burglary and sentenced to state prison.

In early 1973, Harris became acquainted with defendant Cooks and defendant Moore in San Quentin prison where the three men were inmates. Cooks was about 29 years old, black, muscular, about 6 feet tall, and a boxer or fighter. Moore was also about 29 years old, black, 6 feet 1 inch tall, muscular, and weighed 200 to 210 pounds. Moore was in prison for violation of parole on his 1969 conviction of burglary of a San Bernardino television store. Moore grew up in San Bernardino with six brothers and seven sisters, including Caucasian stepbrothers and stepsisters who were children of his Caucasian stepmother. Although Moore testified that he attended school through the ninth grade, he could not read or write.

Harris testified that while in prison he taught other prisoners the martial art of Kung Fu. Cooks, and later Moore, asked him to teach them Kung Fu. Cooks said he wanted to learn Kung Fu because he wanted to learn how to kill white people. He wanted to kill white people because, among other reasons, "they had castrated and killed and stomped our (black) babies' heads in." He wanted to learn Kung Fu and how to "break people's necks, punch their eyes out, break their heads and bust their hearts." Cooks told Harris that when he (Cooks) got out of prison he was going to join the "Death Angels," which Harris said was a group of blacks whose objective was to kill white people and start a race war. Harris testified that while in prison about all Cooks talked about was killing white people.

Harris testified that he had similar conversations with Moore who wanted to learn Kung Fu because he had bad experiences with white people and wanted to kill them. Moore, on the other hand, denied he ever asked Harris to teach him Kung Fu. Moore denied he hated whites or had bad experiences with them.

Of the three men, Cooks was the first to be released from prison in June 1973. He obtained a job at a Shabazz (Muslim) bakery on Randolph Street (Ingleside area in southwest part of city), San Francisco. He apparently lived at a Muslim halfway house at 531 Waller Street. Harris was released from prison

on parole on July 27, 1973 (two years after his commitment). Moore was released on November 11 or 12, 1973, and he also went to live at the Muslim halfway house on Waller Street.

When Harris was released from prison he went to live at the Crittendon House, a halfway house in Oakland. He obtained a job selling fish for the Nation of Islam Temple in Oakland. He soon became dissatisfied with the job because of the small amount of money he was earning and because he thought his employer was cheating him.

In August 1973, Harris went to the Nation of Islam Temple 26 at Geary and Fillmore Streets, San Francisco, in search of a different job. He met defendant Green in the temple's snack shop and talked to him about a job. Green was employed at Black Self Help, 1645 Market Street (between 12th and Brady), San Francisco.[3] Black Self Help was owned and managed by Thomas Manney, and in the business of moving, storing, repairing, and selling furniture and other items.[4] After talking with the temple captain, Albert Leonard, Green drove Harris to Black Self Help and introduced him to Thomas Manney who gave Harris a job that paid $4.50 per hour.

When Harris started work at Black Self Help in August 1973, he met defendant Simon who was employed there as Thomas Manney's assistant manager.[5] Other Black Self Help employees included Clarence Jamerson,[6] Edward Land,[7]

---

[3]Green was 21 years old. He grew up in Berkeley in a family which included his parents and three sisters. He graduated from high school where he was an outstanding basketball player. Green is 6 feet 1 inch tall, and weighed 147 pounds. He has a light complexion, including freckles, large hazel-green eyes, a thin and narrow face. He started work at Black Self Help in late 1972. The record does not disclose any prior criminal convictions.

[4]At the time of trial, Thomas Manney, a black man, was 32 years old, and married with six children. He grew up in San Francisco, attended St. Ignatius High School and San Francisco State University. He played football and once tried, unsuccessfully, to play for the Pittsburgh Steelers. Manney organized Black Self Help in 1967. He is a member of the Nation of Islam and had a policy of providing jobs for black Muslims on their release from prison. Manney had no criminal record.

[5]Simon, a black man, was born in Opelousas, Louisiana, on May 5, 1945. He grew up in Beaumont, Texas. He testified that he attended college in Tyler, Texas, three and one-half years. In 1970, at age 25, he came to California with friends, leaving his wife (Patricia) and baby daughter in Texas. Shortly after his arrival in California he was arrested in Marysville for possession of a stolen gun. He pleaded nolo contendere to that charge (Pen. Code, § 496) and was released. He came to San Francisco and obtained a job at Black Self Help in January 1971. He met Ada Dison. In November 1971, he and Ada Dison went to Mexicali, Mexico, where he obtained a divorce from his Texas wife and married Ada the same day. Simon and his wife purchased a house in San Francisco. They separated in May 1973.

[6]Jamerson was 29 years old, married with two children. In 1970 he was convicted of receiving stolen property in Santa Clara County and served prison time at Susanville. In July 1972, he started work at Black Self Help as a mechanic. His main job was to keep the trucks and cars running. He is a large heavy black man.

[7]Edward Land was about the same age as the other Black Self Help employees. After serving two prison terms, he came to San Francisco from Los Angeles in 1973 and worked at Black Self

Douglas Burton,[8] Dwight Stallings,[9] Sylvester Bounds,[10] and Charles Gillespie.[11] When Moore was released from prison in November 1973, he too was given a job at Black Self Help. Although Cooks was not employed at Black Self Help, Harris testified that Cooks was frequently in the store. Only Manney, Simon, Green and Jamerson had keys to the store. All the Black Self Help employees and their wives or girl friends were members, or in the process of becoming members, of the Nation of Islam Temple 26. They were commonly known as Muslims or Black Muslims.

Harris' initial work involved cleaning the store. Two or three weeks later he started working primarily with Green as a helper in moving or delivering furniture. Green owned a white or beige 1971 Dodge van (Tradesman 100) which he used to deliver furniture for Black Self Help. Green kept moving pads for protection of the furniture in his van. Green's van was the only van used at Black Self Help. Simon owned an old, white, four-door Dodge Dart automobile. He sold it to Green in November 1973, but Simon continued to use it. Thomas Manney owned a number of vehicles, including several trucks and a 1959 black, four-door Cadillac that he kept at the store most of the time and which Simon often used. Clarence Jamerson owned a 1970 "Sherwood Green" (greenish gold), four-door Cadillac.[12] Dwight Stallings owned a red 1961 Cadillac. Harris and Moore had no driver's license, owned no vehicle, and did not have access to any Black Self Help vehicles. Harris and Green became good friends. Green often provided Harris with transportation. Moore worked primarily with Simon who often provided Moore with transportation.

In April 1973, Green rented an apartment (unit No. 7) at 844 Grove Street, San Francisco, and lived there until his arrest on May 1, 1974. In May 1973, J.C. Simon separated from his wife, Ada Dison Simon, and moved in with Green. In August 1973, Simon rented his own apartment (unit No. 2) in the same building at 844 Grove Street and lived there until his arrest on May 1, 1974. Simon testified that his former wife (Patricia) and daughter from Texas

---

Help until the end of October 1973. He then became a salesman for the Nation of Islam, but continued to visit the Black Self Help store once or twice a week. He met Moore while in prison at Chino. Land is a slender black man with a very dark complexion.

[8]Douglas Burton was 24 years old. He grew up in the the State of Mississippi. After serving in the United States Navy he came to California and got a job at Black Self Help in November 1973. He initially lived in Redwood City but moved to the Civic Center Hotel at 20 Twelfth Street and Market, which was about a block from the Black Self Help store. The record shows no prior criminal record.

[9]Dwight Stallings did not testify. He is a black man about the same age as the other Black Self Help employees.

[10]Sylvester Bounds worked at Black Self Help from late 1972 or early 1973 to October 1973.

[11]Charles Gillespie did not testify. He was hired at Black Self Help in 1971 and worked there until June or July of 1974. Green estimated that Gillespie was 45 to 50 years old.

[12]Jamerson had obtained a "Certificate of Nonoperation" for his Cadillac from the California Department of Motor Vehicles, but he nevertheless drove the car.

lived with him from September 24, 1973, to December 18, 1973, and that Moore moved in with him on December 19, 1973.[13] Moore was in the process of becoming a member of the Nation of Islam. Simon tried to teach Moore how to read and write and helped with his "lessons." Moore moved out of Simon's apartment on or about March 1, 1974.[14] On March 29, 1974, Moore married a girl named Gloria and moved into her apartment at 1853 Divisadero Street, near Pine Street, San Francisco.[15] Harris lived in Oakland until mid-October 1973, when he moved in with Carolyn Patton, his fiancee, at 68 Hilltop Road (Hunter's Point Housing Project), San Francisco. He and Carolyn were married on October 23, 1973. Green served as best man and J.C. Simon, in his words, "gave the chick away."[16] The marriage lasted 17 days.[17]

Harris testified that upstairs in the Black Self Help store on Market Street was a large room where meetings were held. In August and September 1973, Harris attended about four meetings in that room. J.C. Simon, Larry Green, Edward Land, Dwight Stallings, and a number of other people attended those meetings. There was usually a speaker or leader.[18] At one meeting a motion picture of the Watts riot in Los Angeles was shown. It showed police beating black people.

Harris testified that in October 1973, he and Green visited Cooks in his apartment. Green transported Harris to Cooks' apartment in his Dodge van. Cooks asked Harris if he could get him a gun. Harris told Cooks he would have to find one himself. Cooks asked Harris "if I wanted to go out and kill some people with him." Harris said he wasn't interested. Cooks went into another room.

---

[13]On December 22, 1973, Moore told a police officer he was living at 542 Waller Street.

[14]In late February 1974, Simon and Moore went to Chicago to attend "All Saviors Day," a religious observance at the Nation of Islam Temple in Chicago. Two or three days after they returned on or about February 28, Simon asked Moore to move out of the apartment because he (Simon) wanted to get married. Simon's girl friend at that time was Greta Burgess who lived at Shields and Randolph Streets (Ingleside area), San Francisco.

[15]Gloria met Moore in November 1973, at the Shabazz bakery on Randolph Street where she worked with Cooks. Simon, Green, and Moore frequently came into the bakery. Later, Gloria worked at another Shabazz bakery on Divisadero Street.

[16]On December 10, 1973, Harris served as a witness to Green's marriage at City Hall, San Francisco. Green's wife, Dinah, worked at a Muslim sewing center on Randolph Street. She was a good friend of Harris' wife, Carolyn.

[17]Two days after the marriage Harris was apparently arrested on outstanding traffic warrants issued out of southern California. Law enforcement officers transported him to Santa Ana, apparently. Harris said the warrants had been issued to his brother and he was released because of the mistaken identification. He returned to San Francisco. On November 11, 1973, he rented a room for two weeks (through Nov. 25) at the Empress Hotel at 144 Eddy Street, San Francisco. Thereafter, he apparently stayed at the YMCA at Golden Gate Avenue and Leavenworth Street when he was not staying with his new girl friend, Deborah Turner, at Hickory and Webster Streets, San Francisco.

[18]The court excluded evidence that some of the speakers gave instructions on how to make bombs.

When he returned he said he had another gun. Cooks then removed a machete from under the mattress of his bed. Harris testified that Green participated in the conversation and said they could use his van "to go out and make some hits." Cooks wanted to know the exact area where they were going and "take some people." Harris said he did not know the city very well. Green said he knew the city and they could go with him. Cooks and Harris then went out with Green in his van. Cooks had a .22 caliber automatic pistol and talked about killing some white people. Green said nothing. They drove around the city about three hours, but "no one was hurt that night."

Harris testified that in October 1973, he attended two meetings in Simon's apartment at 844 Grove Street. Green drove Harris to 844 Grove Street in his van. Simon, Grove, Jamerson, Land, and Stallings were present at those meetings. Cooks was not present. Simon did most of the talking. He asked Harris how he "felt about white people," whether he thought they were his enemies and whether his mind was "together enough to destroy the enemy," meaning white people. Green said nothing. Harris testified that Simon "quoted some lessons about killing the white devil." He quoted from "some type of binder" which contained a number of pages. Simon had a three-ring, loose-leaf binder which contained, among other things, Muslim literature and material used in "processing" a person for membership in the Nation of Islam. (People's Exhibit No. 16.) It included references to white people as devils who, for various reasons, had to be killed. Jamerson had a similar binder.

At the second meeting in Simon's apartment Simon again talked about killing white people and asked Harris whether he had his "mind together" and could kill someone. He talked about meetings at the temple. None of the others present talked much at this meeting. Simon went into a bedroom and returned with a large case which contained two long sharp knives and several handguns, including a .357 Magnum, a .38 snubnose, and a .32 caliber automatic pistol. Simon picked up the .32 automatic and said Harris should go out and use the gun to kill people. Harris said he did not need a gun. He could use his hands. Simon put the gun down and told Harris he "wasn't ready."

Harris testified that similar meetings took place in Simon's apartment in November or December 1973. At that time, Manuel Moore was present with Simon, Green, Jamerson, Land, and Stallings. Simon again asked Harris if he could kill anybody, whether he had his mind together, and how he felt about white people. Simon told Harris he would have to go out and kill some people to show he could be trusted. Harris told Simon he was not going to kill anyone because no one had hurt him. Simon replied, "Man, you still haven't got yourself together yet." Moore did not participate in that conversation.

Harris testified that Simon talked about "Death Angels" at Black Self Help and at his apartment when Green, Land, Jamerson, Stallings, and other people were present. Moore was present at these talks at Black Self Help. Simon said that if a person wanted to join the "Death Angels," he would have to kill four white children or five or six white women and nine white men. Muslim literature in Simon's binder contained similar statements. The other persons present said nothing. Simon did not specify the persons to be killed, "only white people." In a conversation at Black Self Help Moore told Simon he (Moore) wanted to join the Death Angels. In a later conversation, Green told Harris he was not going to join because "it involves too much killing." This was in December 1973 (after the killing of Mrs. Hague). Harris told Green he was not going to join.

Thomas Manney, J.C. Simon, Manuel Moore, Larry Green, Clarence Jamerson, Edward Land, and Douglas Burton testified and denied that meetings, as described by Harris, had ever taken place. They testified that they had never heard of "Death Angels." They denied they ever discussed the killing of white people. Simon testified that Harris was never in his apartment, and other witnesses testified they had never seen Harris in Simon's apartment or in the building. Green testified that he never took Harris to his (Green's) apartment or Simon's apartment but Harris visited him in his apartment two or three times after he was married.

Harris worked at Black Self Help until February 1, 1974. He testified that he quit and moved to Oakland with his "wife," Deborah Turner, because he feared he was going to be killed. Manney testified that he fired Harris on February 1, 1974, because a number of items (cameras, stereo equipment) were missing from the store and customers' storage units.

Michael Armstrong, age 23, and Thomas Manney knew each other since Armstrong was a young boy and lived in the Ingleside area of San Francisco. Armstrong said he was frequently in the Black Self Help store. Armstrong was granted immunity from prosecution and testified that Manney has asked him to get him some guns. In October 1973, Armstrong obtained a .32 caliber automatic pistol from Ella Bell through a narcotic transaction, and sold it to Manney for $55. In mid-October 1973, with Manney acting as an intermediary, Armstrong sold a .22 caliber automatic pistol to Jessie Cooks for $45. Armstrong had stolen that gun in a burglary. In late October 1973, Armstrong purchased a .32 automatic pistol from a Samoan named Moo Moo Tooa for $30 and sold it to Manney for $55. In November 1973, Armstrong sold a .357 Magnum and two .9 millimeter handguns to Manney for about $120. In April 1974, Armstrong sold a .38 caliber "special" to J.C. Simon for $45.

Thomas Manney and J.C. Simon denied they ever owned or possessed any guns of any kind. Green, Moore, and other defense witnesses denied they ever possessed any guns or saw any guns at Black Self Help.

III. October 20, 1973—Attempted Kidnap of Children; Crimes Committed Against Richard and Quita Hague

On October 20, 1973, a Saturday, Anthony Harris worked at the Black Self Help store. He said he wore a black suit with a Nehru collar and either a white or yellow shirt. He left the store shortly after 6 p.m. When he left, Cooks and Green were leaving the store through the rear door. Harris walked to the bus or streetcar stop at Market and Van Ness to get on a bus or streetcar that would take him to 68 Hilltop Road where he was living with Carolyn Patton.

Harris testified that while he was waiting for a streetcar, Green and Cooks drove up in Green's Dodge van and offered him a ride home. Green was driving. Cooks was the passenger. After Green drove around the city a while Harris realized they were not taking him home and asked where they were going. Harris noticed that Cooks had a .22 caliber automatic pistol. Cooks kept it in his boot. Harris also observed a long, sharp knife (a machete) next to the driver's seat. After riding around the city a while Cooks asked Harris if he had his "mind together" and whether he could kill someone. Cooks told Harris he (Harris) had to kill someone, but Harris said he could not do it. Cooks said, "Okay," and put the gun back in his boot. Harris feared that Cooks might kill him. They drove a while longer until Cooks directed Green to stop and park the van. They parked near a school (Corpus Christi) on Francis Street, which is between Mission Street and Alemany Boulevard in the southwest part of San Francisco.

Harris testified that Cooks and Green left the van. Harris remained in the van and watched Cooks and Green walk up a hill toward a house where three children (Michele Carasco, Marie and Frankie Stewart) were playing in the front yard. Harris testified that the boy came down the steps in front of the house. Cooks grabbed him around the neck and Green grabbed the two girls. Cooks and Green forced the three children toward the van. Cooks held a gun at the side of the boy's neck. Cooks told Harris to open the doors. Harris opened the doors and got out of the van. The children were struggling. Harris testified that he ran toward the boy, pushed him to the ground, and told Cooks to let him go, because "he would tell his parents on us." The boy started running and yelling, "cops." The girls broke loose and ran. The children ran to a nearby house and then to a rectory where a priest provided them with safety. Green said, "Let's get out of here." Cooks forced Harris back into the van and they left the area.

Michele Carasco, a perceptive 12-year-old girl, testified that on the night of October 20, 1973, she and other children were having a birthday party for her brother at 71 Francis Street. Michele and two friends, Marie and Frankie Stewart, were playing in the front yard when two black men walked up and one, the bald-headed man (Cooks), asked where Mission Street was located. He then pulled out a gun and told the children, "Just be quiet and follow us." Michele identified Cooks as the bald or clean-shaven black man who pulled out the gun. She described the other black man as about 20 to 21 years old with a short Afro. The black men forced them to walk to a van which Michele described as a "white, fairly new" van with doors in the back and a door on the side. She testified that there was a third man standing next to the van. Cooks told him to open the door and "get out the sacks." Michele asked Cooks, "Is this a joke?" Cooks told her to shut up and called her a "brat." When asked whether the third man next to the van was black or white, Michele testified that "he was kind of half and half," "he wasn't all black and he wasn't all white. He could have been [black], but his complexion was very light." He was "fairly young" and "medium build."[19] Michele testified that as they reached the van, Frankie (Stewart) yelled "cops" and ran, and that she and Marie also ran away to a lady's house and then to the rectory. In court, Michele identified Cooks. The prosecutor did not ask her if she could identify Green or Harris.[20]

Harris testified that after the attempted kidnaping of the three children, Green drove to Broadway in the North Beach area of the city. Cooks told Green to park at a certain place, which turned out to be the north side of Chestnut Street near the intersection of Powell Street.

Richard Hague, a mining engineer, testified that on October 20, 1973, he and his wife, Quita (age 29), lived at 399 Chestnut Street near Stockton Street (on Telegraph Hill). About 9:30 p.m., they went out for a walk. They walked down the hill on the south side of Chestnut (westward) toward Powell Street. Mr. Hague was carrying a wallet with $10 or $11 and credit cards, a house key, and a small silver fruit knife. Harris testified that when they saw the couple (the Hagues) Cooks opened the side door of the van, got out, and ordered Harris out of the van. Green got out of the van. Cooks and Green walked across the street and Harris followed at a distance. Mr. Hague testified that as he and his wife walked down Chestnut Street they saw two black men standing next to a board fence along a vacant lot. As they approached the two men, one walked to the curb side of the sidewalk and forced the Hagues to walk between them. Mr. Hague observed that the black man standing next to the curb (Hague's right) was either bald or had a clean-shaven head. Hague identified the man in

---

[19]Michele's description of the third man was consistent with the appearance of Green (see fn. 3, *ante*), but inconsistent with Harris' testimony that he waited in the van while Cooks and Green forced the children to the van.

[20]The Stewart children did not testify.

court as defendant Cooks.[21] Mr. Hague did not observe any particular or distinguishing features about the second black man, except that he had medium-length kinky hair, was "average size" (neither large nor small), and wore a checkered coat. Both men appeared to be well-dressed and neatly groomed. Hague testified, as did Harris, that Cooks grabbed Hague's right arm and said something to the effect, "You're coming with us in the van. Get into the van." Harris testified that Cooks pulled out a gun and held it in Mr. Hague's back. Hague testified that it was the other black man who pointed a pistol at him. Harris testified that he told the woman to run, and that Cooks told him to shut up or "he'll do me a job." Mrs. Hague started running down the street yelling, "Oh, my God, this can't be true." Harris testified that Cooks put the gun to the man's head and told the woman that if she didn't come back he would shoot and kill the man. Hague testified that he told his wife "they already have us, let's cooperate and they won't hurt us," or something to that effect. Mr. Hague thought they were merely going to be robbed, and that if they did not resist they would not be hurt. Mrs. Hague returned and followed Cooks as he forced Mr. Hague across the street to the van. Hague described the van as a white Dodge with doors on the side and back. Cooks forced him into the van through the side cargo doors and ordered him to lie face down with his head toward the rear of the van. Mr. Hague testified that when he entered the van another black man was sitting in the driver's seat with one hand over the right side of his face. Hague observed a lot of debris on the floor of the van, and that there were a number of quilted pads similar to pads used by furniture movers. Mr. Hague identified Green's van (see People's Exhibit No. 10) as similar to the van in which he and his wife were abducted, including the same type of doors.

Harris testified that while Cooks was forcing the man (Mr. Hague) into the van, the woman (Mrs. Hague) attempted to let the air out of the tires. Cooks went around to the side of the van, grabbed the woman by the hair, slapped her, called her a lot of names, yanked her around the van to the other side and pushed her into the van. Cooks ordered her to lie face down behind the passenger seat with her head to the rear of the van. Mr. Hague was lying behind the driver's seat. Green was inside the van.

Immediately after Mr. and Mrs. Hague were placed in the van, a San Francisco police car with Officers Bruce Marovich and Benjamin McAlister stopped next to the van to inquire whether anything was wrong. Harris testified that he and Cooks were standing next to the van on the curb side. Cooks went around to the rear of the van and told the officers, who remained in their patrol car, that everything was all right, that they were merely having tire trouble. Officer Marovich identified Cooks as the man who had walked up to the police car and said, "Everything is all right, Officer, we had a flat tire and we're fixing it."

---

[21]Mr. Hague also identified Cooks before trial from a group of photographs. (People's exhibit No. 34, photograph No. 4.)

Officer Marovich identified a photograph of Harris as the second person he saw standing next to the open cargo door on the curb side of the van. Officer Marovich thought a third person was in or near the van, but he was not certain. Officer Marovich did not see or identify Green. Officer McAlister, who testified as a defense witness, saw a black man standing at the rear of the van and a black man seated behind the steering wheel of the van, but he could not identify any of the defendants. After Cooks told the officers everything was all right, the officers drove away. Officer Marovich identified Green's white or beige van as the same type of van he saw at Chestnut and Powell Streets on the night of October 20, 1973, but on cross-examination he conceded he could not say it was the same van.

When the police officers left, Harris and Cooks entered the van and Green immediately drove away. Mr. Hague testified that Cooks straddled his body and the other man straddled his wife's body. Cooks tied Mr. Hague's hands behind his back with a piece of yellow cord or twine. Cooks then tied Mrs. Hague's hands behind her back with another piece of yellow cord or twine. Mr. Hague testified that Cooks then went through his pockets and took his (Hague's) wallet and knife. Mr. Hague kept saying something to his wife. Cooks told him to shut up. Harris testified that the man kept talking, and that Cooks reached behind the seat, grabbed a club of some kind, hit the man on the head a number of times and knocked him unconscious. Harris testified that the woman would not remain quiet so Cooks took his gun and hit her on the back of her head. Mr. Hague also testified that Cooks hit him in the head, that he could feel blood trickling down the side of his face, that the last thing he remembers seeing was a "Safeway" sign near Chestnut and Columbus when he lost consciousness. Mr. Hague did not remember any of the subsequent events.

Harris testified that Green drove down by the docks. Harris noticed a car, which looked like a black Lincoln Continental Mark III or IV following the van. Cooks told Harris, "Don't worry about it. It's all right."[22]

Harris testified that Cooks asked him if he could rape a white woman, and Harris said it was against the teachings of Islam. Cooks asked Green if he could rape the woman and he said he would not do it. Mrs. Hague told them to go ahead and rape her, take all her money and stuff, "just don't kill me." Harris testified that Cooks fondled the woman and then told Harris to "choke her out." Harris refused.

Harris testified that Green drove to a dark, industrial area near some railroad tracks in the southern part of San Francisco and parked near a high concrete wall. Harris noticed that there were two cars which appeared to have followed

[22]Thomas Manney testified that Albert Leonard, captain of Temple 26, drove a Lincoln Continental Mark IV. Simon testified that "Mahmond" drove a Lincoln Continental Mark IV.

them. The two cars stopped about half a block away. One car appeared to be a Lincoln Mark III or IV and the other car a Cadillac or station wagon.

Harris testified that Cooks and Green got out of the van, opened the side doors, and then he (Harris) got out. Green then grabbed the woman (Mrs. Hague) by her hair, pulled her out of the van, grabbed the machete, pulled her about 20 feet from the van, and, with one hand on his hip and one arm around the woman's neck, Green threw her to the ground.[23] Harris testified that Green then raised the machete above his head and started slicing and chopping away at the woman's neck. When he had finished Green walked to where Harris was standing and said, "You ought to have seen all the blood gooshed out of the Devil's neck." Green threw his hands up and said, "I did it." Green had removed Mrs. Hague's wedding ring and offered it to Harris who said he did not want it.

Harris testified that Cooks had pulled the man (Mr. Hague) out of the van. Cooks took the machete from Green and started "whacking the man with it." Cooks then offered Harris the machete and asked whether he wanted to hit the man. Harris refused. Harris testified that he kept looking back at the two cars parked nearby. He saw flashes of light as if someone were taking pictures.[24] Meanwhile, Cooks kept hitting the man. Harris told Cooks the man was dead. Green said, "let's get out of here." When Cooks finally stopped hitting the man, he climbed into the van and they drove away.

Green and Cooks asked Harris if they could use his place to clean up. They drove to 68 Hilltop Road where Harris was living. Green noticed that there was a lot of blood in the back of the van and wanted some water to clean it out. The moving pads on the floor of the van were bloody. Harris testified that he went into the apartment alone and told Carolyn to go into the bedroom. He did not want her to see Green and Cooks. He took a large plastic pail or trash can, cut a hole on the side, placed it in the sink and filled it with water. The purpose was to use it to wash the blood out of Green's van. He took the container of water outside. After Green and Cooks had cleaned out the van they went into the house and used the bathroom to clean up. When Green came out of the bathroom he again offered Harris the ring he had removed from Quita Hague's hand. Green told Harris to give it to "Sister Carolyn," whom Harris was to marry three days later. Harris took the ring and gave it to Carolyn later that night. On cross-examination, Harris testified that while he had attempted to prevent Carolyn from seeing Green and Cooks in the house (living room), Carolyn looked out from the bedroom and saw them.

---

[23]Mrs. Hague was 5 feet 4 and 1/2 inches tall and weighed 125 pounds. Mr. Hague was 5 feet 9 inches tall and weighed about 150 pounds.

[24]Harris said that the "Death Angels" required pictures of the "sting" or "killing."

Meanwhile, at about 11 p.m., John Battenberg and his wife were driving near 25th and Minnesota Streets when they came across Richard Hague who came staggering out of the darkness with his hands tied behind his back. Battenberg observed that Hague was severely injured. He stopped, untied Hague's hands, noticed severe lacerations on Hague's face, neck, and head, and that he appeared to be in a state of shock. Battenberg placed Hague in his car and took him to the southeast police station in the Potrero Hill area. The officers on duty called for an ambulance which took the injured Hague to San Francisco General Hospital.[25] A number of officers went to the area where Battenberg had picked up Hague, recovered the cord used to bind Hague's hands, and searched the area. Officer John Matulay found Mrs. Hague's body face down, with her hands tied behind her back, on a railroad track. Her head was nearly severed from her body. (People's exhibit Nos. 42, 43.)

Harris' ex-wife Carolyn Patton (Anderson), testified that she had met Jessie Cooks, Larry Green, and J. C. Simon through Temple 26, and that she met Harris at the Black Self Help store. She denied that Harris was living with her before their marriage on October 23, 1973, since under the laws of Islam a man could not come to a single girl's house without an escort. Before she and Harris were married Harris came to her house for dinner three or four times a week and each time he brought Green with him. Harris never brought Cooks to her house, and Simon never came to her house.

Carolyn Patton testified that one night (before the 11 o'clock T.V. news) in October (1973) Harris came to her apartment at 68 Hilltop Road. He was wearing a black suit with a Nehru collar and a pink shirt which was covered with blood. Harris testified that he had only a speck of blood on the lapel of his suit and that he never wore a pink shirt. Carolyn asked Harris about the blood on his clothes and he said "he was out killing folks," or "devils." Harris testified that he had told her "they [Cooks and Green] had been out killing folks." Carolyn testified that Harris burned his bloody shirt. Harris denied it. Carolyn testified that Harris gave her a ring while she was in the kitchen that night, and that she retired to the bedroom. She testified that Harris filled a trash can with water and went outside with it, but she did not go outside to see what he was doing. She testified that she did not see Green or Cooks or anyone else with Harris at her home that night.

On the following night, October 21, San Francisco police were on the lookout for a white Dodge van, based on the description of the van received as a result of the attempted kidnap of the children and the crimes against the Hagues. About 11:30 p.m., San Francisco Police Officers Lawrence Man-

---

[25]Mr. Hague did not regain full consciousness until the next day in the hospital. He had severe lacerations on his face from his mouth to his ears, on top of his head, and on his neck. His jaw was broken. Plastic surgery was needed to repair his jaw, mouth and left ear.

willer and Frank Reed stopped a white Dodge van at Steiner and O'Farrell Streets. The driver was defendant Green who was described as black, with a light complexion, hazel eyes, 6 feet 1 inch tall, 150 pounds, and slim. The van was registered to Green who gave his address as 844 Grove Street, apartment No. 7. Officer Reed used his flashlight to look into the van for other occupants. He observed large pieces or sheets of cardboard on the floor in the rear of the van, some cardboard pieces upright on the driver's side, and pieces of burlap cloth or gunny sacks. The cardboard sheets looked "fairly clean." There were no moving pads in the van. The officers arrested Green on an outstanding traffic warrant, transported him to northern police station where, with the assistance of Thomas Manney, Green was released on bail. Green was released without being questioned about his possible involvement in the crimes committed the previous night.

In May 1974, after Harris had provided San Francisco police with information about the Hague crimes, San Francisco police inspectors went to Carolyn Patton's apartment at 68 Hilltop Road, interviewed her, and seized Quita Hague's wedding ring which Carolyn was still wearing on the little finger of her right hand. Mr. Hague identified the ring as the ring he had given his wife, the former Quita Perelli-Minetti, when they were married in 1966.

Defendant Green testified in his defense. Green testified that he was not with either Harris or Cooks on October 20, 1973, that he was home with a cold that night, and that he had not loaned his van to any other person that night. Green acknowledged that he owned a beige 1971 Dodge van that he used to deliver furniture for Black Self Help, and that it usually had moving pads in it, but no burlap or gunny sacks. Green had driven Harris to his home at 68 Hilltop Road a number of times. Before Harris married Carolyn Patton on October 23, 1973, Green had dinner with them three or four times a week. Green denied he was involved in any killings or shootings, and he denied he had attended any meetings at which the killing of white people was discussed.

A. *Sufficiency of Evidence to Corroborate Accomplice's Testimony*

The trial court instructed the jury that Anthony Harris was an accomplice as a matter of law,[26] and therefore his testimony had to be corroborated. Cooks and Green argue that the evidence was insufficient, as a matter of law, to cor-

---

[26]An accomplice is defined as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.)

Because any possible error in ruling that Anthony Harris was an accomplice as a matter of law afforded the defendants greater protection, we need not pass on the correctness of the trial court's ruling. We shall assume without deciding that Harris was an accomplice as a matter of law. (See *People* v. *Perry* (1972) 7 Cal.3d 756, 769, fn. 3 [103 Cal.Rptr. 161, 499 P.2d 129].)

roborate Anthony Harris' testimony identifying them as the perpetrators of the crimes against Richard and Quita Hague.

Penal Code section 1111 provides, in part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

■ To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. (*People* v. *Luker* (1965) 63 Cal.2d 464, 469 [47 Cal.Rptr. 209, 407 P.2d 9]; *People* v. *Perry, supra,* 7 Cal.3d 756, 769; *People* v. *Szeto* (1981) 29 Cal.3d 20, 27 [171 Cal.Rptr. 652, 623 P.2d 213].) "The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." (*People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556]; see also *People* v. *Luker, supra,* 63 Cal.2d 464, 469; *People* v. *Holford* (1965) 63 Cal.2d 74, 82 [45 Cal.Rptr. 167, 403 P.2d 423]; *People* v. *Perry, supra,* 7 Cal.3d 756, 769; *People* v. *Hathcock* (1973) 8 Cal.3d 599, 617 [105 Cal.Rptr. 540, 504 P.2d 476]; *People* v. *Szeto, supra,* 29 Cal.3d 20, 27.) Although the corroborating evidence must raise more than a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant. (*People* v. *Santo* (1954) 43 Cal.2d 319, 327 [273 P.2d 249]; *People* v. *Perry, supra,* 7 Cal.3d 756; *People* v. *Szeto, supra,* 29 Cal.3d 20.) The corroborating evidence of "inculpatory participation" need not be direct nor extend to every fact and detail. It may be circumstantial (*People* v. *Henderson* (1949) 34 Cal.2d 340, 343 [209 P.2d 785]), and may be sufficient although "slight and entitled to little consideration when standing alone." (*People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Perry, supra*; *People* v. *Szeto, supra*; see also *People* v. *Harper* (1945) 25 Cal.2d 862, 876-877 [156 P.2d 249]; *People* v. *Hathcock, supra,* 8 Cal.3d 599.) Finally, "[u]nless a reviewing court determines that corroborating evidence should not have been admitted or that it could not reasonably *tend* to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal." (*People* v. *Perry, supra,* 7 Cal.3d at p. 774, original italics; *People* v. *Szeto, supra,* 29 Cal.3d at p. 27.)

In this case, Richard Hague, Officer Bruce Marovich, and Michele Carasco identified Cooks; therefore, there is no merit to Cooks' argument that the evidence was insufficient to corroborate the testimony of Harris that he (Cooks) participated in the crimes. No witness, however, other than Harris, identified Green as the third black man in the van on the night of October 20, 1973. Michele Carasco gave police a general description that was consistent with Green's appearance (see fn. 19, *ante*), but she could not identify him. There was, however, independent circumstantial evidence that tended to connect Green and his van with the crimes committed on October 20, 1973. The question is whether it was sufficient.

Mr. Hague, Officer Marovich, and Michele Carasco testified that Green's white or beige van (People's exhibit No. 10) was the same type of, or similar to, the van used by the three black men in commission of the crimes in question. They conceded that they could not say it was "the van." Green used his van to deliver furniture for Black Self Help. His van was the only van used for that purpose and the only van among the Black Self Help vehicles. Green usually kept moving pads in his van. Mr. Hague testified that when he was forced into the van he observed, and was ordered to lie on, heavy pads similar to pads used by furniture movers. That observation tended to connect the van to Black Self Help and Green. When Green was stopped by police the night after the crimes, there were no moving pads in his van. The officer saw pieces of "fairly clean" cardboard on the floor in the cargo area. The moving pads had been removed, suggesting that they may have been removed because they were stained with blood, as Mr. Hague and Harris described. One of the officers who stopped Green also observed pieces of burlap cloth or sacks in Green's van. Michele Carasco testified that Cooks had told one of the men to "get out the sacks." Green himself testified that on the night of October 20, 1973, no other person used his van that night.

Other circumstantial evidence tended to corroborate Harris' testimony and connect Green with the Hague crimes. Harris, a relative newcomer to San Francisco, knew few people and had few friends other than Green. Harris and Green worked together and socialized together. They were good friends. Harris owned no vehicle, did not drive, did not have access to any Black Self Help vehicles, and was dependent on Green for transportation. During the week before the Hague crimes, Green had taken Harris to his home at 68 Hilltop Road three or four times and had dinner with Harris and Carolyn Patton. Carolyn testified that Harris never came to her home alone and that Green came with him. Simon and Cooks never came to her house. Although Carolyn denied she saw Green and Cooks with Harris on the night Harris came home and gave her a ring (Quita Hague's ring), she corroborated Harris' testimony that he came home, filled a trash can with water and took it outside. Although she denied knowing what Harris was doing outside with a trash can of water at 11

o'clock at night, the evidence indicates that it may have been used to wash the blood out of Green's van, as Harris testified.

Finally, Harris' testimony about the crimes committed on the night of October 20, 1973, was corroborated in detail by the testimony of Michele Carasco, Mr. Hague, Officer Marovich, and other police officers who investigated the crimes. Moreover, Harris' testimony that Cooks participated in the crimes was corroborated by the identification testimony of Mr. Hague, Michele Carasco, and Officer Marovich. When that corroborative evidence is considered with the corroborative evidence tending to connect Green with the crimes, the jury could reasonably conclude that Harris was telling the truth when he testified that Green was the driver of the van. We are unable to hold that the corroborative evidence was insufficient, as a matter of law, to connect Green with the crimes. There was substantial evidence to support the jury's verdict that Green was guilty of the crimes committed against Richard and Quita Hague.[27] (See, generally, *People v. Johnson* (1980) 26 Cal.3d 557 [162 Cal.Rptr. 431, 606 P.2d 738]; *People v. Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468]; *People v. Towler* (1982) 31 Cal.3d 105 [181 Cal.Rptr. 391, 641 P.2d 1253]; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781].)

▪ Cooks argues that the corroborating evidence was also insufficient to support the finding that he used a firearm in committing the offenses against Mr. and Mrs. Hague. Michele Carasco, however, testified that Cooks had a gun at the time of the attempted kidnap. Her testimony tended to corroborate Harris' testimony that Cooks possessed a .22 caliber pistol and used it in committing the crimes on October 20, 1973. (See *People v. Henderson, supra,* 34 Cal.2d 340, 343.)

## B. *Rereading of Mr. Hague's Testimony*

During its deliberations the jury told the court it wanted to hear again the testimony of Richard Hague "from the time he first saw the two men on the corner until he was knocked out. We would like to hear both sides on this point only." The trial judge, Cooks' attorney, one of Green's attorneys (Mr. Jacko), and the two prosecutors went to the judge's chambers and agreed on those portions of the transcript that would fulfill the jury's request. Mr. Hague's testimony, including relevant direct examination and cross-examination by Mr. Jacko, was then reread to the jury. Green's attorney, Mr. Jacko, then objected

---

[27]Whether Green actually killed Quita Hague, as Harris testified, is not critical to the question of Green's guilt. Conceivably, Cooks or possibly Harris killed her. The critical question was whether Green was the driver of the van. If he was the driver, he was clearly an aider and abettor and therefore guilty as a principal. (Pen. Code, § 31.) Also, as a coconspirator he could be found guilty of the crimes committed by his coconspirators. (See *People v. Harper, supra,* 25 Cal.2d 862, 870.)

and requested that additional portions of his cross-examination of Mr. Hague be reread, particularly that portion which related to the black man seated in the driver's seat of the van. The trial judge denied Mr. Jacko's request because he had not requested that those portions of his cross-examination be reread when they had met in chambers and agreed on the testimony to be reread. On appeal, Cooks and Green argue that the trial court erred in denying Mr. Jacko's request.

■ Generally, the trial court must allow the rereading of relevant testimony as requested by the jury. (See Pen. Code, § 1138; *People* v. *Butler* (1975) 47 Cal.App.3d 273 [120 Cal.Rptr. 647]; *People* v. *Litteral* (1978) 79 Cal.App.3d 790 [145 Cal.Rptr. 186].) In this case the trial court substantially complied with the jury's request. A review of the cross-examination in question shows that Mr. Jacko did not cross-examine Mr. Hague about the third black man seated in the driver's seat of the van. Mr. Jacko did ask Mr. Hague three questions about what he meant by "black man." Those questions, however, did not relate to the driver of the van. Moreover, they preceded, and were separate from, those portions of the cross-examination that were reread. Mr. Jacko's cross-examination of Mr. Hague related primarily to the "second black man" who held a pistol pointed at Mr. Hague while outside the van. Accordingly, we conclude that under the circumstances the trial court did not abuse its discretion in denying Mr. Jacko's request. Neither Cooks nor Green was prejudiced by the trial court's ruling since Mr. Jacko's cross-examination of Mr. Hague did not relate to Cooks and it was apparent from all the testimony that was reread that Mr. Hague could not identify Green. (See Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 834-837 [299 P.2d 243].)

IV. OCTOBER 23, 1973—COOKS KIDNAPS AND ASSAULTS LINDA ENGER

On October 23, 1973, about 8:30 p.m., Linda Lou Enger, a 27-year-old college graduate with a degree in psychology, was walking to her apartment at 75 Waller Steet, near the University of California Extension at Laguna and Waller, when she realized a man was following her. She removed her keys from her purse and ran to the entrance of her apartment building, but before she could open the door the man, Cooks, grabbed her arm and held a .22 caliber automatic pistol against her neck.[28] Cooks told her to be quiet, not to try anything, or he would kill her. Cooks forced her to walk down Waller toward Octavia Street. He insisted that she place her arm around his neck as they walked. They walked to a parking lot under a freeway where Cooks made her remove her lightcolored raincoat because it was "too conspicuous." She placed it in some bushes with her purse and briefcase. With Cooks holding the gun in his hand, Enger and Cooks walked up Octavia Street to a minipark where they sat and talked. In response to Cooks' questions, Ms. Enger told him she had at-

---

[28]Cooks did not challenge Ms. Enger's in-court identification of him.

tended a meeting at the Unitarian Church that night. They discussed the activities of the church. Cooks then forced her to walk to a vacant lot at the corner of Buchanan and Page Streets. With gun in hand, Cooks ordered Ms. Enger to sit in some bushes. After about half an hour of conversation, Cooks asked Ms. Enger if she were going to call the police. She said she would not. Cooks, however, said he was convinced she would call the police and therefore he would have to kill her. He pointed to two places on her forehead and said if he shot her in either place she would be dead immediately, before anyone found her, and he would be "long gone." Ms. Enger kept talking to him. Cooks asked her how she felt about the world situation, the environment, the war in Viet Nam, the oppression of black people. In discussing those subjects, Cooks said the time had come to put an end "to this sort of thing," meaning the oppression of black people. Cooks said the "world had to be changed," that "people were going to be killed and the streets would be lined with blood." Cooks said "people would be killed indiscriminately, and that there was no use to be afraid or upset with it." Ms. Enger tried to convince Cooks that killing people was "not a valid thing to do." Cooks replied, "he didn't feel that was the case, that was just the way things were, that is the way it worked." That conversation lasted about an hour. Cooks threatened 10 to 15 times to kill her.

Ms. Enger changed the subject and thought she had convinced Cooks not to kill her. However, she thought if she could get back to her apartment there was a better chance that someone would be near if he did decide to shoot her. Cooks and Ms. Enger returned to the parking lot where she had left her raincoat, purse and briefcase. She picked up those items. Cooks accompanied her to her apartment and left a while later.[29] Ms. Enger telephoned a friend and reported the two-hour ordeal to the police.

Two days later, Cooks telephoned Ms. Enger at work and asked why she was not in her apartment the previous night. Ms. Enger told him she was afraid of him. Cooks asked if she had gone to the police, and she said, "No." Cooks asked, "Do you want me to just leave you alone." Ms. Enger said, "Yes," and Cooks ended the call.

### V. October 30, 1973—Cooks Murders Frances Rose and Is Immediately Arrested

On October 30, 1973, at approximately 9:05 p.m., Frances Rose, a 28-year-old Caucasian woman, was shot and killed in her Ford Mustang in the driveway of the University of California Extension at 55 Laguna Street, San Francisco. She was shot four times, once in the right side of her chest, once in the right side of her neck, and twice in the right side of her face with a .22 caliber

---

[29]Cooks sexually assaulted Ms. Enger in her apartment, but the trial court excluded that evidence.

automatic pistol. (People's exhibit No. 56.) A witness, who lived in an apartment across the street, saw the gunman walk away from the car. She described him as a black man about 25 years old, 5 feet 10 or 11 inches tall, muscular build, wearing a navy-blue watch cap, light-colored pants, an olive-green jacket, and gloves. She described the suspect to police who arrived at the scene within a couple of minutes. A few minutes later, because he matched the description of the gunman, police stopped Cooks about five or six blocks away near Waller and Steiner Streets. Cooks had discarded his cap and jacket. He was perspiring profusely. The officers pat-searched him and found he was carrying a loaded .22 caliber automatic pistol. The officers transported Cooks to the place of the shooting, turned him over to Inspector Falzon who transported him to the Hall of Justice. Seventeen .22 caliber long bullets were found in a pocket of Cooks' pants. After he was advised of his constitutional rights, Cooks agreed to make a statement. Cooks said he first met Frances Rose when she pulled up in her car and offered him a ride. He got into the car and once in the car he became very angry because she began making racial slurs by calling him a "Nigger." He became angry and shot her three, "possibly four," times. Cooks told the officers where he had discarded his cap and jacket. Officers found the navy-blue watch cap and olive-green jacket about 50 feet from where Cooks was detained.

The .22 caliber automatic pistol seized from Cooks was the gun Michael Armstrong sold to Cooks in October 1973. Anthony Harris testified that the gun was the same as the gun he had seen in Cooks' apartment.[30]

## VI. NOVEMBER 25, 1973—MURDER OF SALEEM ERAKAT

On the morning of November 25, 1973, a rainy Sunday, 52-year-old Saleem Erakat was shot and killed in a back room of his small grocery store at 452 Larkin Street, San Francisco. He was apparently killed shortly after 11 a.m.[31] Erakat was shot once in the head, behind his right ear, with a .32 caliber automatic pistol. His body was found in a sitting position in a corner of the store's restroom. (People's exhibit No. 57.) Erakat's hands were tied behind his back with a necktie. His wallet, checkbook, and wristwatch had been taken from him. The pockets of his trousers, in which he usually carried $150 to $200, had been turned inside out and were empty. An estimated $800 to $900 in

---

[30]Cooks was charged with the murder of Frances Rose in a separate action and, in December 1973, he pleaded guilty to first degree murder and was sentenced to state prison. The trial court, in this case, denied Cooks' motion to strike all evidence of the Frances Rose murder on the ground of "double punishment and jeopardy." (Pen. Code, § 654.)

[31]A bartender at Harrington's bar near Erakat's store testified that on November 25, 1973, he went to work shortly before 11 a.m. and saw Erakat alone in the store. Another witness testified that he went to Erakat's store to purchase some beer at approximately 11 a.m., and found a black man who told him the store was closed. The black man resembled Anthony Harris. There was a briefcase on the floor next to him. The witness did not see Erakat or any other person in the store.

currency had been taken from a cigar box, and money had been taken from the cash register. Police found one .32 caliber bullet and one empty .32 caliber shell casing on the floor of the room where Erakat was shot. A quilt with nine bullet holes, but no bloodstains, was apparently used by the gunman to muffle the noise of the gunshot. Anthony Harris' palm print was lifted from the doorknob inside the room where Erakat was killed.

On November 25, 1973, Harris was staying at the Empress Hotel at 144 Eddy Street. (See fn. 17, *ante.*) Harris testified that on the morning of the Erakat killing he telephoned J. C. Simon to inquire whether there was any work for him at Black Self Help that day. Harris wanted to earn extra money. Simon told Harris no one was working but he could go to the store and clean. Harris did not have a key to the store. Simon, who had a key to the store, said he would pick up Harris. Harris asked him to pick him up at the YMCA at Golden Gate Avenue and Leavenworth Street, which was two blocks from Erakat's store. About 20 or 30 minutes later, Simon drove up in Green's Dodge van. Eddy Land was with Simon. Harris entered the van. Simon drove around a couple of blocks, stopped on Larkin Street, said something about a "sting" at the store, told Harris to get out of the van and walk across the street, which was directly across the street from Erakat's store. Simon and Land drove around the block, parked the van on Golden Gate Avenue near Larkin, and walked to Erakat's store. Harris remained standing across the street a few minutes and then walked across the street to Erakat's store. Harris saw no one inside the store. He walked inside.[32] Simon came out of the back room and told Harris not to let anyone into the store. A man came into the store. Harris met him at the doorway and told him the store was closed. Harris closed the front door of the store and placed a "closed" sign in the window of the door. Shortly thereafter a woman came to the store and asked whether Mr. "Saleem" was in, and Harris told her he was not. She left, returned and looked through the window, and then left again.[33] Harris testified that a couple of seconds later he heard a "pow" in the back room of the store. He walked to the back room of the store, looked in and saw Simon, Land and a man (Erakat) on the floor with blood coming out of him. Simon was standing over the man and holding a bag. Harris testified that he just stood there and looked at Erakat while Simon and Land walked out of the room. Harris said he then "hurried out of there." Simon and Land told Harris to wait and see that no one followed them. Simon and Land walked to the

---

[32]Harris admitted that when he testified before the grand jury he denied he was in Erakat's store. He explained that he had denied any involvement in the Erakat murder because he had not been granted immunity, had been told he would not be granted immunity if he had killed anyone, and that he was afraid his parole would be revoked if he said he was in Erakat's store at the time of the murder and robbery.

[33]The woman testified that she had gone to the store to purchase something. She observed a black man standing near the door which had a "closed" sign on it. The man was young, with medium to dark complexion, short neat hair. He was wearing a dark raincoat and she thought he had a black briefcase.

van parked on Golden Gate Avenue. Harris waited a couple of minutes and then joined Simon and Land in the van. Harris testified that Simon had a black briefcase and a small pistol. Simon, Land, and Harris then went to the Black Self Help store. Simon told Harris to start cleaning the store, but a short time later Simon told Harris he had to leave the store because Simon did not want Manney to find him there. Harris testified that he then walked to his girl friend's (Deborah Turner) apartment on Webster near Hickory Street, a distance of four to six blocks. Harris denied he took Erakat's wallet and wristwatch from Erakat's body.

About noon on the day of Erakat's murder, a city bus driver on the No. 5 McAllister Street line was checking his bus at the end of his route at Ocean Beach when he found Erakat's wallet stuffed in a rear seat of the bus.[34] He also found some of Erakat's credit cards and papers scattered on the floor of the bus. Later that day, he reported his findings to the police. He remembered that two black men had gotten on his bus at McAllister and Jones Streets, sat on the rear seat of the bus, and had gotten off at Fillmore. He thought one man resembled a person he knew (Henry Bonham). His description of the second black man did not match Harris.

Two days after the Erakat murder, Harris pawned Erakat's wristwatch, for $10, at a San Francisco pawn shop. Harris testified that he took the watch from the Black Self Help store because Manney owed him money.[35] When Harris pawned the watch he used his true name and the address of Black Self Help.

Simon and Land denied any involvement in the Erakat murder and robbery. They denied they saw Harris that day. The defense was alibi. On November 25, 1973, the Nation of Islam Temple 26 leased the auditorium and banquet hall at the Scottish Rite Memorial Temple at 19th and Sloat Boulevard, San Francisco. The lease provided for use of the facilities from 11 a.m. to 6 p.m. The main purpose of the meeting was to raise funds for construction of a hospital. The featured speaker was Minister Yusaf Hazziz, the former Joe Tex. Simon testified that he went to the Scottish Rite Temple about 9:40 a.m. that day (Nov. 25) to help prepare the auditorium and banquet hall for the meeting.[36] He

---

[34]The No. 5 McAllister Street line runs from the Trans Bay Terminal in downtown San Francisco, up Market Street to McAllister Street and west to the ocean. McAllister Street is one and one-half blocks from Erakat's store.

[35]The manager of the Empress Hotel testified, as a defense witness, that on November 27, she went to Harris' room and saw a watch with a gold band, a camera, and a suitcase, that when she returned to the room later everything was gone. She rented the room to another person on November 28, 1973.

[36]A rebuttal witness who was responsible for the lighting and sound systems at the Scottish Rite Temple on November 25, 1973, testified that he arrived at the temple shortly before 11 a.m., that a number of black people were outside the building, but that no one was allowed into the building until 11 a.m.

testified that he remained there until 6 p.m. or 6:30 p.m. He wore his FOI (Fruit of Islam) uniform,[37] and drove his Dodge Dart. Edward Land also denied any involvement in the Erakat murder and robbery. Land testified that about 10 a.m. on November 25 he went to the Scottish Rite Temple at 19th and Sloat Boulevard and was there until 6 p.m., except for a brief time around 11 a.m. when he went out to pick up some guests. Green and Moore and other witnesses testified that they also attended the meeting at the Scottish Rite Temple on November 25 and that Simon was there. Manney was also there, but Harris did not attend.

The defendants argued that Anthony Harris murdered and robbed Erakat by himself. The defense pointed out that no witness had seen more than one black man in Erakat's store at the time in question, that Harris' palm print was found on the inside knob of the door to the room in which Erakat was killed, and that Harris' numerous inconsistent statements to police and his perjured testimony before the grand jury concerning his noninvolvement in the Erakat murder rendered his testimony totally unreliable.

## VII. December 11, 1973—Murder of Paul Dancik

On December 11, 1973, about 9:45 p.m., 26-year-old Paul Dancik, a Caucasian, was shot and killed on the sidewalk near a public telephone in front of an apartment complex at 300 Haight Street between Buchanan and Page Streets. He was shot three times in the back and chest with a .32 caliber automatic pistol. Three .32 caliber shell casings were found a few feet from his body, and two .32 caliber slugs were removed from his body. Another .32 caliber bullet was found under his body. In the opinion of a firearms identification expert, the .32 caliber bullets that killed Dancik were fired from the same gun used to kill Erakat.

Anthony Harris testified that on a night in December 1973, about 9 p.m., he was standing at a bus stop on Haight Street, waiting for a bus to take him to his girl friend's apartment at Webster and Hickory Streets, when J.C. Simon and Manuel Moore drove up in Thomas Manney's black Cadillac and offered him a ride. Harris entered the car and sat on the back seat. Simon drove to the "projects" on Haight Street, parked the car and waited. Simon and Moore got out of the car. Simon told Harris to wait in the car. Harris saw Moore walk into some bushes near a public telephone at the entrance to the apartment complex. Simon walked to the "end of the car and stopped." Harris heard a gunshot. Simon ran back to the car. Moore ran out of the bushes between two buildings and back to the car. Simon immediately drove away to Hickory and Webster Streets, which was about two blocks away. There Simon and Moore got out of

---

[37]The Fruit of Islam is an organization of black men who are members in good standing of the Nation of Islam in North America.

the car and talked to two black men seated in a Cadillac similar to Clarence Jamerson's greenish-gold Cadillac. Simon and Moore returned to the car in which Harris was waiting, followed the other Cadillac to a Japanese store where Simon parked and told Harris to get out. Simon told Harris he would have to make it on his own.

Police responded to the reported shooting at 9:47 p.m. When they arrived at the scene they found Dancik's body on the sidewalk near the street. A Latin male, about 50 years old, approached the officers and told them two black men had walked up to Dancik and "just opened up on him." The man described one suspect as 20 years old, 5 feet 7 inches tall, 125 pounds, light skin, 2-inch Afro, wearing a navy-blue pea coat and blue jeans. He described the other suspect as about 20 years old, 5 feet 8 inches tall, 145 pounds, dark complexion, 3-inch Afro, wearing a navy-blue pea coat and blue jeans. He thought both men possibly had a .32 caliber automatic pistol.

Betty Owes and her daughter, Edna Thomas, were walking from the apartment complex at 300 Haight Street to a car parked in the driveway when Dancik was shot and killed. Mrs. Owes testified that she heard two gunshots. From a distance of about fifteen feet she saw two black men leaving the area of the telephone at the entrance to the apartment complex. Both men appeared to be about 22 or 23 years old. One had a pistol in his hand. He had a darker complexion than the other man, was about six feet two inches tall, slender, and wearing a long black maxicoat and a "flip or knit" hat. The other man was wearing a three-quarter length leather jacket and a brown knit hat. Edna Thomas, who testified as a defense witness, also heard two gunshots and then saw two black men run past her car and within three feet of her. One of the men had a gun. She described him as six feet two inches tall, very dark complexion, four-inch natural hair, mustache, wearing a black "Caesar's hat" with a wide brim. She described the second man as six feet two or three inches tall, dark brown complexion, wearing a long black coat and black high heel shoes. Neither Mrs. Owes nor her daughter identified any of the defendants.

The defense urged that the Dancik murder was drug-related and not a random shooting. There was, however, no substantial evidence to support that assertion.

VIII. DECEMBER 13, 1973— SHOOTING OF ARTHUR AGNOS; MURDER OF MARIETTA DIGIROLAMO

About 8:20 p.m. on December 13, 1973, Arthur Agnos, who was an assistant to Assemblyman Leo McCarthy, had just left a meeting with a community group at Wisconsin and 23d Streets, and was standing on the street next to his

car talking to 2 women when he was shot twice by a black man standing 10 or 12 feet away. Two bullets passed through Agnos' body (one through the chest left of his heart and one above his hip bone on the left side), front to back. Police found two .32 caliber shell casings and one copper casing at the place where the assailant fired the gun. In the opinion of a firearms identification expert, the .32 caliber bullets fired at Agnos were fired from the same gun used in the murders of Erakat and Dancik.

The gunman made no attempt to rob Agnos. Agnos got only a "fleeting glimpse" of the gunman's face. There was only one dim street light. Agnos thought the gunman was about five feet eight to ten inches tall, medium build, medium to fair complexion, with a modest natural haircut, and wearing a navy knit cap. He had a round face. Agnos was shown photographs of individual black men while he was in the hospital, and he attended the lineups in May 1974. Agnos could not identify his assailant. Nor did any other witness identify the gunman.

About 9:45 p.m. on December 13, 1973, 31-year-old Marietta DiGirolamo was shot and killed on the sidewalk at Haight and Divisadero Streets, San Francisco. She was shot in the back and chest three times with a .32 caliber automatic pistol. (People's Exhibit No. 60.) Police found three .32 caliber shell casings at the place of the shooting. Two .32 caliber slugs were removed from the body. In the opinion of a firearms identification expert, the bullets that killed Ms. DiGirolamo were fired from the same gun used to shoot Erakat, Dancik, and Agnos. Ms. DiGirolamo's purse was found next to her body. Nothing had been taken from her.

Gerald Bjork witnessed the shooting of Ms. DiGirolamo from a distance of 25 to 30 feet. He described the gunman as black, about 5 feet 10 or 11 inches tall, stocky, 180-185 pounds. Bjork identified Clarence Jamerson as the gunman, and testified that he was "90 percent" certain of his identification. The defense, however, called a police officer who had interviewed Bjork. The officer's note indicated that Bjork said he was walking on Divisadero, heard and saw a black man and a white woman arguing across the street, heard shots and saw the man run. Bjork reportedly said he could not see the man's face.

On cross-examination of Inspector Moses, the defense sought to show that the police, in investigating the murder of Marietta DiGirolamo, picked up a yellow balloon found on the street in a bus zone in the general area of the shooting. The defense argued that the balloon, together with other evidence that Ms. DiGirolamo had used narcotics, tended to show that the murder was drug-related and not a random killing. The trial court found that there was no connection between the balloon and Ms. DiGirolamo and ruled that no inference of drug usage by Ms. DiGirolamo could be inferred from the mere presence of a

balloon on the street. The court also noted that the autopsy of Ms. DiGirolamo showed no usage of narcotics or drugs. The court, therefore, ruled that the evidence was irrelevant and inadmissible.

On appeal Simon argues that the court erred in excluding the balloon and proffered evidence of Ms. DiGirolamo's drug usage. As the trial court found, however, there was no evidence that connected Ms. DiGirolamo with the yellow balloon. Nor was there any suggestion or evidence that the balloon contained or had contained narcotics or drugs. The proffered evidence did not attempt to show that Ms. DiGirolamo and the person who killed her were involved in a narcotic transaction at the time. We conclude, therefore, that the trial court did not abuse its discretion in ruling that the balloon and proffered evidence of drug usage were irrelevant and inadmissible. (Evid. Code, § 352; cf. *People* v. *Manson* (1976) 61 Cal.App.3d 102, 157-158 [132 Cal.Rptr. 265], cert. den., 430 U.S. 986 [52 L.Ed.2d 382, 97 S.Ct. 1686].)

IX. DECEMBER 20, 1973—MURDER OF ILARIO BERTUCCIO; SHOOTING OF TERESA DEMARTINI

At approximately 8 p.m. on December 20, 1973, 81-year-old Ilario Bertuccio was shot and killed on the street in the 2000 block of Bancroft Street, which is in the Bay View area (southeast) of San Francisco. He was shot four times in the chest and right shoulder. (People's Exhibit No. 61.) Police found four .32 caliber shell casings at the place of the shooting. One .32 caliber slug was removed from Bertuccio's body. In the opinion of a firearms identification expert, the bullets that killed Ilario Bertuccio were fired from the same gun used to shoot Erakat, Dancik, Agnos, and DiGirolamo.

The shooting of Bertuccio was heard by 18-year-old Gaetano Bernado who lived nearby with his parents. He looked out a window of his home, saw a man lying on the street and a black man running down the street to a white car that was similar to Green's white Dodge Dart. Bernado saw another black man sitting in the car. The man running down the street entered the car and it was driven away quickly with its lights off. Bernado described the man who ran down the street as approximately 5 feet 10 inches or 6 feet tall, 170 to 180 pounds. Bernado picked Simon out of a lineup as the man who most resembled the man he saw run to the car. Bernado picked Moore out of the same lineup as the man who most resembled the man seated in the car. Bernado, however, did not identify Simon or Moore or any other defendant in court.

About 10 p.m. on December 20, 1973 (2 hours after the Bertuccio murder), 21-year-old Teresa DeMartini was parking her car on Central Street, between Grove and Fulton Streets, when she noticed a white car, with a black male driver, double-parked at Central and Grove. The white car, which was similar to Green's Dodge Dart, was driven to the corner of Central and Fulton Streets. Ms. DeMartini saw a second black man walk from Fulton to the white car. The two men talked and looked at her as she got out of her car. As DeMartini was locking her car the black man standing next to the white car walked to her car, pulled his hand with a pistol out of his coat pocket and shot her three times. As she fell to the ground, a fourth shot shattered the window on the driver's side of her car and the bullet lodged in the back of the front seat. The man, without taking DeMartini's purse or anything from her person, ran toward Fulton Street. While lying wounded on the street and calling for help, DeMartini saw a "big car" back out of a driveway and head toward her. To avoid being run over she rolled under her car. Preston Demmings, a nearby resident, heard the gunshots and a woman screaming, looked out the window of his residence, saw the woman lying on the street, saw a Cadillac with two black males back out of a driveway, saw the car being driven down Central and almost run over the woman who rolled under her car. The Cadillac resembled Clarence Jamerson's car.[38]

Ms. DeMartini described her assailant as black, about 26 years old, 5 feet 10 inches or 6 feet tall, medium build, with matted hair, wearing a long camel coat and a cream-colored ski cap. Police showed her photographs of individual black men while she was in the hospital, but she did not see her assailant's photograph among them. She assisted a police officer in drawing a composite sketch of her assailant, and that composite was received in evidence by stipulation. (Defendants' joint exhibit No. V.) In May 1974, DeMartini picked Moore out of a lineup as the man who most resembled her assailant, but she was not certain of her identification and did not identify Moore or any other defendant in court.

Police found three .32 caliber shell casings and one .32 caliber copper-jacketed bullet at the place of the shooting. A fourth bullet was recovered from the seat of DeMartini's car. In the opinion of a firearms identification expert, the .32 caliber bullets used in the shooting of Ms. DeMartini were fired from the same gun used in the shooting of Erakat, Dancik, Agnos, DeGirolamo, and Bertuccio.

---

[38]Dwight Stallings, a Black Self Help employee, apparently lived about two houses from Demmings on Central Street, but there was no evidence to implicate him in the shooting of Ms. DeMartini.

X. December 22, 1973—Murders of Neil Moynihan and Mildred Hosler

About 5 p.m. on December 22, 1973, a San Francisco police officer stopped a 1974 Fleetwood Cadillac at Grove and Webster Streets to issue a traffic citation. Leonard Vaughn, a 200-pound black man, was the driver and another black man, who resembled Anthony Harris, was the only passenger. While the officer was issuing the citation to Vaughn, defendants Simon and Moore walked up to Vaughn's car and started talking to the passenger. Simon was wearing a yellow hard hat (construction helmet), and Moore was wearing a green United States Army field jacket and wire-rim glasses. The officer ordered Moore and Simon to stand aside. He asked them for identification. Simon gave his residence as 844 Grove Street and Moore gave his residence as 542 Waller Street. Simon and Moore were then allowed to leave.

At approximately 8:10 p.m. on December 22, 1973, 19-year-old Neil Moynihan, a Caucasian, was shot in the head, neck and chest three times (People's exhibit No. 63) and killed at the 12th Street entrance to Stevenson Alley behind the Civic Center Hotel at 12th and Market.[39] A few minutes later, 50-year-old Mildred Hosler was shot and killed at the other end of Stevenson Alley near Gough and McCoppin Streets, about four blocks from where Moynihan was killed. Hosler was shot five times in the chest and abdomen. (People's exhibit No. 63.) Police found four .32 caliber shell casings at the place of the Moynihan shooting and four .32 caliber shell casings where Hosler was shot. One .32 caliber slug was removed from Moynihan's body and four .32 caliber slugs were removed from Hosler's body. In the opinion of a firearms identification expert, the bullets that killed Moynihan and Hosler were fired from the same gun used in the shooting of Erakat, Dancik, Agnos, DiGirolamo, Bertuccio, and DeMartini.

Immediately after the Moynihan shooting, two witnesses saw a black man running westward on Stevenson Alley. Witnesses described the man as about six feet tall, moderate to husky build, short (one-inch or two-inch) Afro hair style, wearing casual clothes. The man stopped and looked at one of the witnesses a couple of seconds, but the witness could not identify him.

Shortly after the Moynihan shooting, another witness (Carlos Paniagua) heard three or four gunshots, looked out a window and saw a woman (Hosler) lying on the sidewalk. He saw a man jump onto a concrete wall, turn and fire one or two shots at the wounded woman. Paniagua testified that the gunman "was not white," but he did not look black. The gunman was wearing a tight,

---

[39]Stevenson Alley is a short street in back of the Black Self Help store and parking lot at 1645 Market. At the time of Moynihan's murder, Douglas Burton, a Black Self Help employee, was living at the Civic Center Hotel.

waist-length jacket, and dark pants. He had "kind of curly, unkempt" hair, but not kinky hair. Paniagua identified no one.

Approximately 10 or 15 minutes before the Hosler shooting, Jack Frost and his wife were walking from a market to their apartment at 40 Gough Street. As they passed the entrance to Stevenson Alley Mr. Frost observed a parked white Dodge Dart. A person seated behind the steering wheel "scooted down" when he saw them. Frost saw a yellow or orange construction helmet in the Dodge Dart. A Black Self Help truck was parked behind the car. Frost had frequently seen Black Self Help employees wearing yellow or orange hard hats.

About 8:20 p.m. on December 22, two San Francisco patrol officers observed a white Dodge Dart with two black males at Octavia and Haight Streets. The officers followed the car as it turned onto Page Street, went around the block, onto Octavia, and stopped at Hickory Street. The passenger alighted from the car. He appeared to be a clean-cut, husky, black male, about six feet tall, dressed in dark clothes. He walked down the street and the driver of the car drove away. The officers followed the car, which was being driven by Simon, to his apartment at 844 Grove Street. The officers detained Simon and asked who was in the car with him. Simon said he had been alone for about half an hour, that he had come from Black Self Help where he worked.[40] Simon did not appear to be armed. He was wearing a three-quarter length dark coat, light-colored pants and shirt. The officers looked into Simon's car and saw Black Muslim newspapers and a yellow hard hat (construction helmet).

Two days later, on December 24, another San Francisco police officer stopped Green's Dodge Dart. Green was the driver and gave the officer permission to search the car. The officer searched for a gun, but found none. Two days later, on December 26, another officer stopped the Dodge Dart. Simon was the driver. He gave his address as 349 Fillmore Street.

XI. JANUARY 28, 1974—MURDERS OF TANA SMITH, VINCENT WOLLIN, JOHN BAMBIC, JANE HOLLY; SHOOTING OF ROXANNE MCMILLIAN

On the afternoon of January 28, 1974, a Monday and a "slow day" at Black Self Help, Simon and Moore drove to Oakland in Manney's 1959 black Cadillac. About 4:30 p.m. Simon and Moore were returning to San Francisco when a California Highway Patrol (motorcycle) officer stopped Simon near the Bay Bridge toll plaza to issue a citation for defective equipment on the car. The officer noted that Simon had short hair, parted on one side, and no sideburns. After issuance of the citation, Simon and Moore returned to San Francisco. Moore was living with Simon at 844 Grove Street at the time.

---

[40]Simon testified that on December 22, 1973, about 8 p.m., he went to the Black Self Help store to get some food. He denied any involvement in the Moynihan and Hosler murders.

Anthony Harris testified that he worked at the Black Self Help store that day.[41] After work he went to see Larry Green at his apartment at 844 Grove Street. As he reached the apartment building Harris met Simon and Moore coming out of the building. They told Harris that Green was not home. Simon and Moore entered Manney's black, four-door Cadillac. They offered Harris a ride to the FOI (Fruit of Islam) house on Sutter near Divisadero Street.[42] Harris accepted the offer and entered the back seat. Harris testified that Simon drove to Geary and Divisadero, stopped and looked around a brief time, and then drove to Sutter and Divisadero where Harris alighted from the car and proceeded to walk to the FOI house. Harris observed that Simon drove down Sutter (eastward), turned right and drove back toward Geary Street. Harris testified that he went to the FOI house, stayed only a few minutes, and was walking back to Geary Street when he heard shots. Harris was on his way to the Muslim Temple at Geary and Fillmore.

Meanwhile, at approximately 7:35 or 7:45 p.m., 25-year-old Tana Smith, a Caucasian, was shot on the sidewalk in front of a store at the corner of Geary and Divisadero Streets. She was shot twice in the back with a .32 caliber pistol and died a short time later. (People's exhibit No. 92.) A motorist, 23-year-old David Benveniste, was driving slowly, behind a city bus, northbound on Divisadero at Geary Street when he heard the gunshots. He looked to his right and saw a black man with a gun standing over a woman lying on the sidewalk.[43] Benveniste was about 15 feet away. Benveniste described the gunman as a black man, about six feet tall, medium build, with a shaven area around his ears and temple. The man was wearing a hat with a wide brim and a paisley-printed scarf on the hat, a three-quarter length brown leather jacket, dark slacks, shoes and socks. Benveniste watched the gunman as he stood over the body of the woman and then run about 10 steps to the corner, eastward on Geary and then across Geary Street. Benveniste later telephoned Paula Mordhorst and told her he had witnessed a murder. He also described what he had seen to the police.

On May 1, 1974, Benveniste was in the hospital and unable to attend the lineups. Police later showed him photographs of the lineups and he picked out

---

[41]Black Self Help records show that on January 28, 1974, Anthony Harris and Larry Green were the only hourly employees who worked that day.

[42]Although not entirely clear, Harris was apparently living at or near the FOI house on Sutter Street at the time.

[43]Benveniste owned and operated a floral shop on California Street between Divisadero and Broderick. Paula Mordhorst worked in the shop part-time. About 7 p.m. on January 28, Benveniste closed his shop. He and Paula Mordhorst drove to Mount Zion Hospital at Post and Divisadero to deliver flowers to a patient. Benveniste and Ms. Mordhorst apparently had a romantic relationship and an argument. Benveniste dropped Ms. Mordhorst off at the hospital to make the delivery. She was going to walk to her home from there. Benveniste drove on down the street, crossed Geary, turned right on O'Farrell, then right on Divisadero and had just crossed the intersection at Geary and Divisadero when he witnessed the murder of Tana Smith.

Simon and Moore. Police then showed him a group of close-up photographs of individual black men (Black Self Help employees, including Anthony Harris) and Benveniste narrowed his identification to Simon. Benveniste was "reasonably sure" of his identification based on the photographs, but he wanted to see what the man looked like with a hat. Police then showed him a videotape of the lineups, which included the wearing of hats. The videotape of the lineup confirmed his identification of Simon. ██ ██ ██ ██ In court, Benveniste identified Simon as the man he saw shoot Tana Smith, stating that he was "90 percent" certain of his identification.[44] No other eye-witness connected Simon or Moore to the Tana Smith murder.[45]

Shortly after the Tana Smith shooting, Harris rejoined Simon and Moore at the Muslim Temple at Geary and Fillmore Streets. A few minutes later they entered Manney's black Cadillac and drove around the city. Simon was the driver. Moore was the passenger on the front seat and Harris sat on the back seat. Harris admitted he had taken a few "reds" about that time.

At approximately 7:55 p.m. on January 28, 69-year-old Vincent Wollin was shot and killed on the sidewalk on Scott Street between McAllister and Fulton Streets. He was shot twice, once through the heart, with a .32 caliber pistol.

---

[44]After Paula Mordhorst learned that Benveniste had testified at the trial and identified Simon as the person who shot Tana Smith, she telephoned defense counsel and told them Benveniste had told her he doubted whether he could identify the man who shot the woman at Geary and Divisadero Streets. She then so testified, as a defense witness, at the trial. On cross-examination, she conceded that her religious point of view was that a person should not "condemn another" (testify against a) person even if the person was guilty. She also conceded that her romantic relationship with Benveniste had terminated and that she did not work in his floral shop after February 14, 1975.

After Mordhorst had talked to defense counsel during the trial, Benveniste telephoned her on August 15, 1975. A substantial part of that conversation was recorded, with Benveniste's consent, in his apartment by two police inspectors. During the conversation Mordhorst asked Benveniste if the conversation was being recorded and he told her "yes," it was. She nevertheless continued the conversation. The defendants complained that the recording of the telephone conversation violated Ms. Mordhorst's constitutional right of privacy, and that the prosecution should not have been allowed to use the information in cross-examining her. The objection was overruled. The prosecution did not introduce the tape-recorded conversation in evidence. It was then introduced in evidence by the defense. Contrary to Green's argument on appeal, the recording of the telephone conversation between Benveniste and Mordhorst, with Benveniste's consent, did not violate Mordhorst's Fourth Amendment and other constitutional rights (*People v. Murphy* (1972) 8 Cal.3d 349, 358-362 [105 Cal.Rptr. 138, 503 P.2d 594]). Nor did it violate her right of privacy under article I, section 1, of the California Constitution, or the California Invasion of Privacy Act (Pen. Code, §§ 630-637.2). (See *People v. Ayers* (1975) 51 Cal.App.3d 370, 374-378 [124 Cal.Rptr. 283]; *People v. Montgomery* (1976) 61 Cal. App.3d 718, 731-732 [132 Cal.Rptr. 558]; see also *People v. Sloss* (1973) 34 Cal.App.3d 74, 83-85 [109 Cal.Rptr. 583].)

[45]Harris' testimony placed Moore and Simon together in the area at the time of Tana Smith's murder, but Harris was not with them at the moment and did not witness the murder.

(People's exhibit No. 93.) A woman, who was standing in front of her home across the street, witnessed the shooting. She described the gunman as a black man, about 6 feet tall, 165 pounds, slender, 25 to 30 years old, wearing a full-length overcoat and a hat with a brim. The gunman took nothing from the victim, and ran toward Fulton Street. The witness could not identify the gunman.

Shortly after 9 p.m. on January 28, 80-year-old John Bambic was shot and killed on the sidewalk near 9th and Howard Streets. He was shot twice in the back, once through the heart, with a .32 caliber pistol. (People's exhibit No. 94.) Two witnesses heard the shots, saw Bambic lying on the sidewalk, and saw a man running across the street to a black Cadillac parked at the service station. One witness described the car as having huge taillights, "like a big stream of red lights across it, like a juke box," as it drove out of the station and northbound on 9th Street. The same witness, who was walking on the sidewalk at the time of the shooting, described the gunman as a husky man, about 5 feet 10 inches tall, more than 160 pounds, wearing dark clothing, including a long coat. The witness could not tell the race of the man, but he was not a white man.

About 9:45 p.m. on January 28, 45-year-old Jane Holly was shot and killed in a laundromat at 1440 Silver Avenue near Brussels Street. (People's exhibit No. 95.) At the time, she was the only Caucasian among approximately 15 black people in the laundromat. Lonnie C. Green (not related to defendant Green), a black United States Navy serviceman, was in the laundry at the time. He was seated near the front door. He was reading when he heard someone hit the front door. He looked up and saw a black man, about 6 feet tall, about 25 years old, clean-shaven, wearing old scuffed work shoes ("farm type," "boondock type," high tops), and a black hat with a brim and gold band. The hat was a "floppy type hat," and worn tilted to one side. Green did not recall the other clothing the man was wearing. Green looked directly at the man, who looked directly at him. Green watched the man as he walked up behind Jane Holly who had her back turned and was removing clothing from a dryer. The man pulled a gun out of his waistband and shot Jane Holly twice in the back with a .32 caliber automatic pistol. The man said nothing, turned and walked out. Lonnie Green picked Moore out of a lineup as the person he saw shoot Jane Holly. Mr. Green identified Moore in court, and stated in effect that his identification of Moore was based on his observation of him in the laundromat at the time of the shooting.[46]

Anthony Harris testified that he was with Simon and Moore in Manney's black Cadillac at the time of the laundromat shooting. Harris testified that Simon drove to the area, parked, looked at the laundromat, returned to the car,

---

[46]Witness Lonnie Green testified: "The identification that I picked the man out in the lineup because he was the man I saw that shot the lady in the laundromat."

and then parked around the corner from the laundromat. Simon and Moore got out of the car while Harris waited in the car. Harris testified that he heard shots, that Simon and Moore came running back to the car, that in running to the car one of them bumped into two young women on the sidewalk in front of, or near, the laundromat. Simon and Moore got into the car and they drove off.

Other witnesses observed a 1959 black Cadillac near the laundromat at the time of the shooting of Jane Holly. A resident of the area saw a black man get out of the Cadillac and walk toward the laundromat at 1440 Silver Avenue. The witness described the man as in his "early 30's," 6 feet tall, thin, about 180 pounds, wearing a three-quarter length tan coat and hat.

Denise Norman, age 18, and her friend, Vera Lang, had just walked out of a different laundromat at the corner of Silver Avenue and Brussels and were on their way to their car when they heard two gunshots. A black man came running down the sidewalk, from the laundromat where the shooting occurred, bumped into Denise, and then ran to a black Cadillac parked around the corner. Vera Lang and Denise Norman heard someone in the car say, "Hey, man, come on, let's get out of here." Although Denise Norman and Vera Lang initially thought the black Cadillac was a two-door, they later said they did not pay much attention to the number of doors and that the 1959 black, four-door Cadillac (Manney's) police later showed them in the garage of the Hall of Justice was similar to the car they saw on the night of the shooting.

Denise Norman described the man who bumped into her as 6 feet 1 inch tall, slender, early 20's, short Afro, and wearing a coat. He held his hand under his coat. She was unable to identify either Moore or Simon. Vera Lang described the man as 6 feet 1 inch tall, about 25 years old, three-quarter length black leather jacket, dark slacks, black shoes, medium natural hair style, and hair around his mouth. She identified no one.

A few minutes after the shooting of Jane Holly in the laundromat at 1440 Silver Avenue, 23-year-old Roxanne McMillian was shot twice outside her home at 102 Edinburgh Street (Excelsior area), which is just off Silver Avenue and about 1.3 miles from 1440 Silver Avenue. Mrs. McMillian had gone to her car in front of the house to pick up an item and was walking back to the house when a black man walked up and said, "Hi." Mrs. McMillian said "Hi" and started up the stairs. The black man then shot her twice in the back with a .32 caliber pistol. One bullet passed through her body. The other struck her spine and caused paralysis from the waist down. Mrs. McMillian described the gunman as a black man, about 25 to 30 years, 5 feet 11 inches tall, 185-190 pounds, dark complexion, no hair on face, wearing a dark, suit-length coat, black hat with a large brim down over his face. She could not identify any of the defendants as the gunman. A resident in the area (Mrs. Carol Matison) heard

the gunshots, went to a window and saw a black man with short hair and heavy shoes running down the street and get into the passenger side of a dark blue or black Cadillac with large tail fins.[47] The man was wearing no coat or hat, only slacks and a long-sleeve shirt.

Anthony Harris testified that about five minutes after the laundromat shooting he was sitting in the back seat of the Cadillac (Manney's) when he heard more shots. Simon and Moore were out of the car and had walked across the street to a house. After the shots, Simon and Moore returned to the car and they drove away. They apparently then changed vehicles (from Manney's Cadillac to Green's Dodge Dart).

## A. *The Gun Used*

San Francisco police found two .32 caliber Winchester-Western shell casings at the place of the Tana Smith murder, and a .32 caliber slug was removed from her body. Police found two .32 caliber Winchester-Western shell casings at the place of the Vincent Wollin murder, but no slugs were found or removed from his body. Police found two .32 caliber Remington-Peters shell casings at the place of John Bambic's murder, and one .32 caliber slug was removed from his body. Police found two .32 caliber Remington-Peters shell casings at the place of Jane Holly's murder, and one .32 caliber slug was removed from her body. Police found two .32 caliber Remington-Peters shell casings and one .32 caliber bullet at the place of the McMillian shooting. In the opinion of two firearm identification experts, the bullets used in the murders of Tana Smith, Vincent Wollin, John Bambic, and Jane Holly, and the shooting of Roxanne McMillian on January 28, 1974, were fired from the same .32 caliber automatic pistol, but they were not fired from the gun used in the 1973 shootings of Erakat, Dancik, Agnos, DiGirolamo, Bertuccio, DeMartini, Moynihan and Hosler.

## B. *Alibi*

Simon and Moore denied any involvement in the alleged crimes committed on January 28, 1974. They testified that they were not with Harris that day or night. Simon, Moore, Green, Jamerson, and Burton all testified that on the night of January 28, 1974, they went to the Winterland auditorium at Post and Steiner Streets where they saw a closed circuit televised fight between Muhammad Ali and Joe Frazier. They all testified that they went to the fight in Clarence Jamerson's Cadillac, that before the fight started they sold "Muhammad Speaks" newspapers in front of the auditorium, that they attended the entire fight and then went home. Jamerson drove Burton to his apartment on Lyon Street. He then drove Green, Simon, and Moore to their apartments at 844

---

[47]The 1959 Cadillacs had large tail fins.

Grove Street. They all testified that they had obtained the tickets, which cost $12.50 each, from Thomas Manney, and that he also attended the fight with them.[48] Jamerson testified that after the fight, and after he had taken Burton, Green, Simon and Moore home, he drove Manney to Black Self Help. The manager of Winterland confirmed that the Muhammad Ali-Joe Frazier fight was televised at the auditorium on the night of January 28, 1974, that the main fight was preceded by an exhibition fight that started at 6:30 p.m., Pacific standard time, and that the main fight lasted 12 rounds. He did not remember the time the fight was over. Defendants thought the fight ended about 9:30 p.m. An officer investigating the shooting of Tana Smith at Geary and Divisadero, two blocks from Winterland, testified that the crowd leaving the fight interfered with their investigation.

## C. Sufficiency of the Evidence

■ Simon argues that the evidence was insufficient, as a matter of law, to support his conviction of the murder of Tana Smith. He argues that David Benveniste's identification testimony was "inherently unreliable." Benveniste's identification testimony, however, was evidence for the jury to weigh. (See *People* v. *Rist* (1976) 16 Cal.3d 211, 216 [127 Cal.Rptr. 457, 545 P.2d 833], and cases cited.) Benveniste testified that he was "90 percent sure" of his identification. The jury, after hearing all the conflicting evidence pertaining to the identification of Simon, concluded that it proved beyond a reasonable doubt that Simon killed Tana Smith. Testimony of one identification witness is sufficient. (See Evid. Code, § 411.) In light of established rules of appellate review (see *People* v. *Johnson, supra,* 26 Cal.3d 557; *People* v. *Green, supra,* 27 Cal.3d 1; *People* v. *Towler, supra,* 31 Cal.3d 105, 117-118), we cannot hold that the evidence was insufficient, as a matter of law, to support the jury's verdict.

■ Simon argues that the evidence was insufficient, as a matter of law, to support his conviction of the murder of Jane Holly. Although the evidence showed that Moore was the person who actually shot and killed Jane Holly in the laundromat at Silver Avenue and Brussels Street, there was substantial evidence that Simon aided and abetted Moore in the commission of that murder, and therefore he would be guilty as a principal. (Pen. Code, § 31.) Also, as a coconspirator, Simon would be guilty of the crime committed by his coconspirator. (See *People* v. *Harper, supra,* 25 Cal.2d 862, 870; *People* v. *Weiss* (1958) 50 Cal.2d 535, 563 [327 P.2d 527]; see also Perkins, *The Act of One Conspirator* (1974) 26 Hastings L.J. 337.) There was evidence that Moore used the same gun to kill Jane Holly that Simon used to kill Tana Smith.

---

[48]Thomas Manney did not testify whether he attended the fight or provided tickets to Simon, Moore, Green, and his other employees.

There was substantial evidence that Simon was the driver of the car in which Moore was transported to the laundromat where Jane Holly was killed. Harris testified that he was with Simon and Moore in Manney's black Cadillac at the time, and other witnesses tended to corroborate Harris' testimony.

■ Simon argues that the evidence was insufficient, as a matter of law, to support his conviction of the assault with a deadly weapon against Roxanne McMillian. Although there was no evidence whether Roxanne McMillian was shot by Moore or Simon, there was substantial evidence that they committed that crime. The same gun Simon used to kill Tana Smith and that Moore used to kill Jane Holly was used in the shooting of Mrs. McMillian. The shooting occurred within a few minutes after Simon and Moore left the scene of the laundromat murder, and it occurred 1.3 miles away at a place where they easily could have driven within that time. Moreover, a witness described the getaway car that matched the car used by Simon and Moore.

The evidence of the Roxanne McMillian shooting, however, did not establish that Simon was the person who used the gun in committing that crime, and therefore that finding must be stricken from the judgment. (*People* v. *Walker* (1976) 18 Cal.3d 232, 238-243 [133 Cal.Rptr. 520, 555 P.2d 306].)

Moore does not challenge the sufficiency of the evidence to support his convictions of the Tana Smith and Jane Holly murders or the assault on Roxanne McMillian.[49] Nevertheless, we note that there was substantial evidence that Moore conspired with, or aided and abetted, Simon in the murder of Tana Smith. Moore was positively identified as the person who killed Jane Holly. As previously stated, Simon and Moore used the same gun, and that gun connected Moore and Simon to the assault with a deadly weapon against Mrs. McMillian.

XII. April 1, 1974—Murder of Thomas Rainwater and Shooting of Linda Story

Shortly after 9 p.m. on April 1, 1974, two Salvation Army students, 19-year-old Thomas Rainwater and 21-year-old Linda Story, were walking to a market on Geary Street near Webster when they met a black man. As they passed, the black man turned around, pulled out a gun, shot Rainwater twice in the back and killed him instantly. (See People's exhibit No. 97.) The black man then shot Linda Story twice in the back; she survived. The gunman used a .32 caliber automatic pistol. Immediately after the shooting the gunman ran into some bushes and among the apartment buildings on the south side of Geary Street.

---

[49]Moore challenges the fairness of the identification procedures which is discussed later in this opinion.

Linda Story was unable to identify her assailant. Two residents in the area heard the gunshots, looked out the windows of their respective apartments and saw a black man with a gun run from the place of the shootings. The witnesses described him as about 6 feet tall, slender, 150 pounds, 25 to 30 years old, medium dark complexion, no facial hair. One witness thought she saw the man two or three days later in the market at Geary and Webster. A motorist also witnessed the shootings, stopped and assisted the wounded Linda Story, but she (the motorist) could not identify the gunman. Two plainclothed police officers happened to be in a public garage across the street at the time of the shooting. They ran to the scene and searched the area but found no suspect.

Police recovered four .32 caliber Remington-Peters shell casings at the place of the Rainwater and Story shootings. Two fragments of bullets were removed from Rainwater's body, and one .32 caliber slug was surgically removed from Linda Story's body. On the opinion of two firearms identification experts, the .32 caliber bullets used to shoot Rainwater and Story were fired from the same gun used in the shooting of Tana Smith, Vincent Wollin, John Bambic, Jane Holly, and Roxanne McMillian on January 28, 1974.

## XIII. APRIL 14, 1974—SHOOTING OF WARD ANDERSON AND TERRY WHITE

At approximately 9 p.m. on April 14, 1974, a Sunday, 18-year-old Ward Anderson and 15-year-old Terry White were waiting for a bus at the corner of Hayes and Fillmore Streets, San Francisco. A black man, later identified as Moore, walked to the bus stop. Anderson asked him for a cigarette. The man sort of "grunted," walked out into the street, looked down the street, turned around, walked back to where Anderson was standing, pulled out a gun and shot Anderson twice with a .32 caliber automatic pistol. The black man then walked 15 to 20 feet to where White was standing and shot him twice. The man then ran across the street and down Fillmore (southward) toward Grove Street.

Anderson was hospitalized about two weeks and then returned to his home in Mesa, Arizona. While in the hospital in San Francisco he was shown a number of "mug shots" but he identified no one. (Defendants' photographs were not among them.) While Anderson was at his home in Arizona, San Francisco police sent photographs of three lineups to a local police officer who showed them to Anderson. Anderson identified Moore from lineup number one as the man who had shot him. In July 1974, Anderson came to San Francisco and met with Inspector Coreris who showed him enlargments of the lineup photographs. Anderson again pointed to Moore in lineup number one and said, "That's the son-of-a-bitch that shot me." Anderson identified Moore in court and explained that his identification was based on his observation of Moore on the night of April 14, 1974, not on the lineup.

On May 2, the day after the defendants' arrests and the lineups, police showed photographs of the lineups to Terry White who was still hospitalized. White identified Moore in lineup number one as the man who had shot him. White testified that he told Inspector Coreris "that that was the man (Moore) that shot me, there was no question about it, and I still hadn't any questions, and he told me to go through it and make sure, and I went through them and I still said it was the same guy." White based his identification on Moore's face, not his hair. White was also shown individual photographs, including a photograph of Moore wearing wire-rim glasses. White again identified Moore as the man who had shot him, adding that Moore was not wearing glasses at the time of the shooting. White identified Moore in court.

Yolanda Williams, who was 17 years old at the time, had just parked her car in a bus zone on Fillmore Street north of Grove Street when she heard four gunshots. There was a pause between the first two shots and the second two shots. She then saw a black man run down the middle of Fillmore Street from the corner of Hayes. He stopped at the corner of Grove and Fillmore and put a handgun in "his side." She testified that she "got a good look at him." He was about 27 or 28 years old, "heavy build," 175 to 180 pounds, dark complexion, round face, 2 inches of hair on his head, wearing a beige or tan suit, white shoes, and no hat. She attended the lineups on May 1 and identified Moore in lineup number one as the man she had seen running down Fillmore at the time of the shooting. She picked him out "because he looked like the man." She identified no other persons from the three lineups. She identified Moore in court.

Police found four .32 caliber shell casings at the place of the Anderson and White shootings. One .32 caliber slug was surgically removed from Anderson, and one .32 caliber slug was surgically removed from one of White's arms. In the opinion of two firearms identification experts, the bullets used to shoot Ward Anderson and Terry White were fired from the same gun used in the shootings of Tana Smith, Vincent Wollin, John Bambic, Jane Holly, Roxanne McMillian, Thomas Rainwater, and Linda Story.

Moore and his wife, Gloria, testified that on April 14, 1974, they were at the temple (at Geary and Fillmore) from about noon until 7 or 7:30 p.m. They walked to a market at Geary and Webster Streets, purchased some groceries, and walked to their apartment at 1853 Divisadero Street, near Pine. About 8 p.m. they went out to look for a different apartment to rent and returned home about 9:30 p.m. Moore wore a beige suit that day. Moore testified that he also wore a topcoat, glasses, but no hat. Moore denied he owned or possessed a gun or that he was involved in the shooting of Anderson and White. Gloria testified that she had never seen her husband with a handgun.

The defense called a number of other witnesses who were in the area of Hayes and Fillmore at the time of the Anderson and White shootings. They heard what they thought were gunshots and saw a man run down the street. They gave varying descriptions of the man they saw running and the clothes he was wearing. Each witness conceded, however, that he or she did not get a good look at the man's face.

XIV. APRIL 16, 1974—MURDER OF NELSON SHIELDS

On the evening of April 16, 1974, 23-year-old Nelson Shields and his friend, Jonathan May (a pathologist engaged in cancer research at U.C.), played a game of Lacrosse at Funston (now Moscone) Playground in the Marina area (Chestnut and Laguna) of San Francisco. Shields, who owned a station wagon, then transported May to the house of Mr. and Mrs. Connor at 231 Vernon Street to pick up a carpet. They arrived at 231 Vernon Street about 9:30 p.m. While May was talking to Mrs. Connor at the entrance to her house, Shields opened the rear door of his station wagon. While at the rear of his vehicle, Shields was shot in the back three times. The bullets passed through his body, including his heart, a lung, and liver, and killed him instantly. (People's exhibit No. 99.) Police found three .32 caliber shell casings (Winchester-Western) across the street about 25 to 30 feet from the body of Shields. Two .32 caliber slugs were also found, one inside the cargo area of the station wagon and one on the street. In the opinion of a firearms identification expert, the .32 caliber bullets that killed Nelson Shields were fired from the same gun used in the shootings of Tana Smith, Vincent Wollin, John Bambic, Jane Holly, Roxanne McMillian, Thomas Rainwater, Linda Story, Ward Anderson, and Terry White.

Neither Jonathan May nor Mrs. Connor saw the man who shot Shields. Mrs. Connor had seen two black men sitting in a car outside her house about 15 minutes before May and Shields arrived. A 12-year-old girl, who lived nearby, heard the shots, looked out a window and saw a black man running on the sidewalk across the street. He ran up the hill to Shields Street where he turned the corner and disappeared from her view. She saw him put something in his belt, but she did not see his face. She described him as about 5 feet 11 inches tall, 190 pounds, wearing a blue jacket and blue jeans. He either had short hair or was wearing a cap pulled over his head.

A defense witness was outside his house at 701 Shields Street when he heard gunshots. Shortly thereafter a black man ran within three feet of him and to the entrance of the house at the corner of Shields and Ralston. The witness described the man as about 25 years old, slender, 150 to 160 pounds, 5 feet 10 inches tall, light complexion, wearing a "skull" cap. The man rang the doorbell of the house and yelled, "Let me in." A couple of minutes later, some-

one let him into the house. It was occupied by a Mrs. Wills and her grand-daughter, Jacqueline Arnold (age 20). Ms. Arnold testified, as a defense witness, that she lived with her grandmother and her grandmother's "man friend." They took care of four mentally retarded people. She testified that no one came to the door of their house on the night of April 16, 1974. She also mentioned that she knew Michael Armstrong.

At the time of the shooting, Simon's girl friend, Greta Burgess, lived in a rented apartment at 609 Shields Street, which was "around the corner" from the place of the murder of Shields.[50] Simon denied any involvement in the murder of Nelson Shields. He testified that on the night of April 16, 1974, he was at home. Greta Burgess did not testify.

## XV. April 27, 1974—Murder Weapon Found

On April 27, 1974, eight-year-old Cleon Jones and a friend were playing ball in the backyard of the Jones house at 621 Shields Street, San Francisco. The ball went over the backyard fence. Cleon climbed over the fence and, in look-ing for the ball, found a .32 caliber automatic pistol, a Model 70 Beretta with serial number A47469, under some bushes. Cleon picked up the gun and took it to his father in the house. Mr. Jones called the police and they picked up the gun. A couple of days later, a police inspector returned to the Jones residence and was shown where Cleon found the gun. The inspector found four live .32 automatic Winchester-Western bullets at the same place. The location was the backyard of the house at 275 Vernon Street. As previously described, Nelson Shields had been killed at 231 Vernon Street on April 16.

Mitchel Luksich, a firearms identification expert, test-fired the gun with the bullets found at the same location. He also examined the .32 caliber shell cas-ings recovered in the shootings of Tana Smith, Vincent Wollin, John Bambic, Jane Holly, Roxanne McMillian, Thomas Rainwater, Linda Story, Ward Anderson, Terry White, and Nelson Shields. In his opinion, all the .32 caliber bullets used in the shooting of those people were fired from the .32 caliber automatic pistol, Model 70 Beretta, with serial number A47469. Luksich also concluded that the .32 caliber shells used in the 1973 shootings of Erakat, Dan-cik, Agnos, DiGirolamo, Bertuccio, and DeMartini were not fired from the same gun used in the 1974 crimes.[51] Terry Coddington, another firearms iden-tification expert, reached the same conclusions.

---

[50]After Simon was arrested on May 1, 1974, Greta Burgess was the only female to visit him in jail. Between May 19 and December 4, 1974, she visited him 41 times.

[51]The .32 caliber automatic pistol used in the 1973 crimes was never found by police.

## XVI. Murder Weapon Traced to Thomas Manney and Black Self Help

On July 31, 1968, Peter Puppo purchased a .32 caliber automatic pistol, Model 70 Beretta with serial number A47469, at a J.C. Penney Store in Tacoma, Washington. He was stationed in the United States Air Force at that time. In March 1973, Puppo lived in San Francisco with Bradford Bishop. Puppo gave the gun to Bishop as a result of losing a wager. Bishop sold the gun to Edmond St. Andre in April 1973. Richard Arzave, a friend of Edmond St. Andre, admitted he took the gun from St. Andre's home in April 1973. Three days later, Arzave sold the gun to David Bonelli, a pharmacist at 1607 Twentieth Street, San Francisco. Two or three days later, Bonelli sold the gun to Moo Moo Tooa, a 60-year-old Samoan who was in poor health and a regular customer at Bonelli's pharmacy. Moo Moo Tooa pawned the gun at the San Francisco Loan Association at 35 Sixth Street on May 5, 1973, and reclaimed it on August 30, 1973. In late October 1973, Michael Armstrong purchased the gun from Moo Moo Tooa and sold it to Thomas Manney, owner and manager of Black Self Help.[52] Manney denied he purchased or owned any gun.

In April 1974, Simon purchased a .38 caliber special from Michael Armstrong for $45. The transaction took place on Vernon Street (Ingleside) in the area where Nelson Shields was killed on April 16, 1974. The record is not clear whether the transaction took place before or after April 16.

## XVII. Joint Legal Representation of Green and Moore; Asserted Conflict of Interest

At the trial, Cooks was separately represented by court-appointed counsel, Mr. Roger W. Pierucci. Simon was separately represented by Mr. John F. Cruikshank, Jr., Green and Moore were jointly represented by Mr. Clinton W. White and Mr. Edward W. Jacko, Jr., a New York lawyer who appeared as counsel *pro hac vice* (Cal. Rules of Court, rule 983). Counsel for Green, Moore, and Simon were retained with financial assistance from the Nation of Islam.

 On appeal, Green and Moore argue that there was a conflict of interest in the joint representation, that the purported pretrial waivers of any potential conflict of interest in favor of proceeding with counsel of their choice were ineffective, and therefore they were denied their right to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution and article I, section 15, of the California Constitution.

---

[52]Moo Moo Tooa died in September 1974, and thus the only evidence that Moo Moo Tooa sold the gun in question to Armstrong was the testimony of Armstrong. The pawn shop documents show that Moo Moo Tooa pawned the gun with serial number A47469.

■ In a criminal case, a defendant's constitutional right to counsel at trial does not include an automatic right to separate counsel for each codefendant. (*People* v. *Chacon* (1968) 69 Cal.2d 765, 773-774 [73 Cal.Rptr. 10, 447 P.2d 106].) One counsel may represent more than one defendant if the representation is effective and free of conflicting interests. (*People* v. *Chacon, supra*; *In re Watson* (1972) 6 Cal.3d 831, 842 [100 Cal.Rptr. 720, 494 P.2d 1264]; *People* v. *Cook* (1975) 13 Cal.3d 663, 670-672 [119 Cal.Rptr. 500, 532 P.2d 148], cert. den., 423 U.S. 870 [46 L.Ed.2d 100, 96 S.Ct. 135]; *People* v. *Barboza* (1981) 29 Cal.3d 375, 378 [173 Cal.Rptr. 458, 627 P.2d 188]; *Glasser* v. *United States* (1942) 315 U.S. 60, 70 [86 L.Ed. 680, 699, 62 S.Ct. 457]; *Holloway* v. *Arkansas* (1978) 435 U.S. 475, 481-483 [55 L.Ed.2d 426, 432-433, 98 S.Ct. 1173]; *Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 345-350 [64 L.Ed.2d 333, 344-348, 100 S.Ct. 1708].) Where counsel represents two or more defendants, effective representation is denied when, among other instances, counsel must take preferential action or exercise preferential judgment in order to better represent one defendant to the prejudice of a codefendant. (*In re Watson, supra*, 6 Cal.3d at p. 842; *People* v. *Cook, supra*, 13 Cal.3d at p. 670.)

■ When a trial court undertakes to appoint counsel for indigent codefendants, it must assume the burden of assuring that its appointment does not result in a denial of effective counsel because of some possible conflict. (*People* v. *Cook, supra*, 13 Cal.3d 663, 671.) On the other hand, where multiple defendants freely and voluntarily retain joint counsel the trial court need not initiate an inquiry into the propriety of multiple representation. (*Cuyler* v. *Sullivan, supra*, 446 U.S. 335, 346-348 [64 L.Ed.2d 333, 345-347]; see also *People* v. *Cook, supra*, 13 Cal.3d at pp. 671-672; *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 620, fn. 12 [180 Cal.Rptr. 177, 639 P.2d 248].) Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the trial. (*Cuyler* v. *Sullivan, supra*; *Maxwell* v. *Superior Court, supra*, 30 Cal.3d at p. 620, fn. 12.) Nevertheless, a trial court's inquiry as to potential conflicting interests of codefendants jointly represented by retained counsel may be appropriate (*People* v. *Cook, supra*, 13 Cal.3d 663, 672, fn. 7), provided the inquiry does not interfere with the defendants' right to counsel of their choice (see *Maxwell* v. *Superior Court, supra*, 30 Cal.3d at p. 613).

■ As a general rule, "the mere possibility of a conflict does not warrant pretrial removal of competent counsel in a criminal case over defendant's informed objection. When the possibility of significant conflict has been brought to the court's attention and the danger of proceeding with chosen counsel has been disclosed generally to defendant, he may insist on retaining his attorneys if he waives the conflict knowingly and intelligently for purposes of the criminal trial." (*Maxwell* v. *Superior Court, supra*, 30 Cal.3d 606, 619; see also *In re Noday* (1981) 125 Cal.App.3d 507, 516-519, hg. den [178 Cal.Rptr. 653].)

In this case, Green, Moore, and Simon were jointly represented by Mr. Clinton White at their arraignment and during the months before trial. Early in the proceedings, however, Mr. White informed the court that because of the complexities of the case at least one and probably two more attorneys would join him in the representation of Green, Moore, and Simon. In September 1974, Mr. White informed the court that Mr. Edward Jacko, of New York, would definitely be participating as joint counsel. Although not a member of the Nation of Islam himself, Mr. Jacko had been retained in a number of cases to defend members of the Nation of Islam in criminal trials throughout the country. Mr. White told the court that Mr. Jacko would head the defense team of lawyers.

During the pretrial proceedings, Judge Joseph Karesh asked Mr. White whether there was any potential conflict of interest in jointly representing Green, Moore, and Simon. Mr. White stated that in his opinion there was no conflict "in terms of overall innocence," but conceivably there could be some conflict as between Moore and Simon insofar as it involved cross-examination of witnesses on the issue of identification. In response to the court's question about impermissible joint representation of codefendants with conflicting interests, Mr. White said it would depend on whether the defendants were fully apprised of the potential conflict and waived it. The court then advised Moore, Simon, and Green individually that Mr. White had indicated that there was a potential conflict of interest in jointly representing each of them, and that they each had the right to separate court-appointed counsel if they could not afford counsel and wanted separate counsel. The court gave the defendants about a week (to Sept. 6, 1974) to inform the court of their decision.

A week later, the defendants appeared with counsel before Judge Morton Colvin, the master calendar judge. Judge Colvin was informed that there was a potential conflict of interest in the joint representation of Green, Moore, and Simon. The court then advised Moore, Simon, and Green as follows:

"Mr. Moore, by a potential conflict, it means simply this, that in the preparation by Mr. White of the case for Mr. Moore, for yourself, Mr. Simon and Mr. Green, it may be that in preparing a defense for Mr. Simon and Mr. Green, it may be necessary to prepare a defense which might possibly prejudice your interests. Do you understand that?

"DEFENDANT MOORE: Yes, sir.

"THE COURT: And you also understand that you are entitled to separate counsel, and if you can't afford one, the Court will appoint one for you. Do you understand that?

"DEFENDANT MOORE: Yes, sir.

"THE COURT: Bearing all that in mind, do you have any objection to Mr. White proceeding to represent both you, Mr. Simon and Mr. Green?

"DEFENDANT MOORE: No, sir.

"THE COURT: All right.

"And, Mr. Simon, by way of possible potential conflict, it means that Mr. White, in the preparation of his case for Mr. Moore and Mr. Green, may have to prepare a defense for Mr. Moore and Mr. Green which may possibly prejudice your interests. Do you understand that?

"DEFENDANT SIMON: Yes, Sir.

"THE COURT: And you also understand that you are entitled to separate counsel, and if you cannot afford one, the Court will appoint one for you. Do you understand that?

"DEFENDANT SIMON: Yes.

"THE COURT: Having that in mind, do you have any objection to Mr. White continuing to represent both you, Mr. Moore and Mr. Green?

"DEFENDANT SIMON: No.

"THE COURT: All right.

'And, Mr. Green, by way of a possible potential conflict, it means that Mr. White, in the preparation of his defense of Mr. Moore and Mr. Simon, may have to put forward a defense that might possibly prejudice your interests. Do you understand that?

"DEFENDANT GREEN: Yes, sir.

"THE COURT: And you also understand that you are entitled to separate counsel, and if you can't afford one, the Court will appoint one for you?

"DEFENDANT GREEN: Yes, sir.

"THE COURT: And having all that in mind, do you have any objection to Mr. White continuing to represent both you, Mr. Moore and Mr. Simon?

"DEFENDANT GREEN: No, sir.

"THE COURT: And, Mr. White, is it agreeable with you that you continue to represent both Mr. Moore, Mr. Simon and Mr. Green?

"MR. WHITE: Yes, sir, it is, your Honor."

On September 11, 1974, Mr. Jacko appeared with Mr. White and applied for leave to appear as counsel *pro hac vice.* The court found the application in order. The court asked Moore, Simon, and Green individually whether they consented and desired both Mr. White and Mr. Jacko to represent them, and each defendant said, "Yes, sir."

In October 1974, Mr. White informed the court that Mr. John Cruikshank would be joining the defense lawyers as a third lawyer for Green, Moore, and Simon, and that Mr. Cruikshank might separately represent one of the defendants. On November 13, 1974, Mr. White and Mr. Cruikshank appeared as attorneys for Green, Moore, and Simon.

A few days before commencement of trial on March 3, 1975, Mr. White and Mr. Cruikshank submitted to the court a substitution of attorneys whereby Mr. Cruikshank would be substituted as attorney for Simon in place of Mr. White (and Jacko). (See Code Civ. Proc., § 284.) Mr. Cruikshank was prepared to proceed and did not ask for a continuance. Judge Karesh refused to accept the substitution of attorneys, stating that Green, Moore, and Simon were entitled to joint representation by Mr. White, Mr. Jacko, and Mr. Cruikshank. While the jury was being selected, Simon petitioned the Court of Appeal, First Appellate District, for a writ of mandate to compel the superior court to accept and file his substitution of attorneys. The Court of Appeal denied the petition. Simon then filed his petition in the California Supreme Court which granted the petition and ordered the issuance of a peremptory writ of mandate. The Supreme Court ordered that Simon be represented by Attorney Cruikshank and that codefendants Moore and Green be jointly represented by Attorneys White and Jacko on condition that codefendants Moore and Green and Attorney Jacko file their written consent to the substitution. (*Simon v. Superior Court* (1975) 13 Cal.3d 864 [120 Cal.Rptr. 75, 533 P.2d 203].)

Presentation of evidence commenced on April 15, 1975. Thereafter, no question about conflict of interest arose during the trial.[53]

---

[53]Simon asserts that his attorney, Mr. Cruikshank, was never introduced to the jury as Simon's attorney, and thus the trial judge circumvented Simon's rights by not directly recognizing his trial counsel. The assertion, however, is based on a misreading of the record which shows that immediately before the commencement of the presentation of evidence Mr. Cruikshank introduced himself to the jury and said he was the attorney for Mr. Simon.

On appeal from a judgment of conviction, the defendant (appellant), in order to demonstrate a violation of his Sixth Amendment rights due to a conflict of interest in joint representation, must establish that an actual conflict of interest adversely affected his lawyer's performance. The mere "possibility of conflict is insufficient to impugn a criminal conviction." (*Cuyler* v. *Sullivan, supra,* 446 U.S. 335, 350 [64 L.Ed.2d 333, 348].)

Green and Moore argue that there was an actual conflict of interest. Green argues that because Moore was identified by certain witnesses, he (Green) was prejudiced by the joint representation. Moore argues that because certain witnesses' descriptions of the suspect tended to resemble Green rather than him (Moore), his (Moore's) counsel could not fully and effectively cross-examine the witness without prejudice to either Green or himself (Moore). A review of the record fails to show, however, that any significant conflict of interest developed between Green and Moore. They were not accused of the same crimes, except for the conspiracy count to which they had a common defense. Moore was not implicated in the Hague crimes, and Green was not implicated in the crimes committed by Moore on January 28 and April 14, 1974. Moreover, the record shows that counsel for Green and Moore cross-examined all the eyewitnesses at length on all aspects of the identification issue.

The trial court imposed the rule that only one attorney would be allowed to cross-examine each witness on behalf of each defendant, and that only one of the two prosecutors (Mr. Dondero and Mr. Podesta) would be allowed to cross-examine each witness on behalf of the People. The court did allow all the attorneys to make opening statements and closing arguments. Green now argues that the rule allowing only one attorney (Mr. White or Mr. Jocko) to cross-examine each witness resulted in a denial of effective assistance of counsel due to the conflict of interest. We find no merit in that contention because no significant actual conflict of interest developed between Green and Moore.

Moore suggests that Mr. Jacko's primary interest was in protecting the Nation of Islam rather than Moore's interests. We find no merit in that suggestion. Moore's interests were not inconsistent with the interest of the Nation of Islam. The record shows that Mr. Jacko and Mr. White represented Moore and Green vigorously and effectively.

In any event, assuming arguendo that there was an actual conflict of interest in the joint representation of Green and Moore, the defendants waived the conflict in order to be represented by two retained and highly experienced counsel of their choice. Green and Moore argue that their respective waivers of the conflict of interest were ineffective because the court did not adequately explain the conflict of interest to them and did not adequately inquire whether they understood the consequences of the waiver. Although the defendants may not

have understood all the legal implications of a conflict of interest, the record shows that they were advised of the possibility of a conflict, that their counsel might have to prepare a defense for one that might be prejudicial to the other, and that they were, therefore, entitled to court-appointed counsel if they could not afford to retain counsel and wanted separate counsel. Green and Moore did not want court-appointed counsel. They said they wanted to be represented by Mr. White and Mr. Jacko despite any potential conflict of interest. We are satisfied that Green and Moore knowingly and intelligently waived any conflict of interest.

■ Green also argues that the trial court misinterpreted rule 983 of the California Rules of Court and thereby denied him the right to separate counsel.[54] Green argues that the court misinformed Mr. Jacko that to appear as counsel *pro hac vice* he would have to associate a California attorney who would appear at trial with Mr. Jacko. Green argues that rule 983 merely requires association of an active member of the State Bar of California and does not require him to appear in court every day. Green argues that Mr. Jacko could have associated another local attorney, other than Mr. White, thereby providing each defendant separate counsel. Green's argument, however, is based on a misinterpretation of rule 983. When an out-of-state attorney associates a California attorney, pursuant to rule 983, the California attorney has a legal and ethical responsibility for seeing that the defendant, in a criminal case, is effectively represented. A perfunctory association, with no regular appearance at trial, would not fulfill that obligation. Moreover, Green's argument is not supported by the record. Mr. White and Mr. Jacko intended to jointly represent Green and Moore. At no time did the defense lawyers indicate that they wanted to bring in a fourth defense lawyer so each defendant would be separately represented. The defense lawyers told the court they did not have the money to hire a fourth lawyer.

Accordingly, we conclude that Green and Moore were not denied their constitutional right to effective assistance of counsel as a result of any potential or actual conflict of interest in the joint representation.

---

[54]Rule 983(a) provides: "A person who is not a member of the State Bar of California but who is a member in good standing of and eligible to practice before the bar of any United States court or of the highest court in any state, territory or insular possession of the United States, and who has been retained to appear in a particular cause pending in a court of this state, may in the discretion of such court be permitted upon written application to appear as counsel *pro hac vice,* provided that an active member of the State Bar of California is associated as attorney of record. No person is eligible to appear as counsel *pro hac vice* pursuant to this rule if (1) he is a resident of the State of California, or (2) he is regularly employed in the State of California, or (3) he is regularly engaged in substantial business, professional, or other activities in the State of California. Absent special circumstances, repeated appearances by any person pursuant to this rule shall be a cause for denial of an application."

XVIII. Motion to Set Aside the Indictment

Simon contends that the trial court erred in denying his motion to set aside the indictment (Pen. Code, § 995). In contending that the evidence was insufficient to hold him to answer, Simon argues that the evidence was insufficient because it consisted only of the uncorroborated testimony of Anthony Harris and identification testimony of one witness (David Benveniste) who was "only 90 percent positive" of his identification.

Penal Code section 1111 provides that "a conviction" may not be based solely on the uncorroborated testimony of an accomplice. Section 1111 does not apply to the sufficiency of evidence to hold a defendant to answer. (*People* v. *McRae* (1947) 31 Cal.2d 184 [187 Cal.Rptr. 741]; *People* v. *Manson, supra,* 61 Cal.App.3d 102, 167.) In other words, the uncorroborated testimony of an accomplice may be sufficient to hold a defendant to answer.

Moreover, contrary to Simon's assertions, the identification testimony of David Benveniste was sufficient to hold Simon to answer the charge of murdering Tana Smith. Testimony of other witnesses who testified before the grand jury tended to connect Simon with the other crimes. Accordingly, the trial court properly denied Simon's motion to set aside the indictment.

XIX. Motions to Suppress Evidence (Simon's Binder); Validity of Search Warrant

Green, Moore, and Simon contend that the trial court erred in denying their motions to suppress evidence (Pen. Code, § 1538.5), particularly Simon's binder (People's exhibit No. 16), which police seized pursuant to execution of a search warrant.[55] The contents of Simon's binder tended to support the prosution's theory that the defendant conspired to kill white people. The binder also tended to corroborate the testimony of Anthony Harris who said that when he attended meetings in Simon's apartment Simon read from a binder and talked about killing white people.[56]

---

[55]Cooks made a separate motion to suppress evidence, specifically the .22 caliber automatic pistol seized from him at the time of his arrest for the murder of Frances Rose. He also challenged the validity of the search warrant. His motion was denied. He does not argue the search and seizure issues on appeal.

[56]Simon's binder was a black, three-ring, loose-leaf binder. A photograph of the Honorable Elijah Muhammad was taped on the cover. Simon's name and former address appeared on the inside cover. The binder contained advertisements of the Black Self Help Moving and Storage Company and other Muslim enterprises such as the Shabazz bakeries. It contained photographs of Simon, the Black Self Help employees in front of a Black Self Help moving van, and a photograph of the uniformed FOI (Fruit of Islam) members. It also contained lists of names and officials of the "Muhammad University of Islam Number 26," announcements of featured speakers at Muslim events, a Muslim newspaper, and Muslim religious and educational material.

## A. *The Search Warrant and Its Execution*

On April 30, 1974, San Francisco Municipal Court Judge Eugene Lynch issued a search warrant based on three affidavits of San Francisco Police Inspectors Gus Coreris, Edward Erdelatz, and William Armstrong. The warrant authorized a nighttime search of the apartments of Green and Simon, the Black Self Help store at 1645 Market Street, all Black Self Help moving vans and trucks, Green's Dodge van, the white Dodge Dart used by Simon and Green, Thomas Manney's black, four-door Cadillac, and a 1970 Cadillac registered to Albert Lawyer Leonard. The warrant authorized a search for 22 specific items listed in Inspector Coreris' affidavit, including guns, machetes, knives, rope, twine, baling wire, plastic bags, a black attache case, and four items of property stolen from Richard and Quita Hague and Saleem Erakat.

About 5 a.m. on May 1, 1974, a number of San Francisco police officers went to 844 Grove Street and to the Black Self Help store to execute the search warrant. Simon and Green were in their respective apartments at the time. They were arrested. In searching Simon's apartment, Inspector Carl Klotz observed a black attache case next to a nightstand in Simon's bedroom. Inspector Klotz opened the attache case and found Simon's binder. ■■■■ He opened the binder, examined its contents, and seized it.[57]

In addition to the binder, the police seized two swords and scabbards and a piece of rope in Simon's apartment. The inventory lists no items as seized from Green's apartment. The police found no guns in the apartments and cars of either Green or Simon.[58] Nor did they find any guns at the Black Self Help store or in Black Self Help vehicles. The police seized a number of items at the Black Self Help store, including an axe, a machete, five knives, a spear, a hatchet, a handsaw, rope, wire, and quilted pads. None of those items, however, was introduced in evidence at the trial. The police seized a Polaroid camera and other items from Albert Leonard's Cadillac, but those items were not introduced in evidence. Miscellaneous items (receipts, traffic citations) were seized from the other vehicles, but nothing incriminating.

## B. *Probable Cause; Reliability of Information From Untested Informant*

■■ Defendants argue that the affidavits in support of the search warrant were insufficient, as a matter of law, to establish probable cause for the search

---

[57]The inventory, on return of the search warrant, does not mention the black binder seized from Simon's apartment. No objection to the incomplete inventory was made in the trial court. Failure to file an inventory, as required by Penal Code section 1537, does not render the warrant ineffective or require exclusion of the seized property from evidence. (*People* v. *Phillips* (1958) 163 Cal.App.2d 541, 548 [329 P.2d 621], overruled on another point in *People* v. *Butler* (1966) 64 Cal.2d 842 [52 Cal.Rptr. 4, 415 P.2d 819].)

[58]Inspector Klotz did observe a can of gun oil in Simon's apartment.

in that the affidavits failed to set forth facts showing the reliability of the information provided by the informant, Anthony Harris. For an affidavit based on an informant's hearsay statement to be legally sufficient to support the issuance of a search warrant, the affidavit must (1) allege the informant's statement in language that is factual rather than conclusionary, (2) establish that the informant spoke with personal knowledge of the matters contained in his statement, and (3) contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the information was credible or reliable. (*Aguilar* v. *Texas* (1964) 378 U.S. 108, 114 [12 L.Ed.2d 723, 729, 84 S.Ct. 1509]; *Spinelli* v. *United States* (1969) 393 U.S. 410, 413 [21 L.Ed.2d 637, 642, 89 S.Ct. 584]; *People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681]; *People* v. *Benjamin* (1969) 71 Cal.2d 296, 301 [78 Cal.Rptr. 510, 455 P.2d 438]; *People* v. *Scoma* (1969) 71 Cal.2d 332, 336-338 [78 Cal.Rptr. 491, 455 P.2d 419]; *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 152 [81 Cal.Rptr. 613, 460 P.2d 485]; *Price* v. *Superior Court* (1970) 1 Cal.3d 836, 840 [83 Cal.Rptr. 369, 463 P.2d 721]; *People* v. *Superior Court (Johnson)* (1972) 6 Cal.3d 704 [100 Cal.Rptr. 319, 493 P.2d 1183]; *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 892-896 [101 Cal.Rptr. 375, 495 P.2d 1295], cert. den., 409 U.S. 982 [34 L.Ed.2d 246, 93 S.Ct. 318]; *Alexander* v. *Superior Court* (1973) 9 Cal.3d 387, 390-395 [107 Cal.Rptr. 483, 508 P.2d 1131]; *People* v. *Kurland* (1980) 28 Cal.3d 376, 392 [168 Cal.Rptr. 667, 618 P.2d 213], cert. den., 451 U.S. 987 [68 L.Ed.2d 844, 101 S.Ct. 2321].)

Although information given by an untested informant is not sufficient, by itself, to constitute reasonable cause for an arrest or search, such information may be sufficient if corroborated "in essential respects" by other facts, sources or circumstances. (*People* v. *Lara* (1967) 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202], cert. den., 392 U.S. 945 [20 L.Ed.2d 1407, 88 S.Ct. 2303]; *People* v. *Fein* (1971) 4 Cal.3d 747, 752 [94 Cal.Rptr. 607, 484 P.2d 583]; *Jones* v. *United States* (1960) 362 U.S. 257, 269-271 [4 L.Ed.2d 697, 707-708, 80 S.Ct. 725].) As the Supreme Court explained in *People* v. *Lara, supra,* the "corroboration need not itself amount to reasonable cause to arrest [or search]; its only purpose is to provide the element of 'reliability' missing when the police have had no prior experience with the informant. Accordingly, it is enough if it gives the officers reasonable grounds to believe the informant is telling the truth, for in this type of case the issue is 'not whether the information obtained by the officers emanated from a reliable source, but whether the officers could reasonably rely upon that information under the circumstances.'" (67 Cal.2d at pp. 374-375.) While the court made these statements in the context of a warrantless arrest based on information from an untested informant, the statements are also applicable to affidavits in support of a search warrant.

The affidavits in this case consist of approximately 16 typewritten pages of factual information. The affidavit of Inspector Coreris consists of 10 typewrit-

ten pages, including about 6 pages of factual information supplied by Anthony Harris. The other four pages state facts obtained by his independent investigation of the crimes, including the vehicles owned by the suspects, and the places where they resided and worked. Coreris' affidavit stated in substance that police had the Black Self Help store and the suspects under surveillance for the preceding three days.

Inspector Coreris' affidavit identified Anthony Harris as a black male, 28 years old, with two prior prison terms for burglary and assault on police officers. It stated that Harris was released from prison in "October" 1973. It includes Harris' statement that he joined the Muslim religion while in prison, went to work for the Muslims when he was released, and worked at Black Self Help in San Francisco. The affidavit sets forth Harris' detailed factual statement describing his presence with Green and Cooks on October 20, 1973, the attempted kidnap of the three children and the crimes against Richard and Quita Hague. The affidavit includes Harris' factual statement about the robbery and murder of Saleem Erakat on November 25, 1973, and Simon's participation in those crimes. It includes facts about the murder of Paul Dancik on December 11, 1973, the shooting of Arthur Agnos on December 13, 1973, the laundromat murder of Jane Holly on January 28, 1974, and the participation of Moore and Simon in those crimes. The affidavit includes Harris' statement that in January 1974 he saw certain guns and a machete in a large black case in Simon's apartment in 844 Grove Street, and that Simon and Moore discussed going out "to make a hit." Harris described the "Death Angels," and stated that at Black Self Help he had seen a large display of photographs of 500 to 600 persons who belonged to the "Death Angels."

Harris told Inspector Coreris that while working at Black Self Help he had been required to help move what he believed were bodies in plastic bags at Black Self Help. Harris stated that on one occasion, in late December 1973, Larry Green asked him to help dispose of a body that Green had wrapped in a plastic bag. They placed the bag in Green's van and drove to Ocean Beach where he and Green dumped the bag and body on the beach. Harris said that all his actions were compelled out of fear of great bodily injury or death to himself and his family.

The affidavit of Inspector Erdelatz states facts about the body of "John Doe 169," a white male, 25-30 years old, found in a plastic bag at Ocean Beach on December 24, 1973. The man's head, hands, and feet had been cut off and were not in the bag. The affidavit of Inspector Coreris states that Harris identified police photographs of the body of "John Doe 169."[59]

---

[59]At the trial the court excluded the photographs of the body of "John Doe 169," and no evidence of that murder was allowed.

The affidavit of Inspector Armstrong states facts obtained by independent investigation of the attempted kidnap of the three children and the crimes against Richard and Quita Hague on October 20, 1973. His affidavit includes Richard Hague's description of what happened to him and his wife that night, including his description of the white Dodge van and moving pads in the van.

We conclude that the affidavits adequately met the requirements of *Aguilar, supra,* 378 U.S. 108, and the California decisions that have followed *Aguilar.* The information provided by Harris was factual and based on his personal knowledge. Additional facts obtained by independent police investigation and from Richard Hague, a reliable "citizen-victim-informant" (see *People* v. *Hill* (1974) 12 Cal.3d 731, 761 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on another point in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872]), corroborated in detail the information pertaining to the crimes described by Harris. Although corroborative facts about the crimes, with no corroborative evidence identifying the perpetrators, may be insufficient to *convict* the accused of a crime based on testimony of an accomplice (Pen. Code, § 1111), corroborative facts about the crimes may be sufficient to support a magistrate's conclusion that information provided by an untested, but known, informant was reliable for issuance of a search warrant. Moreover, in this case Harris' statements that he participated in the disposal of bodies and was present when other crimes were committed by the defendants, were declarations against his penal interest (Evid. Code, § 1230) and tended to add some credibility to his statements. (See *United States* v. *Harris* (1971) 403 U.S. 573, 583 [29 L.Ed.2d 723, 734, 91 S.Ct. 2075]; *Skelton* v. *Superior Court, supra,* 1 Cal.3d 144, 154, fn. 7; *People* v. *Kurland, supra,* 28 Cal.3d 376, 392.)

██ ██ ██ Accordingly, we conclude that the affidavits were sufficient to support the magistrate's finding of probable cause for issuance of the search warrant.[60]

## C. *Denial of Evidentiary Hearing to Impeach Harris' Credibility*

██ Green argues that the trial court erred in denying his motion for an evidentiary hearing to test the veracity of Anthony Harris. (*Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234]; *People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130]; *People* v. *Kurland,*

---

[60]Preference must be accorded searches under a warrant. In a doubtful or marginal case a search under a warrant may be sustainable where a search without a warrant would not. (*United States* v. *Ventresca* (1965) 380 U.S. 102, 106 [13 L.Ed.2d 684, 687, 85 S.Ct. 741]; see also *People* v. *Superior Court (Corona)* (1981) 30 Cal.3d 193, 207 [178 Cal.Rptr. 334, 636 P.2d 23].) Whatever doubt may remain in this case is resolved by the "preference to be accorded warrants." (See *People* v. *Mesa* (1975) 14 Cal.3d 466, 470 [121 Cal.Rptr. 473, 535 P.2d 337].)

*supra,* 28 Cal.3d 376, 383.) In *Theodor,* the Supreme Court held that pursuant to a motion under Penal Code section 1538.5, a defendant may challenge the "factual veracity of an affidavit" in support of a search warrant, and if statements contained therein are demonstrated to be false and if the affiant was unreasonable in believing the truth of such information, those facts must be excised from the affidavit and probable cause tested from the remaining truthful information. The *Theodor* case dealt primarily with negligent ("unreasonable") mistakes of fact in an affidavit. The court rejected the view that all false or inaccurate statements must be excised from the affidavit. Rather, only unintentional false statements which could not reasonably be believed must be excised for the purpose of determining probable cause.

In *Cook,* the Supreme Court held that under the rationale of *Theodor,* evidence must be excluded if it was obtained pursuant to a warrant issued on an affidavit that contained deliberately false statements of fact.

In *Kurland,* the Supreme Court held that an affidavit for issuance of a search warrant may be attacked if the affiant omitted material and adverse facts. Facts are material and hence must be disclosed if their omission would make the affidavit "substantially misleading." (28 Cal.3d at pp. 384-385.)

In *Theodor,* the court said: "Before a hearing is required to test the veracity of an affidavit, the defense must relate, with some specificity, its reasons for contending that the affidavit is inaccurate." (8 Cal.3d at p. 103.) In this case the defense did not offer to show that the affidavits contained any intentional misstatements of fact or even any negligent misstatements of fact. The defense requested an evidentiary hearing primarily to impeach the credibility of Anthony Harris by showing that certain statements he made to the affiant, Inspector Coreris, were inconsistent with his testimony before the grand jury a couple of weeks later. The defense referred to certain statements pertaining to the Hague incident and the murder of Erakat. The defense asserted that Harris was lying when he said Green, Moore, and Simon committed the crimes described by Harris, and therefore the defense wanted the court to reexamine the credibility of Harris' statements in light of his inconsistent statements to police and the grand jury.

Although the trial court may have erred in denying the defendants an evidentiary hearing to prove inaccurate facts in the affidavits, a review of the defense offer of proof fails to show that the affiant could not have reasonably believed Harris' statements at the time they were made. (Cf. *Burke* v. *Superior Court* (1974) 39 Cal.App.3d 28, 34-35 [113 Cal.Rptr. 801].) The affiant could not reasonably foresee that Harris would make specific inconsistent statements when he later testified before the grand jury. Moreover, the asserted inconsistencies were relatively insignificant. Therefore, we do not believe the defendants were prejudiced by the denial of an evidentiary hearing.

■ Although defendants' counsel on appeal do not argue the point, trial counsel for Green and Moore mentioned the failure of Inspector Coreris' affidavit to state that a reward of $30,000 had been offered to the person who would provide San Francisco police with information leading to the arrest and conviction of the persons who committed the "Zebra" crimes. The defense argued that the reward was a material fact bearing on Harris' credibility and should have been included in the affidavit. Although the reward was relevant to show Harris' reasons for becoming an informant, in light of the *Kurland* decision we conclude that the failure of the affiant to mention the reward did not render the affidavit *"substantially misleading."*

D. *Alleged Exploratory Search*

■ Defendants argue that Simon's binder was not "particularly described" in the search warrant and was seized during an unlawful exploratory search. The Fourth Amendment of the United States Constitution and article I, section 13, of the California Constitution require that a warrant particularly describe the place to be searched and the things to be seized. (See also Pen. Code, § 1525.) The requirement of particularity is designed to prevent general exploratory searches that unreasonably interfere with a person's right to privacy. (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 249 [118 Cal.Rptr. 166, 529 P.2d 590].) As a general rule, the police may seize only those articles enumerated in the search warrant. (*People* v. *Superior Court* (*Meyers*) (1979) 25 Cal.3d 67, 72-73 [157 Cal.Rptr. 716, 598 P.2d 877].) However, "[W]hen officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers' efforts." (*Skelton* v. *Superior Court, supra,* 1 Cal.3d 144, 157; *People* v. *Superior Court, supra,* 25 Cal.3d at p. 73.)

■ In this case the search warrant did not mention Simon's binder or any similar material in the list of items to be seized. However, as previously stated, the warrant did specifically authorize the search and seizure of the black attache case in which Simon's binder was found. The black attache case was believed to be relevant to the Erakat murder and robbery. Thus the officers were authorized to open the black attache case as part of their search for weapons and other evidence that might connect Simon to the "Zebra" crimes.

Defendants nevertheless argue that the binder could not be lawfully seized since it was not "contraband." The settled law is, however, that police may lawfully seize evidence that tends to connect the defendant with a felony even if the evidence is not contraband. (*Warden* v. *Hayden* (1967) 387 U.S. 294, 300-308 [18 L.Ed.2d 782, 788-792, 87 S.Ct. 1642]; *People* v. *Thayer* (1965)

63 Cal.2d 635 [47 Cal.Rptr. 780, 408 P.2d 108], cert. den., 384 U.S. 908 [16 L.Ed.2d 361, 86 S.Ct. 1342]; *People* v. *Terry* (1970) 2 Cal.3d 362, 394-395 [85 Cal.Rptr. 409, 466 P.2d 961], cert. den., 406 U.S. 912 [32 L.Ed.2d 112, 92 S.Ct. 1619]; *North* v. *Superior Court* (1972) 8 Cal.3d 301, 307 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; *Guidi* v. *Superior Court* (1973) 10 Cal.3d 1, 14 [109 Cal.Rptr. 684, 513 P.2d 908]; *People* v. *Hill, supra,* 12 Cal.3d 731, 762; see also Pen. Code, § 1524, subd. (a)(4).) Here, Simon's binder was relevant evidence that tended to connect him with the suspected conspiracy, and hence it was lawfully seized.

### E. *"Stale" Information as Basis of Warrant*

■ Green argues that the information in the affidavits was "stale" and hence insufficient to establish probable cause for issuance of the search warrant. "As a general rule, information is stale, and hence unworthy of weight in the magistrate's consideration of an affidavit, unless the information consists of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" (*Alexander* v. *Superior Court, supra,* 9 Cal.3d 387, 393, quoting *Sgro* v. *United States* (1932) 287 U.S. 206, 210 [77 L.Ed. 260, 263, 53 S.Ct. 138, 85 A.L.R. 108].) In other words, an affidavit in support of a search warrant must provide probable cause to believe the material to be seized is still on the premises to be searched when the warrant is sought. (*People* v. *Mesa, supra,* 14 Cal.3d 466, 470.) The question of "stale" information necessarily depends on the facts of each case. Here, police obtained the search warrant eight days after Anthony Harris first telephoned the police to identify the "Zebra" murderers on April 22, 1974. A number of interviews of Harris were necessary before the police could gather all the information they needed for issuance of a search warrant. Moreover, in contrast to the typical narcotics or robbery case in which the contraband can be readily moved or disposed of, the items to be seized in this case were weapons and instruments used in the commission of numerous murders and shootings over a period of six or seven months. The last suspected "Zebra" murder had occurred a few days earlier on April 16. In light of these facts the magistrate could reasonably conclude that the items to be seized were "probably" on the premises to be searched.

### F. *Emergency as Justification for Search Without Valid Warrant*

■ The People argue, as they did in the trial court, that even if the search warrant was invalid, a search warrant was not required in this case because of exigent circumstances that constituted an emergency. (See *People* v. *Sirhan* (1972) 7 Cal.3d 710, 736-741 [102 Cal.Rptr. 385, 497 P.2d 1121], cert. den., 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1383], overruled on another point in *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 593, fn. 7 [150 Cal.Rptr.

435, 586 P.2d 916]; *People* v. *Remiro* (1979) 89 Cal.App.3d 809, 831 [153 Cal.Rptr. 89, 2 A.L.R.3d 1135], cert. den., 444 U.S. 876, 937 [62 L.Ed.2d 104, 197, 100 S.Ct. 160, 197].) In contrast to the *Sirhan* and *Remiro* cases, however, the police in this case did not believe that an immediate search, without a warrant, was necessary due to an emergency. Although time was of the essence, due to news media accounts of developments in the "Zebra" investigation, the police took the time to obtain a search warrant. Under those circumstances we do not believe the search can be upheld on the "emergency" theory in this case.

### G. *Seizure of Binder as Alleged Violation of Freedom of Religion*

Simon argues that the seizure of his binder violated his rights to freedom of religion under the First Amendment to the United States Constitution and article I, sections 2 and 4, of the California Constitution. The binder, however, was not seized for the ideas it contained, but for its evidentiary value as proof of a criminal conspiracy. Under those circumstances it could be lawfully seized without violating Simon's constitutional right to freedom of religion. (Cf. *People* v. *Remiro, supra,* 89 Cal.App.3d 809, 832 [seizure of revolutionary SLA material].)

### XX. Voir Dire of Prospective Jurors

Moore contends that the trial court unreasonably restricted defense counsel's voir dire of prospective jurors. He argues that defense counsel were unable to select fair and impartial jurors because the court refused to permit inquiry as to publicity about the Zebra case. Defense counsel requested permission to ask prospective jurors what they had read, heard, or seen about the Zebra case in the news media. The court ruled that counsel could ask the prospective jurors whether they had been exposed to media coverage of the Zebra case and, if so, whether what they had read, seen, or heard would influence them. Defense counsel were permitted to ask the prospective jurors about their ability to remain impartial despite publicity about the Zebra case and the effect of that publicity on their perceptions of the Black Muslims and the Nation of Islam. Those general inquiries revealed bases for challenges for cause. Defense counsel, however, wanted to question each prospective juror further to determine whether there was any reason for exercising a peremptory challenge. The trial court did not allow it, stating that California law did not permit voir dire for that purpose.

At the time of trial the settled law was that a prospective juror could not be examined on voir dire solely for the purpose of laying the foundation for a peremptory challenge. (*People* v. *Edwards* (1912) 163 Cal. 752, 753 [127 P. 58]; *People* v. *Rigney* (1961) 55 Cal.2d 236, 244 [10 Cal.Rptr. 625, 359 P.2d

23, 98 A.L.R.2d 186]; *People* v. *Crowe* (1973) 8 Cal.3d 815, 830 [106 Cal.Rptr. 369, 506 P.2d 193].) That limitation, however, was abolished by the decision in *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869]. The Supreme Court said that even if a prospective juror asserts that he can judge a case impartially, "further interrogation may reveal bias of which he is unaware or which, because of his impaired objectivity, he unreasonably believes he can overcome. And although his protestations of impartiality may immunize him from a challenge for cause (see Pen. Code, § 1076), they should not foreclose further reasonable questioning that might expose bias on which prudent counsel would base a peremptory challenge." (*Id.*, at p. 402.) The Supreme Court also held that the new rule was applicable only in that case and to voir dire proceedings conducted after the court's decision became final. (*Id.*, at p. 412, fn. 15.) Thus the new rule is not applicable in this case.

Moore also argues that the trial court erred in refusing to permit inquiry into possible prejudicial impressions prospective jurors may have formed from books and articles about the Black Muslims and Nation of Islam. The record shows, however, that the court told counsel repeatedly that it would permit inquiry about the Black Muslims and Nation of Islam. On numerous occasions the prosecutors asked prospective jurors whether they had read any publications by or about the Black Muslims or Nation of Islam; few answered "Yes." Defense counsel also asked, without restriction by the court, a number of prospective jurors about reading specific written material about the Black Muslims and Nation of Islam and their impressions from that material.

Accordingly, we conclude that the trial court did not improperly restrict the scope of the voir dire of prospective jurors.

## XXI. CROSS-EXAMINATION OF ANTHONY HARRIS

Anthony Harris was the first prosecution witness. He testified for twelve days—three days of direct examination and nine days of cross-examination by three defense counsel. Green now complains that his right to confront the witnesses against him was violated when the trial court restricted the cross-examination of Harris. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)

### A. *Possession of Gun and Black Briefcase in 1968*

■ Green argues that the trial court erred in striking the cross-examination testimony of Harris concerning his 1968 arrest in Los Angeles when he had possession of a handgun and a black briefcase. Green argues that the evidence was relevant on the question whether Harris, rather than Simon, possessed a black briefcase and gun at the time of the Erakat murder on November 25, 1973. The trial court ruled that the evidence was too remote and hence irrele-

vant and immaterial. (Evid. Code, § 352.) We find no abuse of discretion in the trial court's ruling.

## B. *Obscenities Uttered by Harris in 1968*

 Green argues that the trial court erred in preventing cross-examination of Harris about a 1968 southern California incident in which he was arrested for assault on a police officer and possession of a gun. The defense wanted to ask Harris whether, at the time of that incident, he threatened to kill the "white fucking cops," and whether, when brought into the courtroom, he said, "Well, where's the motherfuckin' white judge." The defense argued that the evidence was relevant to show Harris' propensity for violence and his hatred of white people. The trial court ruled the evidence inadmissible on the ground it was irrelevant and immaterial. (Evid. Code, § 352.) We find no abuse of discretion in the trial court's ruling.

## C. *Harris' Mental Condition*

 Green argues that the trial court erred in not allowing the defense to cross-examine Harris about his "psychiatric history" to attack his credibility.

When Harris testified before the grand jury he revealed that in 1959, when he was 14 years old, his mother placed him in a state hospital because he was always fighting with his brothers and sisters. He was in the hospital about a year before he escaped. He said he received no psychiatric treatment after that time.

At the trial, the court would not allow the defense to ask Harris, on cross-examination, whether his mother had placed him in a state hospital in 1959. The court ruled the evidence inadmissible on the ground it was irrelevant and immaterial. (Evid. Code, § 352.)

The court also sustained the prosecution's objections to cross-examination of Harris about whether he had received psychiatric treatment while in San Quentin. Defense counsel argued that the evidence was relevant on the issue of Harris' credibility. Counsel referred to a 1969 prison diagnostic study in which a psychiatrist had recommended that Harris be placed in a prison facility that had a psychiatric treatment program because Harris had a severe personality disturbance bordering on psychosis. Counsel also referred to a 1970 report in which another prison psychiatrist had concluded that there was no improvement in the "psychiatric picture," and that Harris' "violence potential is high." When Harris was committed to prison in 1971 he was apparently examined by the psychiatrist who had diagnosed his mental condition when he was hospitalized in 1959. The psychiatrist found no change in Harris and described him as

"homicidal." Defense counsel asserted that Harris had "all the effective classical blocks to communication," and that he suffered from "transference of thought" causing him to attribute his own thoughts (and killings) to others. The defense, however, did not ask the court to appoint a psychiatrist to examine Harris. Nor did the defense offer to present other expert psychiatric testimony. The defense indicated it would call the prison psychiatrists only if Harris would deny, on cross-examination, that he had received psychiatric treatment while in San Quentin. The trial court rejected the defense offer of proof on the ground the proffered evidence was irrelevant and immaterial on the issue of Harris' credibility, as distinguished from his competency which was not in issue.

In determining the credibility of a witness the court or jury may consider any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony, including, but not limited to, any of the following: (1) his demeanor while testifying, (2) the character of his testimony, (3) the extent of his capacity to perceive, recollect, or communicate, (4) the extent of his opportunity to perceive, (5) his character for honesty or veracity, (6) the existence or nonexistence of a bias, interest, or other motive, (7) a prior consistent statement, (8) an inconsistent statement, (9) the existence or nonexistence of any fact testified to by him, (10) his attitude toward the action in which he testifies, and (11) his admission of untruthfulness. (Evid. Code, § 780.)

Cross-examination to test the credibility of a prosecution witness in a criminal case should be given wide latitude. (*Curry* v. *Superior Court* (1970) 2 Cal. 3d 707, 715 [87 Cal.Rptr. 361, 470 P.2d 345].) A witness may be cross-examined about his mental condition or emotional stability to the extent it may affect his powers of perception, memory (recollection), or communication. (*People* v. *Bell* (1955) 138 Cal.App.2d 7, 12 [291 P.2d 150]; *People* v. *Bagley* (1962) 208 Cal.App.2d 482, 487 [25 Cal.Rptr. 340]; see also *People* v. *Imbler* (1962) 57 Cal.2d 711, 717 [21 Cal.Rptr. 568, 371 P.2d 304].) Also, expert psychiatric testimony may be admissible to impeach the credibility of a prosecution witness where the witness' mental or emotional condition may affect the ability of the witness to tell the truth. The admissibility of such testimony rests within the discretion of the trial court. Generally, however, attempts to impeach a prosecution witness by expert psychiatric testimony have been rejected (see *People* v. *Johnson* (1974) 38 Cal.App.3d 1, 7 [112 Cal.Rptr. 834]; *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 385 [121 Cal.Rptr. 69] [psychologist]; *People* v. *Manson, supra,* 61 Cal.App.3d 102, 137-138; *In re Darrell T.* (1979) 90 Cal.App.3d 325, 335 [153 Cal.Rptr. 261]), except in certain sex offense cases.[61]

---

[61]Psychiatric testimony to impeach a prosecution witness has been allowed most often in sex offense cases, particularly where the defendant's guilt rested solely on the uncorroborated testimony of the prosecution witness. (See *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]; *People* v. *Russel* (1968) 69 Cal.2d 187 [70

In this case, the trial court allowed defense counsel great latitude in the cross-examination of Anthony Harris. His credibility was attacked in almost every conceivable legal way, including prior inconsistent statements and prior felony convictions. He was questioned whether his testimony against defendants was motivated by (1) revenge against the Black Muslims because he suspected they had killed his brother, and (2) his desire to collect the reward of $30,000. A review of the record fails to indicate or suggest that Harris' mental condition or emotional instability impaired his ability to accurately perceive, recollect, or communicate. He underwent nine days of grueling cross-examination during which he was reasonably articulate and consistent. He admitted his prior inconsistent statements to police and the grand jury, but explained that he had not been granted immunity from prosecution at the time he made the inconsistent statements and he was afraid his parole would be revoked if he revealed his involvement in the crimes.

We conclude that the trial court did not abuse its discretion in precluding the defense from cross-examining Harris about his hospitalization in 1959 and whether he received psychiatric treatment while in San Quentin. (Cf. *People* v. *Manson, supra,* 61 Cal.App.3d at pp. 137-138.)

XXII. PRETRIAL IDENTIFICATION PROCEDURES; DENIAL OF HEARING OUTSIDE PRESENCE OF JURY

Green, Moore, and Simon argue that the trial court erred in denying them a hearing outside the presence of the jury to determine whether the in-court identifications were tainted by unfair or unduly suggestive pretrial identification procedures.[62]

On May 1, 1974, Green, Moore, and Simon were arrested as were Thomas Manney and Black Self Help employees Clarence Jamerson, Douglas Burton, and Dwight Stallings. That evening, the San Francisco police conducted three lineups. Each lineup consisted of eight black men. Moore, Jamerson, and Simon appeared in the first lineup. Green and Stallings appeared in the second lineup. Manney and Burton appeared in the third lineup. Cooks, who was incarcerated since his arrest on October 30, 1973, did not appear in any of the lineups.

Cal.Rptr. 210, 443 P.2d 794], cert. den., 393 U.S. 864 [21 L.Ed.2d 132, 89 S.Ct. 145]; *In re Ferguson* (1971) 5 Cal.3d 525, 534 [96 Cal.Rptr. 594, 487 P.2d 1234]; *People* v. *Newton* (1966) 244 Cal.App.2d 82 [52 Cal.Rptr. 727]; *People* v. *McIntyre* (1967) 256 Cal.App.2d 894 [64 Cal.Rptr. 530].) The Legislature, however, enacted Penal Code section 1112, effective January 1, 1981, which provides: "The trial court shall not order any prosecuting witness, complaining witness, or any other witness, or victim on any sexual assault prosecution to submit to a psychiatric or psychological examination for the purpose of assessing his or her credibility."

[62]Cooks does not argue the pretrial identification issue on appeal. Nevertheless, we note that the trial court properly found the pretrial photographic identification fair and proper as to Cooks.

Approximately 25 to 30 witnesses of suspected "Zebra" shootings viewed the lineups on the night of May 1. Lonnie Green identified Moore as the man who shot Jane Holly in the laundromat on the night of January 28, 1974. Yolanda Williams identified Moore as the man who ran from the place of the shooting (of Ward Anderson and Terry White) at Fillmore and Hayes Streets on the night of April 14, 1974. Green and Williams would later identify Moore in court. Gaetano Bernado identified Moore and Simon as the two men who resembled the men he saw leave the scene of the Bertuccio murder on December 20, 1973, but he did not identify Moore in court. Teresa DeMartini also identified Moore at the lineup, but she was not positive of her identification and did not identify him in court. Michele Carasco, Richard Hague, Arthur Agnos, and other witnesses viewed the lineups but did not positively identify anyone.

Photographs of the lineups were later shown to David Benveniste, Ward Anderson, and Terry White. Benveniste was also shown a group of individual photographs which included Moore and Simon. Benveniste identified Simon as the person who murdered Tana Smith on January 28, 1974. Anderson and White both positively, and independently of each other, identified Moore from photographs of the first lineup. Benveniste, Anderson, and White identified Simon and Moore in court.

Richard Hague and Michele Carasco were shown a group of photographs of six black men with bald or clean-shaven or very short hair. Hague and Carasco identified Cooks from those photographs and they identified Cooks in court.

Before trial, Cooks moved to suppress the prospective in-court identification of him on the ground it would be tainted by the unfair and unduly suggestive photographic identification. The court stated that it would rule on the admissibility of the in-court identification at the time of trial and denied Cooks' motion.

At the trial, Cooks renewed his motion to suppress the in-court identification testimony of Richard Hague and Michele Carasco. Green, Moore, and Simon also moved to exclude the in-court identification testimony of David Benveniste, Lonnie Green, Ward Anderson, Terry White, and Yolanda Williams. The defense argued that the in-court identifications were tainted by unduly suggestive pretrial identification procedures (i.e., the lineups and photographs) and therefore should be excluded from evidence. The defense requested a hearing or voir dire of the witnesses outside the presence of the jury. The court denied the request, stating that the defendants had not made a sufficient showing that the pretrial identification procedures were unduly suggestive. The court listened to argument about the fairness of the lineups and the photographs, and denied the defendants' motion to suppress the in-court identification testimony.

The defendants then proceeded to cross-examine the witnesses about the pretrial identification procedures.

■ Convictions based on eyewitness identification at trial, after a pretrial identification, will be set aside on the ground of a denial of due process only if the pretrial identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Stovall* v. *Denno* (1967) 388 U.S. 293, 301-302 [18 L.Ed.2d 1199, 1205-1206, 87 S.Ct. 1967] [single person showup]; *Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967] [photographic identification]; *Foster* v. *California* (1969) 394 U.S. 440, 442 [22 L.Ed.2d 402, 406, 89 S.Ct. 1127] [unduly suggestive lineup]; *Coleman* v. *Alabama* (1970) 399 U.S. 1 [26 L.Ed.2d 387, 90 S.Ct. 1999] [lineup]; *Neil* v. *Biggers* (1972) 409 U.S. 188 [34 L.Ed.2d 401, 93 S.Ct. 375] [station-house identification]; *Manson* v. *Brathwaite* (1977) 432 U.S. 98 [53 L.Ed.2d 140, 97 S.Ct. 2243] [single photograph]; *People* v. *Caruso* (1968) 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336] [lineup]; *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677] [lineups]; *People* v. *Floyd* (1970) 1 Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64], cert den., 406 U.S. 972 [32 L.Ed.2d 672, 92 S.Ct. 2418], overruled on another point in *People* v. *Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36 [148 Cal.Rptr. 890, 583 P.2d 748] [lineup, photographs and single-person showup]; *People* v. *Bauer* (1969) 1 Cal.3d 368 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398], cert. den., 400 U.S. 927 [27 L.Ed.2d 187, 91 S.Ct. 158] [lineup]; *People* v. *MacPherson* (1970) 2 Cal.3d 109, 116-117 [84 Cal.Rptr. 129, 465 P.2d 17] [lineup]; *People* v. *Banks* (1970) 2 Cal.3d 127 [84 Cal.Rptr. 367, 465 P.2d 263] [lineup]; *People* v. *Martin* (1970) 2 Cal.3d 822 [87 Cal.Rptr. 709, 471 P.2d 29] [view of lone suspect through one-way mirror at police station]; *People* v. *Tribble* (1971) 4 Cal.3d 826, 833 [94 Cal.Rptr. 613, 484 P.2d 589] [lineup]; *People* v. *Bisogni* (1971) 4 Cal.3d 582 [94 Cal.Rptr. 164, 483 P.2d 780] [lineup and single-person showup]; *In re Terry* (1971) 4 Cal.3d 911 [95 Cal.Rptr. 31, 484 P.2d 1375] [lineup]; *People* v. *Hunt* (1977) 19 Cal.3d 888, 893-894 [140 Cal.Rptr. 651, 568 P.2d 376] [photographic identification and chance confrontation at police station]; *People* v. *Blair* (1979) 25 Cal.3d 640, 659-662 [159 Cal.Rptr. 818, 602 P.2d 738] [photographic identification followed by lineup]; *People* v. *Nation* (1980) 26 Cal.3d 169, 179-182 [161 Cal.Rptr. 299, 604 P.2d 1051] [photographic identification followed by lineup].) Whether due process has been violated depends on "the totality of the circumstances." (*Stovall* v. *Denno, supra,* 388 U.S. at p. 302 [18 L.Ed.2d at p. 1206]; *People* v. *Blair, supra,* 25 Cal.3d at p. 659.)

■ When a defendant challenges the fairness of a pretrial identification, the defendant has the initial burden of establishing that the pretrial identification was suggestive or unfair. (*People* v. *Hunt, supra,* 19 Cal.3d 888, 893.) If the

defendant sustains his burden of showing that the pretrial identification was suggestive, the in-court identification need not necessarily be excluded if the People can demonstrate that the in-court identification was otherwise reliable. (*Neil v. Biggers, supra,* 409 U.S. 188; *Manson v. Brathwaite, supra,* 432 U.S. 98.) In California, the burden shifts to the People to prove by clear and convincing evidence that the in-court identifications were based on the witness' observations of the accused at the scene of the crime, that is, independent of the suggestive pretrial identification. (*People v. Caruso, supra,* 68 Cal.2d 183, 189; *People v. Banks, supra,* 2 Cal.3d 127, 139-140; *People v. Bisogni, supra,* 4 Cal.3d 582, 587; *People v. Rodriguez* (1970) 10 Cal.App.3d 18, 30 [88 Cal.Rptr. 789].) In determining the reliability of an in-court identification following a suggestive pretrial identification, the factors to be considered include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." (*Neil v. Biggers, supra,* 409 U.S. at pp. 199-200 [34 L.Ed.2d at pp. 411-412].)

In *Watkins v. Sowders* (1981) 449 U.S. 341 [66 L.Ed.2d 549, 101 S.Ct. 654], the United States Supreme Court held that a state criminal trial court is not required by the due process clause of the Fourteenth Amendment to conduct a hearing out of the jury's presence whenever a defendant contends that a witness' identification of him was "arrived at improperly." The court recognized that a hearing outside the presence of the jury may be the prudent procedure, but due process of law does not require such a hearing in all cases.

A number of California decisions indicate that a hearing outside the presence of the jury is the proper procedure where a defendant asserts that an in-court identification of him would be tainted by an unduly suggestive pretrial identification procedure. (See, e.g., *People v. Floyd, supra,* 1 Cal.3d 694, 712 [stating that "A hearing outside the jury's presence is required only where there is some factual conflict concerning the fairness of the lineup"]; *People v. Banks, supra,* 2 Cal.3d 127, 139 [stating that determination of whether the in-court identifications were independent of the illegally conducted lineups should be determined out of the presence of the jury]; *People v. Nation, supra,* 26 Cal.3d 169, 179 [stating that "Since an objection to the identification evidence would have been adjudicated outside the presence of the jury, . . ."]; *People v. Rodriguez, supra,* 10 Cal.App.3d 18, 30 [stating that "Where it is asserted unders the *Stovall* rule that the pretrial identification procedure was so unfair as to taint the in-court identification, the proper procedure requires that the trial court determine initially, outside the presence of the jury, whether such procedure was unfair"]; *People v. Greene* (1973) 34 Cal.App.3d 622, 645 [110 Cal.Rptr. 160] [quoting *Rodriguez, supra*].) No California decision, however,

has held that due process of law requires a hearing outside the presence of the jury in each and every case.

The People, as did the trial court, rely on the cases of *People* v. *Bethea* (1971) 18 Cal.App.3d 930 [96 Cal.Rptr. 229], cert. den., 405 U.S. 1042 [31 L.Ed.2d 584, 92 S.Ct. 1325] and *People* v. *Dewberry* (1974) 40 Cal.App.3d 175 [114 Cal.Rptr. 815], to support their position that a voir dire of witnesses outside the presence of the jury was not required in the absence of evidence that the pretrial identification procedures were suggestive. Neither case, however, is on point. In *Bethea*, the victim of a robbery identified the defendant from photographs before trial and in person at trial. The defense had subpoenaed the photographs but the prosecution was unable to produce them. The defense then argued that the burden was on the prosecution to show that the pretrial photographic identification procedures were not unduly suggestive. The court rejected the argument, stating that before the prosecution has the burden of proving the fairness of the pretrial identification there must be some evidence of unfairness. Similarly, in *Dewberry,* the victim of a burglary identified the defendant from a group of photographs. The prosecution inadvertently misplaced the photographs and could not produce them. The trial court granted the defendant's motion to suppress any in-court identification by the burglary victim, and, when the prosecutor said he had insufficient evidence to proceed, the court dismissed the action. On appeal, the court relied on *Bethea* and reversed the order of dismissal. Neither the *Bethea* case nor the *Dewberry* case involved the question whether the fairness of the pretrial identification procedure should be determined by voir dire of witnesses outside the presence of the jury.

In this case, each witness who identified one of the defendants in court was cross-examined at length about his or her pretrial identification. A review of the record shows that when the police officers showed the witnesses photographs they did not suggest in any way who the suspects were. Nor does the record show any impropriety in the manner in which the lineups were conducted. Photographs of the lineups fail to show that the lineups were unduly suggestive. Moreover, the testimony of the identification witnesses shows that their in-court identifications were based primarily on their observations of the defendants at the time of the crimes, that is, independent of pretrial identifications.

Furthermore, after each identification witness testified, the trial judge stated in substance that had he heard all the evidence at a hearing outside the presence of the jury he would have found no impropriety in the pretrial identification procedures. For example, after Lonnie Green identified Moore in court, the court stated: "The court finds that there is no constitutional taint whatsoever to the in-court identification, that the lineup was perfectly appropriate and proper. And I would also say that had I taken the testimony prior to the in-court identification, my ruling would have been the same." Also, after the trial judge had

heard all the testimony pertaining to pretrial and in-court identifications, he stated: "I find that as to all the in-court identifications there was no constitutional impermissibility, that they were fairly offered. There is no taint in the pretrial identification. And I would say again that even if I had before me affidavits as to all of them in the form of the ones presented, the result would have been the same."

Accordingly, we conclude that the defendants in this case were not denied due process of law as a result of being denied a hearing, outside the presence of the jury, to determine the admissibility of the in-court identification testimony. (*Watkins* v. *Sowders, supra,* 449 U.S. 341.)

### XXIII. COMPOSITE DRAWINGS C AND D

All four defendants argue that the trial court erred in excluding from evidence two composite drawings or sketches by Inspector Hobert Nelson. Those composite drawings were marked for identification as Cooks' exhibits C and D. They had been released to news media and appeared in the San Francisco Chronicle on April 18, 1974.[63] The defense attempted to introduce those composite drawings in evidence throughout the trial in an effort to show that they did not resemble the defendants.[64] The trial court excluded the evidence for lack of a proper foundation.

 Where a witness to a crime describes the suspect to police who prepare a composite drawing or sketch of the suspect based on the witness' description, the composite drawing is similar to a prior extrajudicial identification by that witness and may be admissible, as an exception to the hearsay rule, as independent evidence of identity. (*People* v. *Imbler, supra,* 57 Cal.2d 711, 716; *People* v. *Miller* (1960) 185 Cal.App.2d 59, 74 [8 Cal.Rptr. 91].) If the witness admits his prior identification, it is admissible under Evidence Code section 1238.[65] If

---

[63]Yoland Williams, who identified Moore in connection with the shooting of Ward Anderson and Terry White on April 14, 1974, testified that she saw the composite drawings in the newspaper, telephoned the San Francisco Police Department and told them that the composite drawings did not resemble the person she had seen.

[64]The defense first attempted to introduce the composite drawings during the cross-examination of Anthony Harris. They asked Harris whether he had telephoned the San Francisco police because the composite drawings resembled him. Harris denied it, stating that he thought the composite resembled Green and not him.

[65]Evidence Code section 1238 provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying and:

"(a) The statement is an identification of a party or another as a person who participated in a crime or other occurrence:

"(b) The statement was made at a time when the crime or other occurrence was fresh in the witness' memory; and

"(c) The evidence of the statement is offered after the witness testifies that he made the identification and that it was a true reflection of his opinion at that time."

the witness denies his prior identification or testifies contrary to it, the prior identification or drawing is admissible as a prior inconsistent statement under Evidence Code section 1235. (See Witkin, Cal. Evidence (2d ed. 1966) The Hearsay Rule, § 541, pp. 512-513.) To be admissible, however, the party offering the composite drawing must lay a proper foundation by showing that (1) the drawing was made at a time when the crime was fresh in the witness' memory, and (2) the composite drawing is offered after the witness testifies that he made the identification on which the drawing is based and that it was a true reflection of his opinion at that time. (See fn. 65, *ante*.)

Composite drawing D showed a black man, about 25 to 30 years old, with a thin face, narrow mustache, and wearing a stocking cap. The drawing was prepared by Inspector Hobert Nelson based on a description given by Anijka Altman who apparently saw the suspect who shot and killed Marietta DeGirolamo at Haight and Divisadero Streets on December 13, 1973. Thereafter, Inspector Nelson showed the drawing to Teresa DeMartini who was shot on the night of December 20, 1973. Ms. DeMartini did not fully approve the drawing.[66] Based on Ms. DeMartini's description, Inspector Nelson made minor changes in the drawing, particularly the eyes. The defense offered this sketch in evidence. However, Anijka Altman was not called as a witness to establish a foundation for the admissibility of the drawing. Ms. DeMartini did not state that the drawing was a true reflection of her description of the suspect. Therefore, the trial court properly excluded the drawing for lack of a proper foundation.

Composite drawing C was also prepared by Inspector Nelson. On April 16, 1974, he went to San Francisco General Hospital to interview Ward Anderson and Terry White who were shot on April 14, 1974. Anderson was in too much pain to be interviewed. White was moved from a ward to a room where Inspector Nelson could talk to him. White was in pain and had tubes in his nose and arms. Inspector Nelson first showed White composite drawing D. White was not satisfied with it. Inspector Nelson then proceeded to draw a new sketch based on White's description (composite drawing C). White described the suspect to Inspector Nelson, but after about 15 minutes of conversation White was on the verge of fainting, unable to continue, and was taken back to the ward where medical personnel administered medication. White went to sleep. Inspector Nelson attempted to complete the drawing. When White awakened Inspector Nelson showed him the drawing (composite drawing C) but White was unresponsive and would "lapse off." At no time did White ever indicate that composite drawing C was an accurate representation of his description of the man who shot him. The record, therefore, fails to show that a proper founda-

---

[66]Teresa DeMartini assisted in the preparation of another composite drawing (Cook's exhibit No. V) by another San Francisco police officer. She "liked that one better," and thus it was received in evidence by stipulation.

tion was laid for admissibility of the composite drawing. Accordingly, the trial court properly excluded it from evidence.

In contending that the prosecution used "manufactured" evidence to convict them, defendants Cooks, Green, and Simon assert that Inspector Nelson prepared composite drawing C at the insistence of Inspector Coreris, based on Coreris' concept of the suspect's appearance, and not on Terry White's description. That assertion is based on passages in the book, "Zebra, the True Account of the 179 Days of Terror in San Francisco" (1979) by Clark Howard. Defendants ask this court to take judicial notice of the contents of that book. Although we may take judicial notice of the fact the book exists, we decline to take judicial notice of its contents. (*People* v. *Manson, supra,* 61 Cal.App.3d at p. 163.) Defendants' assertions are not only contrary to the sworn testimony in this case, they are based on facts outside the record and may not be considered on appeal. (See *In re Rogers* (1980) 28 Cal.3d 429, 437, fn. 6 [169 Cal.Rptr. 222, 619 P.2d 415]; *People* v. *Szeto, supra,* 29 Cal.3d 20, 35.) Moreover, in response to defendants' assertions that the prosecution used "manufactured" evidence to convict them, we would remind them that it was the defense, not the prosecution, who wanted to introduce the composite drawing in evidence. Accordingly defendants' assertions are meritless.

XXIV. GRUESOME PHOTOGRAPHS OF VICTIMS

Cooks, Green, and Simon argue that the trial court erred in allowing the prosecution to introduce inflammatory photographs of the victims, particularly Quita Hague. The two photographs of Quita Hague were black and white. They were taken at the place where her body was found and where she was killed. One photograph showed her face down, with her hands tied behind her back, lying across a railroad track. The other photograph was taken after the police turned her body over. It shows a closeup view of her neck wound. Most of the other photographs were coroners' photographs of the victims showing where bullets entered the bodies. A color photograph of Erakat shows him in a sitting position, with his hands tied behind his back, in a corner of the store's restroom where his body was found. It does not show the head wound but it does show his face and clothing covered with blood.

When gruesome photographs are presented, the trial court, in the exercise of its discretion, must decide whether their probative value outweighs the prejudicial effect. (Evid. Code, § 352; *People* v. *Goodridge* (1969) 70 Cal.2d 824, 836 [76 Cal.Rptr. 421, 452 P.2d 637]; *People* v. *Brawley* (1969) 1 Cal.3d 277, 295 [82 Cal.Rptr. 161, 461 P.2d 361], cert. den., 400 U.S. 993 [27 L.Ed.2d 441, 91 S.Ct. 462]; *People* v. *Terry, supra,* 2 Cal.3d 362, 403; *People* v. *Murphy, supra,* 8 Cal.3d 349, 362-365; *People* v. *Hathcock, supra,* 8 Cal.3d 599, 621; *People* v. *Milan* (1973) 9 Cal.3d 185, 194 [107 Cal.Rptr. 68, 507 P.2d

956]; *People* v. *Cruz* (1980) 26 Cal.3d 233, 253 [162 Cal.Rptr. 1, 605 P.2d 830]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 302 [168 Cal.Rptr. 603, 618 P.2d 149].) In this case, the photographs of Quita Hague were admissible on the issue of malice and to show the manner in which the wounds were inflicted and the circumstances of the crime. (Cf. *People* v. *Brawley, supra,* 1 Cal.3d 277; *People* v. *Hathcock, supra,* 8 Cal.3d 599; *People* v. *Milan, supra,* 9 Cal.3d 185; *People* v. *Cruz, supra,* 26 Cal.3d 233.) The coroners' photographs of the victims were relevant and admissible to assist the jurors in understanding the medical testimony about the autopsies. (Cf. *People* v. *Brawley, supra,* 1 Cal.3d 277; *People* v. *Murphy, supra,* 8 Cal.3d 349.) We conclude that the trial court did not abuse its discretion in allowing the photographs of the victims to be received in evidence.

## XXV. Conspiracy

### A. *Sufficiency of the Evidence*

 ■ Cooks, Green, and Simon argue that the evidence was insufficient, as a matter of law, to support their convictions of conspiracy to commit murder. For an appellate court to sustain a conviction of conspiracy to commit a crime, there must be substantial evidence that (1) the defendant and at least one other person agreed to commit a crime (Pen. Code, § 182, subd. 1); (2) one of the alleged overt acts was committed by one of the conspirators in furtherance of the conspiracy (Pen. Code, §§ 184, 1104);[67] and (3) the conspirators had the specific intent to (a) agree or conspire and (b) commit the offense that is the object of the conspiracy (*People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300]; *People* v. *Backus* (1979) 23 Cal.3d 360, 390 [152 Cal.Rptr. 710, 590 P.2d 837]).

 ■ To prove a conspiracy to commit a crime the prosecution need not show that the parties met and expressly agreed to commit a crime. (*People* v. *Calhoun* (1958) 50 Cal.2d 137, 144 [323 P.2d 427]; *People* v. *Cockrell* (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116], cert. den., 389 U.S. 1006 [19 L.Ed.2d 604, 88 S.Ct. 568].) The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. (*People* v. *Cockrell, supra.*) The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. (*People* v. *Manson, supra,* 61 Cal.App.3d 102, 126; *People* v. *Remiro, supra,* 89 Cal. App.3d 809, 843.) ■ Once there is prima facie evidence of a conspiracy, evidence of a conspirator's extrajudicial statements may be admissible to

---

[67]The overt act need not be criminal in nature. (*People* v. *Causey* (1963) 220 Cal.App.2d 641, 653 [34 Cal.Rptr. 43].) Also, the prosecution is not precluded from proving additional unalleged overt acts. (Pen. Code, § 1104.)

prove the conspiracy. (*People* v. *Steccone* (1950) 36 Cal.2d 234, 238 [223 P.2d 17]; *People* v. *Calhoun, supra,* 50 Cal.2d at p. 143; Evid. Code, § 1223.)

■ Once the conspiracy is established it is not necessary to prove that each conspirator personally participated in each of several overt acts since members of a conspiracy are bound by all acts of all members committed in furtherance of the conspiracy. (*People* v. *Marsh* (1962) 58 Cal.2d 732, 746 [26 Cal.Rptr. 300, 376 P.2d 300]; *People* v. *Cornette* (1958) 158 Cal.App.2d 724 [322 P.2d 1001]; *People* v. *Scott* (1964) 224 Cal.App.2d 146, 151 [36 Cal.Rptr. 402]; *People* v. *Booker* (1968) 263 Cal.App.2d 464, 472-474 [69 Cal.Rptr. 837].) The crime of conspiracy can be committed whether the conspirators fully comprehended its scope, whether they acted together or in separate groups, or whether they used the same or different means known or unknown to them. (*People* v. *Means* (1960) 179 Cal.App.2d 72, 80 [3 Cal.Rptr. 591]; *People* v. *Buono* (1961) 191 Cal.App.2d 203, 215 [12 Cal.Rptr. 604]; *People* v. *Ray* (1962) 210 Cal.App.2d 697, 699-700 [26 Cal.Rptr. 825]; *People* v. *Brown* (1968) 259 Cal.App.2d 663, 671 [66 Cal.Rptr. 623].) Whether an individual conspirator's act was committed in furtherance of the conspiracy is a question of fact. (*People* v. *Smith* (1966) 63 Cal.2d 779, 794 [48 Cal.Rptr. 382, 409 P.2d 222], cert. den., 388 U.S. 913 [18 L.Ed.2d 1353, 87 S.Ct. 2119].)

■ The testimony of an accomplice is sufficient to establish the fact or existence of a conspiracy (the corpus delicti); his or her testimony needs corroboration only as to the defendant's connection with it. (Pen. Code, § 1111; *People* v. *Buono, supra,* 191 Cal.App.2d at p. 216; *People* v. *Hensling* (1962) 205 Cal.App.2d 34, 42 [22 Cal.Rptr. 702]; *People* v. *Ray, supra,* 210 Cal. App.2d at p. 700.) And, it is settled that only slight corroborative evidence is necessary to connect a defendant with the alleged conspiracy. (*People* v. *Harper, supra,* 25 Cal.2d at pp. 876-877; *People* v. *Buono, supra,* 191 Cal.App. 2d at p. 216; *People* v. *Hensling, supra,* 205 Cal.App.2d at p. 42; *People* v. *Lewis* (1963) 222 Cal.App.2d 136, 144 [35 Cal.Rptr. 1].)

Defendants argue that the evidence was insufficient to sustain their convictions of conspiracy to commit murder because the evidence was insufficient to corroborate Anthony Harris' testimony. Harris' testimony, however, established at least a prima facie case of conspiracy by the defendants. His testimony connecting Cooks, Moore, and Simon with the crimes was corroborated by the identification testimony of victims and witnesses to certain crimes. As previously discussed, there was sufficient circumstantial evidence to corroborate Harris' testimony that Green participated in the crimes (see part III, A), and that corroborative evidence also tended to connect Green with the alleged conspiracy. Harris' testimony connecting Cooks with the conspiracy was also corroborated by Cooks' extrajudicial statements to Linda Enger, his confession of the Frances Rose murder, and his possession of the .22 caliber automatic

pistol. Harris' testimony was also corroborated by the contents of Simon's binder and evidence that the gun used by Moore and Simon was also used in the commission of a number of uncharged crimes. When all that corroborative evidence is considered with all the other evidence of the relationship, conduct, and activities of the defendants, the jury could reasonably conclude that Anthony Harris was telling the truth in testifying about the alleged conspiracy to kill white people.

Green argues that the evidence was insufficient, as a matter of law, to prove his specific intent to conspire to commit murder. Contrary to Green's assertions, however, the jury could reasonably infer from all the evidence that Green had the requisite specific intent.

Finally, all four alleged overt acts were proven. They included evidence that, to carry out the object of the conspiracy, Green, Cooks, Moore, Simon and others met in an apartment at 844 Grove Street in October 1973 (overt act No. 1); that on October 20, 1973, Green and Cooks rode in a white Dodge van to the area of Chestnut Street near Powell Street (overt act No. 2); that about 9:30 p.m. December 11, 1973, Simon and Moore rode in a Cadillac to the area of Haight and Buchanan Streets where they got out of the automobile (overt act No. 3); and that on April 14, 1974, Moore walked to the area of Hayes and Fillmore Streets where he talked to two persons on the sidewalk (overt act No. 4).

In light of established rules of appellate review (see *People* v. *Johnson, supra,* 26 Cal.3d 557; *People* v. *Green, supra,* 27 Cal.3d 1, 55; *People* v. *Towler, supra,* 31 Cal.3d 105; *Jackson* v. *Virginia, supra,* 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781]), we conclude that there was substantial evidence to support the defendants' convictions of conspiracy to commit first degree murder.

B. *Evidence of Uncharged Crimes*

 Cooks, Green, and Simon argue that the trial court erred in allowing evidence of uncharged crimes as acts in furtherance of the conspiracy. The settled law is, however, that in a prosecution for conspiracy, evidence of uncharged crimes may be admissible as proof of the common design or plan of the conspiracy.[68] (*People* v. *Pike* (1962) 58 Cal.2d 70, 89 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 330 [23 Cal.Rptr. 779, 373

---

[68]As a general rule, evidence that the defendant committed other crimes is inadmissible if offered solely to prove his criminal disposition. (Evid. Code, § 1101, subd. (b); *People* v. *Thomas* (1978) 20 Cal.3d 457, 464 [143 Cal.Rptr. 215, 573 P.2d 433].) However, as an exception to the rule, evidence of other crimes is ordinarily admissible where it tends to show guilty knowledge, motive, intent, or presence of a common design or plan. (*Ibid.*) The "common design or plan" exception has two distinct applications: (1) it may refer to the defendant's modus operandi or distinctive, characteristic method of committing crimes, or (2) it may refer to " 'a larger con-

P.2d 867]; *People* v. *Cossey* (1950) 97 Cal.App.2d 101, 112-113 [217 P.2d 133]; *People* v. *Darnell* (1950) 97 Cal.App.2d 630, 634 [218 P.2d 172]; *People* v. *Keller* (1963) 212 Cal.App.2d 210, 216 [27 Cal.Rptr. 805]; *People* v. *Lynn* (1971) 16 Cal.App.3d 259, 267-269 [94 Cal.Rptr. 16]; *People* v. *Skelton* (1980) 109 Cal.App.3d 691, 715 [167 Cal.Rptr. 636], cert. den., 450 U.S. 917 [67 L.Ed.2d 343, 101 S.Ct. 1361].) Or, as is also said, evidence of uncharged crimes may be admissible to prove that the charged (substantive) crimes were committed as part of a conspiracy to commit other crimes. (*People* v. *Arnold* (1926) 199 Cal. 471, 486-487 [250 P. 168]; *People* v. *Wilson* (1926) 76 Cal.App. 688, 694-695 [245 P. 781]; *People* v. *Sampsell* (1930) 104 Cal.App. 431, 438 [286 P. 434], cert. den., 281 U.S. 763 [74 L.Ed. 1172, 50 S.Ct. 468]; *People* v. *Braun* (1939) 31 Cal.App.2d 593, 604 [88 P.2d 728]; *People* v. *Ash* (1948) 88 Cal.App.2d 819, 827-828 [199 P.2d 711]; *People* v. *Booker, supra,* 263 Cal.App.2d at pp. 472-474; *People* v. *Remiro, supra,* 89 Cal.App.3d at p. 842.) In contrast to cases where evidence of uncharged crimes committed by the defendants is offered to prove, by inference, an element of the substantive (charged) crime, such as intent or identity (modus operandi) (see, e.g., *People* v. *Lopez* (1963) 60 Cal.2d 223, 249-250 [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Durham* (1969) 70 Cal.2d 171, 186 [74 Cal.Rptr. 262, 449 P.2d 198], cert. den., 395 U.S. 968 [23 L.Ed.2d 755, 89 S.Ct. 2116]; *People* v. *Sam, supra,* 71 Cal.2d 194; *People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Matson* (1974) 13 Cal.3d 35, 40 [117 Cal.Rptr. 664, 528 P.2d 752]; *People* v. *Guerrero* (1976) 16 Cal.3d 719 [129 Cal.Rptr. 166, 548 P.2d 366]; *People* v. *Thomas, supra,* 20 Cal.3d 457; *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883]), in a conspiracy case uncharged crimes may be direct proof of an essential element of the crime of conspiracy itself, namely, overt acts in furtherance of the conspiracy (Pen. Code, §§ 184, 1104). A given conspiracy may be as "limited or as expansive as the capacity of criminal minds to design unlawful combinations" regardless of how bizarre and fanciful. (*People* v. *Manson, supra,* 61 Cal.App.3d at p. 156; *People* v. *Remiro, supra,* 89 Cal.App.3d at p. 842.) Whether an uncharged crime was committed by the defendant or a coconspirator in furtherance of the conspiracy is a question of fact. (*People* v. *Sampsell, supra,* 104 Cal.App. at p. 439.)

Green argues that evidence of the attempted kidnap of the three children on October 20, 1973, should have been excluded because it was not part of the alleged conspiracy to murder. That evidence, however, was not only admissible as an overt act in furtherance of the alleged conspiracy, it was relevant evidence on the issue of identity of the perpetrators of the crimes against Richard and Quita Hague (Evid. Code, § 1101, subd. (b)).

tinuing plan, scheme, or conspiracy, of which the present crime on trial is a part.' " (*People* v. *Sam* (1969) 71 Cal.2d 194, 205 [77 Cal.Rptr. 804, 454 P.2d 700], quoting from McCormick on Evidence (1954) § 157, p. 328; *People* v. *Thomas, supra,* 20 Cal.3d at pp. 464-465.)

Cooks and Green argue that evidence of Cooks' assault and kidnap of Linda Enger on October 23, 1973, should have been excluded because it did not involve a random shooting. That evidence, however, was relevant to prove Cooks' motive and participation in the alleged conspiracy. A prima facie case of conspiracy having been established, Cooks' extrajudicial statements to Ms. Enger pertaining to the killing of white people were admissible to prove the conspiracy and to corroborate Anthony Harris' testimony. Cooks' possession of an automatic .22 caliber pistol during that incident also tended to corroborate the testimony of Michael Armstrong that he had sold such a gun to Cooks.

Cooks, Green, and Simon argue that evidence of the murder of Frances Rose on October 30, 1973, should have been excluded because there was no evidence that it was a random killing. Whether Cooks committed that murder as part of, or independent of, the alleged conspiracy was a question of fact for the jury to decide. (*People* v. *Smith, supra,* 63 Cal.2d at p. 794.) Again, evidence that Cooks possessed and used an automatic .22 caliber pistol in committing that crime tended to corroborate the testimony of Anthony Harris and Michael Armstrong concerning the gun.

Although the defense initially objected to introduction of evidence of the Erakat murder and robbery on November 25, 1973, the defense changed its position and asked that the evidence be admitted. The defense claimed it supported their position that Anthony Harris murdered and robbed Erakat by himself, and that the gun used connected Harris to subsequent killings and shootings.

Harris' testimony connected Moore and Simon with the murder of Paul Dancik on December 11, 1973. Although other witnesses to that murder did not positively identify Moore and Simon, the witnesses gave descriptions that tended to corroborate Harris' testimony and tended to connect Moore and Simon with that crime. (Cf. *People* v. *Buono, supra,* 191 Cal.App.2d at p. 218.) Also, evidence that Simon and Moore used the same gun to kill Dancik that was used to kill Erakat tended to connect Simon with the Erakat murder, as Harris testified.

As previously stated, Gaetano Bernado identified Moore and Simon at the lineups as the two men who resembled the men he saw at the scene of the Bertuccio murder on December 20, 1973. Also, Teresa DeMartini identified Moore at the lineup as the person who resembled the man who shot her on December 20, 1973. Other witnesses tended to place Simon and "a heavyset black man" at or near the scene of the Moynihan and Hosler murders on December 22, 1973. Evidence that the gun used to kill Paul Dancik was the same gun used in the shooting of Arthur Agnos, Marietta DiGirolamo, Ilario Bertuccio, Teresa DeMartini, Neil Moynihan, and Mildred Hosler tended to

connect Moore and Simon with those crimes. In any event, whether those crimes were committed in furtherance of the alleged conspiracy was a question that went to the weight of the evidence, not its admissibility.

Moore was positively identified as the person who shot Jane Holly, Ward Anderson, and Terry White. Simon was identified as the person who shot and killed Tana Smith. Since the same gun Moore and Simon used in committing those crimes was used to commit the other uncharged crimes in 1974, evidence of the uncharged 1974 crimes was relevant and admissible to prove the conspiracy.

We conclude that evidence of the uncharged crimes was properly admitted as overt acts committed in furtherance of the alleged conspiracy.

## C. *Cooks' Arrest as Termination of Conspiracy as to Him*

 Cooks argues that because he was arrested on October 30, 1973, and incarcerated since that date, the alleged conspiracy terminated, as a matter of law, as to him, and therefore evidence of crimes committed by other defendants after that date should not have been admitted against him.

Generally, a defendant's mere failure to continue previously active participation in a conspiracy is not enough to constitute withdrawal. An affirmative and bona fide rejection or repudiation of the conspiracy must be communicated to the coconspirators. (*People* v. *Crosby* (1962) 58 Cal.2d 713, 730 [25 Cal.Rptr. 847, 375 P.2d 839].) Once the defendant's participation in the conspiracy is shown, it will be presumed to continue unless he is able to prove, as a matter of defense, that he effectively withdrew from the conspiracy. (*Ibid.*)

Although a defendant's arrest and incarceration may terminate his participation in an alleged conspiracy, his arrest does not terminate, or constitute a withdrawal from, the conspiracy as a matter of law. (*United States* v. *Harris* (7th Cir. 1976) 542 F.2d 1283, 1301; see also *People* v. *Smith, supra,* 63 Cal.2d 779, 793-794; *People* v. *Buckman* (1960) 186 Cal.App.2d 38, 48 [8 Cal.Rptr. 765]; *People* v. *Beaumaster* (1971) 17 Cal.App.3d 996, 1003-1004 [95 Cal.Rptr. 360].) Withdrawal from, or termination of, a conspiracy is a question of fact. (*People* v. *Buckman, supra,* 186 Cal.App.2d 38].)

In this case, Cooks offered no evidence that after he was arrested he no longer concurred in the general objective of killing white people, that is, the objective of the conspiracy of which he was a part. In any event, Cooks was not charged or convicted of any of the crimes committed by his coconspirators after October 30, 1973. It was apparent to the jury that Cooks was not free to actively participate in those offenses. Moreover, there was substantial evidence that Cooks participated in the alleged conspiracy before October 30, 1973.

We conclude that the trial court did not err in refusing to rule that Cooks' arrest and incarceration on October 30, 1973, terminated the conspiracy as to him as a matter of law.

### D. *Double Jeopardy and Double Punishment*

 Cooks was charged with the murder of Frances Rose in a separate action, and in December 1973 he pleaded guilty to her first degree murder. He now contends that to allow evidence of the Frances Rose murder to be received in this case violated his right to protection against double jeopardy (U.S. Const., Fifth Amend.; Cal. Const., art. I, § 15; see Pen. Code, § 687) and resulted in double punishment (see Pen. Code, § 654). The settled law is, however, that since conspiracy is a separate and distinct crime, a defendant may be prosecuted and convicted of the substantive offense and of conspiracy to commit that offense. (*People* v. *Keene* (1954) 128 Cal.App.2d 520, 529 [275 P.2d 804]; *People* v. *Havel* (1955) 134 Cal.App.2d 213, 217 [285 P.2d 317]; *People* v. *Campbell* (1955) 132 Cal.App.2d 262, 268 [281 P.2d 912]; *People* v. *Cuda* (1960) 178 Cal.App.2d 397, 416 [3 Cal.Rptr. 86]; *People* v. *Clemons* (1960) 182 Cal.App.2d 808, 817 [6 Cal.Rptr. 727]; *People* v. *Garcia* (1960) 187 Cal.App.2d 93, 103-104 [9 Cal.Rptr. 493].) A prior conviction or acquittal of the substantive offense generally does not preclude a subsequent prosecution and conviction of conspiracy to commit that offense, particularly where the substantive crime is not the sole overt act in commission of the conspiracy. (See *People* v. *Lyons, supra,* 50 Cal.2d at p. 260; *People* v. *Darnell, supra,* 97 Cal.App.2d at p. 635; *People* v. *Scott, supra,* 224 Cal.App.2d at p. 152.)

 It is true that while a defendant may be convicted of the substantive crime and the conspiracy to commit it, he may not be punished for both offenses unless the conspiracy extended beyond the substantive offense. (See Pen. Code, § 654; *In re Romano* (1966) 64 Cal.2d 826 [51 Cal.Rptr. 910, 415 P.2d 798]; *People* v. *Skelton, supra,* 109 Cal.App.3d at pp. 726-727.) In this case the alleged conspiracy was not limited to the murder of Frances Rose but extended to the murder of a number of other people. Under these circumstances, Cooks could be lawfully punished for murdering Frances Rose and for conspiracy to murder.

Likewise, defendants Green, Moore, and Simon could be lawfully punished for the substantive offenses of first degree murder and for conspiracy to commit murder.

### XXVI. DISCOVERY BY THE PROSECUTION

Before Anthony Harris testified, the court allowed defense counsel to interview him in the presence of his counsel and in the absence of the prosecutors.

That interview was recorded on tape. The court, on motion by the prosecution, ordered the defense to allow the prosecutors to hear and transcribe the tape. There was no other pretrial discovery by the prosecution.

After the prosecution had presented its case in chief and rested, it moved for discovery of any written or taped statements of 25 named persons, plus statements of other witnesses who were present at the scenes of the charged and uncharged crimes. The defense disclosed that there were 12 to 16 witnesses who had been interviewed by the defendants' investigator and those interviews had been recorded on tape. Relying primarily on *United States* v. *Nobles* (1975) 422 U.S. 225 [45 L.Ed.2d 141, 95 S.Ct. 2160] and *People* v. *Chavez* (1973) 33 Cal.App.3d 454 [109 Cal.Rptr. 157], the court ordered the defense to produce the tapes of the interviews of witnesses who were going to testify. Before the tapes were given to the prosecutors, however, the trial judge listened to each tape, in the presence of defense counsel and in the absence of the prosecutors, and asked counsel to point out the statements that would violate the defendants' privilege against compulsory self-incrimination or the privilege derived from the work product doctrine. The defense argued that the tapes, in their entirety, constituted work product and were protected by the defendants' privilege against self-incrimination. The trial judge overruled the defense objection and turned the tapes over to the prosecutors before each witness testified. The apparent purpose of the prosecutors' discovery was to use the tapes for impeachment purposes if a witness' testimony on direct examination was inconsistent with his or her prior statements to the investigator. The defense turned over the tape-recorded interviews of 12 witnesses, 1 of whom was later unavailable to testify. The defense then terminated the taping of interviews by their investigator. No other statements, oral or written, of 50 other defense witnesses were given to the prosecution.

On appeal, Moore argues that the discovery order requiring the defense to produce the tape of the interview of Anthony Harris violated his (Moore's) constitutional privilege against compulsory self-incrimination and the privilege derived from the work product doctrine. All four defendants argue that the discovery order requiring them to produce their investigator's tape-recorded interviews of defense witnesses also violated their privilege against compulsory self-incrimination and the privilege derived from the work product doctrine. Defendants rely primarily on *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], *People* v. *Thornton* (1979) 88 Cal. App.3d 795 [152 Cal.Rptr. 77], and *People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534].

 In a criminal case, a defendant may not be ordered to give the prosecution "testimonial evidence" (statements) that violates the defendant's constitutional privilege against compulsory self-incrimination, or from the attorney-

client privilege, or the privilege derived from the work product doctrine. (*United States* v. *Nobles, supra,* 422 U.S. 225; *People* v. *Collie, supra,* 30 Cal.3d 43.) The Fifth Amendment privilege against compulsory self-incrimination is personal to the defendant and does not extend to the testimony or statements of third parties called as witnesses at trial. (*United States* v. *Nobles, supra,* 422 U.S. at pp. 233-234 [45 L.Ed.2d at pp. 150-151]; *Williams* v. *Florida* (1970) 399 U.S. 78 [12 L.Ed.2d 446, 90 S.Ct. 1893].) The California Supreme Court, however, has interpreted the California constitutional privilege against compulsory self-incrimination more broadly to include statements (testimonial evidence) of defense witnesses other than the defendant. (See *Allen* v. *Superior Court* (1976) 18 Cal.3d 520 [134 Cal.Rptr. 774, 557 P.2d 65].)

In *Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320, the Supreme Court granted prohibition against the enforcement of a pretrial discovery order that would have compelled a criminal defendant's attorney to disclose to the prosecution the names, addresses and expected testimony of the witnesses the defendant intended to call at trial. The court held that the discovery order violated the defendant's Fifth Amendment privilege against self-incrimination.[69] After discussing *Jones* v. *Superior Court* (1962) 58 Cal.2d 56 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213], which the People cited as precedent for the order, and *People* v. *Schader, supra,* 71 Cal.2d 761, which set forth the broad dimensions of the constitutional privilege against self-incrimination, the court spelled out the mandatory standard to be applied by trial courts in acting on applications for discovery by criminal prosecutors. The court stated: "[I]f we analyze *Jones* in the light of the policy considerations discussed in *Schader,* it is apparent that the principal element in determining whether a particular demand for discovery should be allowed is not simply whether the information sought pertains to an 'affirmative defense,' or whether defendant intends to introduce or rely upon the evidence at trial, but whether disclosure thereof conceivably might lighten the prosecution's burden of proving its case in chief. Although the prosecution should not be completely barred from pretrial discovery, defendant must be given the same right as an ordinary witness to show that disclosure of particular information could incriminate him. [¶] An ordinary witness need not actually prove the existence of an incriminatory hazard as that would surrender the very protection which the privilege against self-incrimination was designed to guarantee. Instead, the privilege forbids compelled disclosures which could serve as a 'link in a chain' of evidence tending to establish guilt of a criminal offense; in ruling upon a claim of privilege, the trial court must find that it clearly appears from a consideration of all the cir-

---

[69]In *Prudhomme,* the court relied primarily on the Fifth Amendment. Thereafter, the United States Supreme Court made it clear that the defendant's Fifth Amendment rights do not extend to statements made by third parties. (*United States* v. *Nobles, supra,* 422 U.S. 225.) The California Supreme Court later reaffirmed *Prudhomme* on state constitutional principles. (*Allen* v. *Superior Court, supra,* 18 Cal.3d at p. 525; see Cal. Const., art. I, § 15.)

cumstances in the case that an answer to the challenged question cannot possibly have a tendency to incriminate the witness. [Citations.]" (*Prudhomme v. Superior Court, supra,* 2 Cal.3d 320 at p. 326.)

In *People* v. *Bais* (1973) 31 Cal.App.3d 663 [107 Cal.Rptr. 519], Division Four of this court extended the *Prudhomme* principles to discovery during trial. After the prosecution had rested and after direct examination of two alibi witnesses, the prosecution moved for discovery of extrajudicial statements made by those witnesses. The court granted the motion without inquiry into the incriminating nature of the information sought. This court concluded that the trial court's failure to make the necessary inquiry constituted reversible error.

In *People* v. *Chavez, supra,* 33 Cal.App.3d 454, the trial court ordered the defendant to turn over to the prosecution statements given by defendant's witnesses. Division One of this court held that the trial court had erred in granting the discovery motion without first inquiring into the incriminating nature of the information sought, but that the error was harmless beyond a reasonable doubt.

In *People* v. *Ayers, supra,* 51 Cal.App.3d 370, 378-379, the trial court granted the prosecution's motion, which was made after the close of the People's case, for discovery of statements of defense witnesses and investigator's notes of conversations with those witnesses so they could be used for possible impeachment. The trial court's order required that the statements and notes be delivered to the court for screening and only those portions which appeared to have a bearing on the credibility of the witnesses would be delivered to the prosecutor. The Second District Court of Appeal upheld the discovery order as consistent with the principles of *Prudhomme.*

In *People* v. *Thornton, supra,* 88 Cal.App.3d 795, the issue was what statements, if any, made to defense investigators by defense alibi witnesses can be discovered by the prosecution. Division Three of this court concluded that such discovery constitutes an unconstitutional violation of a defendant's privilege against self-incrimination even if the statements only impeach the testimony of the alibi witnesses and do not inculpate the defendant. The court further held, however, that the error was not reversible. One justice concurred that the judgment should be affirmed, but disagreed with the majority holding that the discovery permitted by the trial court violated the defendant's privilege against self-incrimination.

In *People* v. *Collie, supra,* 30 Cal.3d 43, the Supreme Court had before it the question of under what circumstances does *Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320, justify prosecutorial discovery of pretrial statements made by defense witnesses to defense investigators. In *Collie,* the trial court had

ordered the defense to turn over their investigator's notes of an interview with a defense witness. The court issued the order after the prosecution rested and after the direct examination of the witness. The Supreme Court reviewed its decisions in *Jones* v. *Superior Court, supra,* 58 Cal.2d 56, *Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320, *Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834 [117 Cal.Rptr. 437, 528 P.2d 45], *Allen* v. *Superior Court, supra,* 18 Cal.3d 520, and what it described as "this tangle of Court of Appeal cases" that have resulted in confusing and inconsistent decisions on this difficult and complex subject. (*Collie, supra,* 30 Cal.3d at pp. 50-53.) The Supreme Court concluded that the trial court had erroneously ordered discovery of the witness' prior statement (30 Cal.3d at p. 56), that at least parts of the investigator's notes constituted "work product" (30 Cal.3d at pp. 59-60), but the error was harmless. The Supreme Court also held that because of the confusion that has resulted from the suggestion in *Prudhomme* that discovery of pretrial statements of defense witnesses may sometimes be allowed (*Prudhomme, supra,* 2 Cal.3d at p. 327), and because the Supreme Court is not the proper body to create procedural (discovery) rules affecting the constitutional rights of a criminal defendant, henceforth lower courts should not order production of any defense evidence in the absence of explicit legislative authorization. (*Collie, supra,* 30 Cal.3d at pp. 48-56.)[70]

■ Following the Supreme Court's admonishments in *People* v. *Collie, supra,* 30 Cal.3d 43, we shall refrain from contributing to the "confusion" of Court of Appeal decisions and not attempt to clarify the scope of a defendant's privilege against self-incrimination in criminal discovery matters. In this case, we conclude that even if the trial court erred in ordering the defense to produce the tapes of the interviews by their investigator, the error did not result in such a miscarriage of justice as to require reversal of the judgments. (Cal. Const., art. VI, § 13; *People* v. *Collie, supra,* 30 Cal.3d at pp. 58-61.) First of all, the defense had obtained the names and addresses of the 11 witnesses in question from the prosecution. Most, if not all, of those witnesses had been interviewed by the police or the district attorney's office, and their notes of those interviews had also been turned over to the defense as part of the defense discovery. The prosecution apparently decided not to call those people as prosecution witnesses because none could identify any of the suspects. None of the witnesses was an alibi witness or friend or acquaintance of any of the defendants. The defense called 6 of the 11 witnesses (Stephen Owens, Steven Brust, Beulah Jackson,

[70]In 1982, the Legislature enacted Penal Code section 1102.5, subdivision (a), which provides: "Upon motion, the prosecution shall be entitled to obtain from the defendant or his or her counsel, all statements, oral or however preserved, by any defense witness other than the defendant, after that witness has testified on direct examination at trial. At the request of the defendant or his or her counsel, the court shall review the statement in camera and limit discovery to those matters within the scope of the direct testimony of the witness. As used in this section, the statement of a witness includes factual summaries, but does not include the impressions, conclusions, opinions, or legal research or theories of the defendant, his or her counsel, or agent."

Merlene Wilson, Ida Patterson, and Howard Hamman) in an attempt to create doubt as to the identification of Moore by Ward Anderson, Terry White, and Yolanda Williams. They claimed they were in the vicinity of the Anderson and White shootings on April 14, 1974. They testified that they heard shots, looked up and saw a black man run down the street. They gave varying descriptions of the man, but on cross-examination they conceded that they had not seen the gunman's face. In light of the positive identification of Moore by Ward Anderson, Terry White, and Yolanda Williams, the defendants were not prejudiced by the fact the prosecutors had the tape-recorded interviews of those defense witnesses.

The other defense witnesses, whose interviews by the investigator were taped, were Janice Hangston, a motorist, who came upon the Thomas Rainwater murder and Linda Story shooting; Brian Phillips who said he was at the corner of Geary and Divisadero Streets at the time of the Jane Holly murder; Vera Lang who was on the sidewalk outside the laundromat at the time of the Jane Holly murder; Eugene Tracy, a resident of the Civic Center Hotel, at the time of the Moynihan and Hosler murders; and Paula Mordhorst who did not witness any of the crimes. In a couple of instances, the prosecutors did not even use the defense tapes during cross-examination. In each other instance, the prosecutor's use of the tapes was minimal and insignificant in light of the other evidence connecting the defendants to the crimes.

Finally, we find no merit in Moore's argument that his constitutional privilege against self-incrimination and the privilege derived from the work product were violated by the pretrial order that required the defense to give the prosecution the tape of the Anthony Harris interview. Although the tape is not before this court, we may assume, in light of the evidence, that Harris' statements to defense counsel incriminated Moore. But since Harris was a prosecution witness, not a defense witness, Moore is in no position to claim that Harris' statements to defense counsel were protected by his (Moore's) privilege against self-incrimination. (Cf. *People* v. *Wiley* (1976) 57 Cal.App.3d 149, 159 [129 Cal.Rptr. 13], overruled on another point in *People* v. *Wheeler, supra,* 22 Cal.3d 258, 286-287.) Also, since the defense may have used Harris' statements during their cross-examination of Harris, the defense thereby waived any claim of privilege under the work product doctrine. (See *United States* v. *Nobles, supra,* 422 U.S. at pp. 238-239 [45 L.Ed.2d at pp. 153-154].)

XXVII. JURY VIEW OF SCENES OF CRIMES

After the prosecution presented its case in chief and before the defense presented its evidence, the jury spent a day viewing the scenes of all the crimes. The defendants objected to the jury viewing the scenes of the crimes in the

daytime, arguing that the jury should see the scenes at night because the crimes were committed at night. Defendants argued that since identification was the main issue in this case the jury should see the lighting conditions at the scenes of the crimes. Defendants' objection was overruled. On appeal, Cooks, Green, and Simon argue that the trial court erred in not granting their request that the jury view the scenes of the crime at night rather than during daylight.

■ Penal Code section 1119 authorizes the trial court to determine whether the jury should view the place in which the offense was committed, and the trial court's decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*People* v. *O'Brien* (1976) 61 Cal.App.3d 766, 780 [132 Cal.Rptr. 616].) In this case, the primary reasons for allowing the jury to view the scenes of the crimes was to make it easier for the jurors to understand the testimony about where the crimes were committed. The main objective was not to show the lighting conditions. It was apparent from the testimony of many witnesses that the lighting conditions at some of the places of the crimes were poor. Moreover, all the scenes could be viewed in one day, whereas two or possibly three nights would have been required to view all the scenes. We conclude that the trial court did not abuse its discretion in denying the defendants' request for nighttime viewing of the scenes of the crimes.

XXVIII. Cross-examination and Competency of Simon

A. *Competency*

When Simon testified on direct examination and on cross-examination by counsel for the codefendants, he was articulate and lucid. There was no question about his competency. When cross-examined by the prosecutor (Mr. Dondero), however, Simon became hostile and responded with absurd answers to the prosecutor's questions. When questioned about his coming from Texas to California, Simon said he came with four friends in a green Delta 88 Special, a truck. He then said he "drove the jet, a 747." The trial judge intervened and asked Simon, "When you left Texas did you get in a truck to come to California?" Simon answered, "No, I rode a snake halfway," a rattlesnake, the "Dondero snake." Simon then said he "took a tornado from Texas to California," "a live tornado." During the next recess, defense counsel conferred with Simon. When he returned to the stand he responded coherently to the prosecutor's questions.

■ During the prosecutor's cross-examination of Simon, however, defense counsel moved for a competency hearing pursuant to Penal Code section 1368. The motion was denied. Simon's codefendants also moved for severance of the trial, and that motion was denied. On appeal, Green argues that the trial court erred in refusing to hold a competency hearing as required by

Penal Code section 1368, or, in the alternative, the court erred in denying the motion for severance of the trial. The record shows, however, that there was no real doubt about Simon's competency. As the trial court remarked, Simon's testimony was lucid and articulate. His bizarre answers to a few questions on cross-examination demonstrated his hostility to the prosecution and the court, but not his incompetency to testify. We conclude that the trial court did not abuse its discretion in refusing to hold a competency hearing and in denying the severance motion.

## B. *Prior Conviction for Possession of Stolen Gun*

When Simon was cross-examined by counsel (Mr. White) for Green and Moore he testified that he never received a gun from Thomas Manney and never owned or possessed a gun. Thereafter, when Simon was cross-examined by the prosecutor, he again denied he ever possessed a handgun. The prosecutor then asked him: "Is it not a fact, Mr. Simon, that in January of 1971 you pled guilty to possessing a stolen handgun in Sutter County?" Simon's counsel objected on the ground a witness cannot be impeached by use of a misdemeanor conviction. The objection was overruled.

On appeal, Green (not Simon) argues that the trial court erred in allowing the prosecutor to impeach Simon's credibility with evidence of a prior misdemeanor conviction. (See *People* v. *Lent* (1975) 15 Cal.3d 481, 484 [124 Cal.Rptr. 905, 541 P.2d 545].) In this case, however, the reference to the prior conviction was not asserted as a specific instance of conduct "tending to prove a trait of his character" (Evid. Code, §§ 787, 788), such as dishonesty, but was offered and properly admitted to contradict his prior statement that he never possessed a gun. (See Evid. Code, § 780, subds. (h) and (i); cf. *People* v. *Gardner* (1975) 52 Cal.App.3d 559 [125 Cal.Rptr. 186], overruled on another point in *People* v. *Wheeler, supra,* 22 Cal.3d 258, 286-287; *People* v. *Wiley, supra,* 57 Cal.App.3d at pp. 157-158; see also *People* v. *Blair, supra,* 25 Cal.3d 640, 664.) The cross-examination was proper.

## C. *Binder and Its Contents*

Anthony Harris testified that at the meetings in Simon's apartment Simon read from a binder and talked about killing white "blue-eyed devils." During Harris' testimony at the beginning of the trial, Simon's binder was marked for identification (People's exhibit No. 16), but the court would not allow the prosecutor to examine Harris about the contents of the binder. The court ordered the binder sealed, and it remained sealed throughout the People's presentation of the case in chief. The court stated a number of times before and during the trial that the Nation of Islam was not on trial, and all parties agreed.

When Simon testified, he denied that any meetings, as described by Harris, had taken place in his apartment where he and others discussed the killing of white people. He denied he read the material in the binder to Moore. On cross-examination the prosecutor questioned Simon about the contents of his binder. Simon objected on the ground it violated his First Amendment rights. His objection was overruled.

Simon's binder contained Muslim educational material in question-and-answer form. (People's exhibit Nos. 16A-16Z.) It included the following:

Q. "Who is the Original Man?"

A. "The Original Man is the Asiatic Black Man, the Maker, the Owner, the Cream of the Planet Earth, God of the Universe."

Q. "Who is the Colored Man?"

A. "The Colored Man is the Caucasian (white man), or Yakub's grafted devil, the Skunk of the Planet Earth."

Q. "Why does Mohammad and any Moslem murder the devil? What is the duty of each Moslem in regards to four devils? What reward does a Moslem receive by presenting the four devils at one time?"

A. "Because he is one hundred per cent wicked and will not keep and obey the laws of Islam. His ways and actions are like a snake of the grafted type. So Mohammad learned that he could not reform the devils, so they had to be murdered. All Moslems will murder the devil because they know he is a snake and also if he be allowed to live, he would sting someone else. Each Moslem is required to bring four devils, and by bringing and presenting four at one time his reward is a button to wear on the lapel of his coat, also a free transportation to the Holy City Mecca to see brother Mohammad."

A number of other questions related to the creation of the "devil" (Caucasians) by Yakub, the devil's conduct, and the necessity of removing the devil "from the planet."

Simon testified that the binder is "my symbolic literature which gives me support and moral strength in this world." He personally selected the material for the binder. He testified that in January 1971 he received certain material from "Allah" in a park at Scott and Hayes Streets in San Francisco. He denied he received any of the material from the temple.

On appeal, Simon and Cooks argue that the prosecutor's cross-examination about the contents of the binder violated Simon's rights under the First Amendment to the United States Constitution, and article I, sections 2 and 4, of the California Constitution, and that the trial court in effect allowed the Nation of Islam to be placed on trial. As explained, however, in *In re Cox* (1970) 3 Cal.3d 205, 223 [90 Cal.Rptr. 24, 474 P.2d 992], "First Amendment rights are not absolutes; the protected conduct begins with the expression of opinion but stops with the perpetration of violence; free discussion must die upon the battlefields of force." Article I, section 4, of the California Constitution expressly provides that the free exercise and enjoyment of religion does not excuse acts that are inconsistent with the "peace or safety of the State." In this case, the binder was not used to prosecute Simon for his religious or social-political views. The contents of Simon's binder were relevant to show his motive for the alleged murders and conspiracy to commit murder. The evidence was also relevant to corroborate Anthony Harris' testimony about meetings where Simon read from the binder and discussed the killing of white people. Accordingly, there was no violation of the defendants' First Amendment rights. (See, generally, *Mohammad v. Sommers* (E.D.Mich. 1964) 238 F.Supp. 806; see also *People v. Rubin* (1979) 96 Cal.App.3d 968 [158 Cal.Rptr. 488], cert. den., 449 U.S. 821 [66 L.Ed.2d 24, 101 S.Ct. 80].)

Cooks also argues that the cross-examination of Simon about the contents of his binder violated Evidence Code section 789, which provides: "Evidence of his religious belief or lack thereof is inadmissible to attack or support the credibility of a witness." The binder, however, was not admitted for the purpose of attacking Simon's credibility because of his religious views. As previously explained, the binder was relevant evidence on the issue whether Simon had committed the alleged crimes.

## XXIX. TESTIMONY OF ABDUL ALIM SHABAZ

After Simon testified and was cross-examined about the contents of his binder, the defense called Abdul Alim Shabaz as a witness to explain the material. Abdul Alim Shabaz was a minister in the Nation of Islam, and director of adult education at the Nation of Islam headquarters in Chicago, Illinois. The Nation of Islam published the newspaper "Muhammad Speaks."

Abdul Alim Shabaz was asked to examine those parts of Simon's binder on which Simon was cross-examined. (People's exhibit Nos. 16A-16P.) He tetified that all that material had come from the Nation of Islam in Chicago. Certain questions and answers were student enrollment rules of Islam. Other parts came from "Muslim lost-found lesson Nos. 1 & 2." He explained that those lessons referred to the people's state of being lost from the body of Islam, that the people had been removed from Africa and Asia to the wilderness of

North America where Master Fard Muhammad found them in Detroit in 1930. All the questions and answers in Simon's binder were part of the teachings of the Nation of Islam in 1973 and 1974. He further explained that Master Elijah Muhammad had prepared those questions and answers. Elijah Muhammad died in February 1975 and was succeeded by his son, Wallace D. Muhammad. Since Elijah Muhammad's death, the Nation of Islam teachings no longer refer to the white man as the devil. The word "devil" now means a state of mind. Abdul Alim Shabaz testified that he had never taught in Temple 26 in San Francisco. He did not know, and had no prior communication with, any of the defendants.

When the defense attempted to have Abdul Alim Shabaz give his opinion or interpretation of the Muslim material in Simon's binder, the court sustained the prosecution's objections on the ground his interpretation of the material was not relevant or a proper subject of expert opinion testimony. The trial court also rejected an offer of proof, stating that the material in the binder spoke for itself and that an offer of proof was not necessary.

On appeal, Cooks, Green, and Moore argue that the trial court erred in not allowing Abdul Alim Shabaz to give his interpretation of the writings in Simon's binder. The record shows, however, that Abdul Alim Shabaz was given ample opportunity to explain the contents of Simon's binder. He identified the source of the material and its purpose. He was allowed to explain that since the death of Elijah Muhammad in 1975 Black Muslims no longer refer to the white man as the "devil," that it is merely a state of mind. The issue in this case was not what the contents of Simon's binder meant to the Nation of Islam or to Abdul Alim Shabaz, but Simon's interpretation of the material. On that issue, the witness was not qualified to give an opinion. As the trial court properly pointed out, the material spoke for itself and needed no further expert interpretation.

## XXX. DENIAL OF DEFENSE MOTION TO RECALL ANTHONY HARRIS

Green argues that the trial court erred in denying the defendants' motion to recall Anthony Harris for further cross-examination about the contents of Simon's binder. The motion was made after Abdul Alim Shabaz had testified and near the end of the defense presentation of evidence.

"After a witness has been excused from giving further testimony in the action, he cannot be recalled without leave of the court. Leave may be granted or withheld in the court's discretion." (Evid. Code, § 778.) We find no abuse of discretion in this case. Anthony Harris was cross-examined by three defense counsel for nine days. He testified that he had seen the binder in Simon's apartment and that Simon had read from it. Harris' personal interpretation or view of the material in the binder was not relevant to the issues in this case.

XXXI. Alleged Misconduct of the Trial Judge

■ Cooks, Green, and Simon argue that the trial judge made improper and prejudicial comments on the evidence. They complain specifically about the court's comments following a rereading of the indictment to the jury, comments while instructing the jury on the inapplicability of the felony-murder doctrine, and the court's reference to the murder of Quita Hague as an "execution."

During the early stages of the trial, and after evidence of a number of uncharged crimes had been introduced, the jury asked the court to reread the indictment to them. The jury obviously needed clarification of the relevance of the uncharged crimes. The court reread the indictment and then proceeded to explain the relevance of the uncharged crimes. Contrary to defendants' assertions on appeal, the court's explanation to the jury was entirely proper and appropriate to assist the jury in understanding the case.

After all the evidence was presented and before closing arguments, the court indicated it would instruct the jury on the felony-murder doctrine as it related to the robbery and murder of Quita Hague. During his closing argument, the prosecutor argued the felony-murder doctrine. Thereafter, the court decided not to instruct the jury on the felony-murder doctrine. The court found it necessary to tell the jury to disregard the prosecutor's argument about felony murder. In the course of that explanation, the court said that the felony-murder doctrine was not applicable to the robbery and murder of Quita Hague, that evidence of the execution of Quita Hague indicated it was first degree murder. The court's characterization of the murder of Quita Hague as an "execution" was proper and appropriate in light of the evidence.

Defendants assert that the trial judge made other improper remarks and comments throughout the trial, but they do not specify them. A review of the record shows that the trial judge exercised reasonable judicial restraint through what was a long and difficult trial involving four argumentative defense counsel. The record shows no prejudicial misconduct.

XXXII. Asserted Misconduct of Prosecutors

A. *Suppression of Evidence*

■ Cooks, Green, and Simon assert that prosecution suppressed evidence of an unlawful surveillance of Temple 26 by the California Department of Justice. They base that assertion on passages from the book, "Zebra, the True Account of the 179 Days of Terror in San Francisco" (1979) by Clark Howard, and again they ask this court to take judicial notice of its contents. As previous-

ly stated (see part XXIII.), this court may take judicial notice of the fact the book exists, but not of its contents. To the extent defendants' assertions are based on facts outside the record they may not be considered on this appeal. Moreover, the record is devoid of any indication that the asserted surveillance was unlawful or that it resulted in evidence favorable to the defendants.

Inspector Coreris stated in his affidavit in support of the search warrant that the defendants had been under police surveillance for three days. Defense counsel were aware of that long before the trial began. Moreover, the trial court ordered the prosecution to give defendants all evidence obtained as a result of the police surveillance. Police obtained only photographs of the people entering and leaving the Black Self Help store and those photographs were made available to the defense. Accordingly, there is no merit to defendants' assertions that the prosecution suppressed favorable evidence.

## B. *Closing Argument*

Simon argues that one of the prosecutors (Dondero) committed prejudicial misconduct when, near the end of his closing argument, he said that the evidence clearly shows that the killings stopped in San Francisco when Harris went to the police and the defendants were arrested. Although the prosecutor's remark may have been improper because it was not justified by the evidence (see *People* v. *Bolton* (1979) 23 Cal.3d 208, 212 [152 Cal.Rptr. 141, 589 P.2d 396]), the defense counsel did not object to the remark. It is settled that misconduct by the prosecutor must be objected to at the trial with a request that the jury be instructed to disregard its effect, unless (1) in a closely balanced case presenting grave doubts as to the defendant's guilt the misconduct contributed materially to the verdict, or (2) the harmful results could not have been obviated by a timely admonition to the jury. (*People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 723 [135 Cal.Rptr. 392, 557 P.2d 976].) In this case, any prejudicial effect of the prosecutor's improper remark could have been obviated by a timely objection and admonition to the jury. Therefore, it is not a ground for reversal on appeal.

## C. *Comments and "Wisecracks"*

Simon also asserts that prosecutor Podesta committed prejudicial misconduct by (1) referring to the grand jury hearing in his direct examination of witnesses, and (2) by making "numerous comments or wisecracks" during defendants' examination of witnesses. Simon, however, does not support his assertions by appropriate references to the pages in the record where the asserted misconduct occurred. Under those circumstances, this court need not consider the point. (*People* v. *Gidney* (1937) 10 Cal.2d 138, 142 [73 P.2d 1186]; *People* v. *Johnson* (1962) 210 Cal.App.2d 273, 278 [26 Cal.Rptr. 614].) In any event,

having reviewed the record, we find defendant's assertions of misconduct by the prosecutors to be unjustified.

## XXXIII. OTHER CONTENTIONS OF SIMON

### A. *Partial Exclusion of Witnesses From Trial*

■ At the commencement of trial the court ruled that witnesses would be excluded from the courtroom only during testimony about the incident to which the witness would later testify. A witness would not be excluded from the entire trial, as the defense requested. Simon now complains that the trial court's order denied him a fair trial. He fails to point out, however, how he was prejudiced by the order. Simon does not explain, nor does the record show, that any witness was in the courtroom when other testimony about a given incident was being presented. We conclude that the trial court's ruling was not an abuse of discretion. (See Evid. Code, § 777.)

### B. *Refusal of Stewart Children to Testify*

Cooks subpoenaed the Stewart children to testify as defense witnesses. Mrs. Stewart brought her daughter, Marie, to the courtroom, but would not allow defense counsel to interview her before calling her to the stand. Mrs. Stewart apparently explained that the entire incident of the attempted kidnap was a very traumatic experience for the children and she was concerned about her daughter's emotional stability as a result of the incident. Defense counsel told the court they would not call the Stewart children to testify without first having an opportunity to interview them. Counsel asked the court to talk to Mrs. Stewart and try to persuade her to consent to such an interview. The court refused, stating it would be inappropriate. The defense then decided not to call the Stewart children as witnesses and allowed the subpoenas to be discharged.

■ Simon now argues that the trial court's failure to use its influence to persuade the Stewart children to be interviewed by defense counsel deprived him of a fair trial. Although the court has the duty to enforce the court's process, including subpoenas of witnesses, it is under no duty to assist counsel in interviewing witnesses in preparation for trial. We find Simon's argument to be without merit.

### C. *Ineffective Assistance of Counsel*

■ ■ Simon contends he was denied his constitutional right to effective assistance of counsel (see *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]) in that his counsel (1) failed to move for a change of venue due to pretrial publicity, and (2) failed to make a timely motion

for severance of his trial from the trial of Cooks on learning that evidence of the Frances Rose murder would be admitted against all defendants. The record shows, however, that the question of pretrial publicity was considered a number of times before commencement of the trial and, in each instance, defense counsel decided, for tactical reasons, to delay the proceedings until any adverse effects of the pretrial publicity subsided. Defense counsel stated that they wanted the trial to be held in San Francisco, not elsewhere. Thus Simon was not denied effective assistance of counsel for failure to move for a change of venue.

The record also shows that Simon's counsel objected to the admissibility of evidence of the Frances Rose murder, and that he thereafter moved for a severance of the trial. The failure of counsel to move for a severance at an earlier stage of the trial did not result in the denial of a meritorious defense. Accordingly, we conclude that Simon was not denied effective assistance of counsel. (See *People* v. *Pope, supra,* 23 Cal.3d 412; see also *People* v. *Reeder* (1978) 82 Cal.App.3d 543, 556 [147 Cal.Rptr. 275].)

## XXXIV. Jury Instructions

### A. *Murder and Conspiracy to Murder Instructions*

Cooks, Green, and Simon argue that the trial court erred in refusing to instruct the jury on second degree murder. Relying on *People* v. *Horn* (1974) 12 Cal.3d 290 [115 Cal.Rptr. 516, 524 P.2d 1300], Green also argues that the trial court erred in failing to instruct on conspiracy to commit second degree murder.

The defense requested instructions on second degree murder, although they did not argue second degree murder in their closing arguments. At first the court was inclined to give the requested instructions as a matter of caution, but when the court asked counsel to point to the evidence that would justify second degree murder instructions, counsel could cite none. The trial court concluded that there was no evidence to warrant second degree murder instructions, that the defendants were either innocent of murder or they were guilty of murder in the first degree. The court instructed the jury accordingly.

■ It is settled law that the trial court must, on its own motion if necessary, instruct the jury on lesser included offenses when the evidence raises a question whether all the elements of the charged offenses are present, but not when there is no evidence that the offense was less than that charged. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another point in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Wickersham* (1982) 32 Cal.3d 307,

323-324 [185 Cal.Rptr. 436, 650 P.2d 311].) In this case, there was no significant evidence that the murders of Quita Hague, Tana Smith, and Jane Holly were less than first degree murder. The defense was misidentification and alibi. There was no evidence of diminished mental capacity. Accordingly, we conclude that the trial court properly refused defendants' requested second degree murder instructions. (Cf. *People* v. *Wade, supra,* 53 Cal.2d 322, 333; *People* v. *Perry, supra,* 7 Cal.3d at p. 788; *People* v. *Preston* (1973) 9 Cal.3d 308, 318-319 [107 Cal.Rptr. 300, 508 P.2d 300].) For the same reasons, the court was under no duty to instruct on conspiracy to commit second degree murder.

### B. *Robbery Instructions; Lesser Included Theft Offenses*

At the time of the offenses in this case, Penal Code section 211a provided, in part: "All robbery which is perpetrated . . . by a person being armed with a dangerous or deadly weapon . . . is robbery in the first degree. All other kinds of robbery are of the second degree." In this case, the trial court instructed the jury that "if you should find the defendant, or any of them, guilty of robbery, it is robbery in the first degree." On appeal, Green relies primarily on *People* v. *Beamon* (1973) 8 Cal.3d 625, 629, footnote 2 [105 Cal.Rptr. 681, 504 P.2d 905], in contending that the trial court erred in failing to allow the jury to determine the degree of the robberies.

■ Where the evidence shows that the defendant is either guilty of first degree robbery or not guilty, it is proper to instruct the jury that if they find the defendant guilty of robbery it is first degree robbery as a matter of law. (*People* v. *Aranda* (1965) 63 Cal.2d 518, 532 [47 Cal.Rptr. 353, 407 P.2d 265]; *People* v. *Israel* (1949) 91 Cal.App.2d 773, 783 [206 P.2d 62], cert. den., 338 U.S. 838 [94 L.Ed. 512, 70 S.Ct. 50]; *People* v. *Johnson* (1973) 33 Cal.App.3d 9, 21 [108 Cal.Rptr. 671].) In this case, Cooks and Green were charged with the robberies of Richard and Quita Hague on the night of October 20, 1973. The undisputed evidence was that Richard Hague was beaten on the head with a club before Cooks removed Hague's wallet from his pocket. There was also evidence that Cooks used a gun. Quita Hague was nearly decapitated with a machete at the time her ring was taken from her hand. The defense was misidentification and alibi. In light of that evidence, the trial court properly instructed the jury that if they found the defendants guilty of robbery it was robbery in the first degree. The case of *People* v. *Beamon, supra,* 8 Cal.3d 625, is distinguishable in that the trial court in that case submitted the question of the degree of the robbery to the jury which failed to fix the degree of the crime, but found that the defendant was armed with a gun at the time of the robbery. The Supreme Court held that the court could not fix the degree of the crime at first degree robbery based on the special finding that defendant was armed with a gun.

Green argues that the trial court erred in failing to instruct the jury on grand theft as a lesser included offense. Again, the argument is without merit in light of the evidence that Cooks and Green were either guilty of robbery or not guilty of any offense. (See, generally, *People* v. *Sedeno, supra,* 10 Cal.3d 703.)

■ Green argues that since Quita Hague's ring was apparently taken after she was killed, the trial court erred in failing to instruct the jury, *sua sponte,* that theft from a dead person (Pen. Code, § 642) is a lesser offense necessarily included in robbery. The argument is meritless for the obvious reason that a robbery can be committed without necessarily committing theft from a dead person, and therefore, under settled law, the latter offense is not necessarily included in the former (robbery). (See, generally, *People* v. *Escarcega* (1974) 43 Cal.App.3d 391, 396 [117 Cal.Rptr. 595], and cases cited therein.)

## C. *False Imprisonment as Lesser Included Offense of Kidnaping*

■ Green argues that the trial court erred in failing to instruct, *sua sponte,* on false imprisonment (Pen. Code, § 236) as a lesser offense necessarily included in the offense of kidnaping (Pen. Code, § 207). The crime of kidnaping necessarily includes the crime of false imprisonment effected by violence. (*People* v. *Gibbs* (1970) 12 Cal.App.3d 526, 547 [90 Cal.Rptr. 866].) In this case, however, the undisputed evidence was that Richard and Quita Hague were forced, at gunpoint, into a van at Chestnut and Powell Streets and transported to an industrial area in the south part of San Francisco where Mrs. Hague was murdered and Mr. Hague was left for dead. In light of that evidence of asportation, and the defense of misidentification and alibi, Cooks and Green were either guilty of kidnaping or they were guilty of no crime. Accordingly, the trial court was under no duty to instruct on false imprisonment as a lesser included offense. (See *People* v. *Camden* (1976) 16 Cal.3d 808, 815-816 [129 Cal.Rptr. 438, 548 P.2d 110]; see, generally, *People* v. *Sedeno, supra,* 10 Cal.3d 703.)

## D. *CALJIC No. 2.27*

Green argues that the trial court erred in giving former CALJIC No. 2.27, as modified: "Testimony which you believe given by one witness, if that witness is not an accomplice, is sufficient for the proof of any fact. However, . . . ." He argues that the instruction should not have been given, that when considered with other instructions on accomplice testimony it was confusing and conflicting. The argument is without merit. The instruction clearly applied to the witnesses who were not accomplices.

## E. *CALJIC No. 2.62*

■ Green argues that the trial court erred in giving the former CALJIC No. 2.62, which provided, in part: "In this case, defendant has elected to and

has testified as to certain facts. If you find that he failed to explain or deny any evidence or facts against him, which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable." Green argues that this instruction should not have been given as to him because there were no facts he failed to explain. The record shows, however, that Green failed to explain the absence of moving pads in his van the day after the crimes committed against the Hagues. Thus there was some basis for the instruction against him.

Cooks argues that the giving of CALJIC No. 2.62 was prejudicial as to him when considered with CALJIC Nos. 2.60 and 2.61. The argument is without merit because the trial court instructed the jury that CALJIC No. 2.62 applied only to the three defendants who testified, namely, Green, Moore, and Simon.

F. *CALJIC No. 3.12.*

The trial court gave former CALJIC No. 3.12, which instructs on the sufficiency of evidence to corroborate the testimony of an accomplice. On appeal, Green complains that the trial court erred in refusing to give proposed modified instructions which explained the meaning of the words "tends to connect" as used in CALJIC No. 3.12 and Penal Code section 1111. We are satisfied, however, that the standard instruction, as given, was adequate. (Cf. *People* v. *Williams* (1980) 101 Cal.App.3d 711, 718-719 [161 Cal.Rptr. 830].)

G. *CALJIC No. 3.13*

At the time of trial, CALJIC No. 3.13 read: "The corroboration of the testimony of an accomplice required by law may not be supplied by the testimony of any or all of his accomplices, but must come from other evidence." Green argues that the trial court erred in refusing to give this instruction. As the trial court pointed out, however, the testimony of Michael Armstrong did not corroborate the testimony of Anthony Harris, and the testimony of Anthony Harris did not corroborate the testimony of Michael Armstrong, the only other possible accomplice in the case. Accordingly, the trial court properly refused to give the requested instruction.

H. *CALJIC No. 6.20*

Cooks argues that the trial court erred in giving CALJIC No. 6.20, which instructed the jury on the law of withdrawal of a conspirator from a conspiracy. He argues that as to him there was no conspiracy and therefore he could not withdraw from a nonexistent conspiracy. The argument, however, is without

merit. As previously discussed, the question whether Cooks withdrew from the alleged conspiracy was a question of fact for the jury to determine. (See part XXV, C.)

I. *Cooks' Proposed Jury Instructions*

Cooks asserts that the trial court erred in refusing to give the following requested instructions: CALJIC Nos. 2.26, 2.41, 3.13, 6.15, 6.16, 6.21, 8.33, 8.34, 8.37, 8.40, 8.42, 8.43, 8.44, 8.45, 8.72, 9.02, 17.01, 17.15, and 17.32. In his brief, however, Cooks fails to discuss the applicability of these instructions, and fails to cite any authority that would support the giving of any of those instructions. His brief merely cites cases stating the general proposition that the trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence. Under these circumstances, an appellate court need not consider the points. (*People* v. *Gidney, supra,* 10 Cal.2d at p. 142; *People* v. *Johnson, supra,* 210 Cal.App.2d at p. 278.) Suffice it to say, we believe no prejudicial error occurred in the trial court's refusal to give Cooks' proposed instructions since the points were either (1) covered by other instructions, or (2) inapplicable to the facts.

DISPOSITION

The judgments of conviction of Jessie Lee Cooks, Larry Craig Green, and Manuel Moore are affirmed. The judgment of conviction of J.C.X. Simon is modified by striking the enhancement for use of a firearm as to count 10 (assault on McMillian), and as modified the judgment is affirmed.

Smith, J., and Grodin, J.,* concurred.

Petitions for a rehearing were denied April 21, 1983, and appellants' petition for a hearing by the Supreme Court was denied July 14, 1983. Grodin, J., did not participate therein. Bird, C. J. was of the opinion that the petitions should be granted.

---

*Assigned by the Chairperson of the Judicial Council.